**CONFIDENTIALITY AND PROPRIETARY RIGHTS AGREEMENT**

THIS CONFIDENTIALITY AND PROPRIETARY RIGHTS AGREEMENT (this "**Agreement**") is entered into as of October 15, 2021 (the "**Effective Date**"), by and between With Purpose, Inc., a Delaware corporation, (the "**Company**", together with any subsidiaries, and other corporate affiliates that currently exist or are formed hereafter, the "**Company Group**"), and Nick Ayers (the "**Investor**")  (the  Company and the Investor are collectively referred to herein as the "**Parties**").

As a condition to the Investor's purchase of common stock of the Company pursuant to the stock purchase agreement therefor (the "**Stock Purchase Agreement**"), whether directly or through a vehicle owned or controlled by such Investor, which the Investor acknowledges to be good and valuable consideration for the Investor's obligations hereunder, the Company and the Investor hereby agree as set forth herein. All references herein to the Investor as a "stockholder" shall mean the Investor's direct or indirect ownership of common stock of the Company.

1.    <u>Confidentiality</u>.

(a)    <u>Confidential Information</u>. The Investor understands and acknowledges that, as a stockholder and in the Investor's additional capacities in service to the Company as a director, officer, employee, agent, consultant or otherwise, the Investor will have access to and learn about confidential, secret, and proprietary documents, materials, data, and other information, in tangible and intangible form, of and relating to the Company Group and its businesses and existing and prospective customers, suppliers, investors, and other associated third parties ("**Confidential Information**"). The Investor further understands and acknowledges that Confidential Information and the Company's ability to reserve it for the exclusive knowledge and use of the Company Group is of great competitive importance and commercial value to the Company, and that improper use or disclosure of Confidential Information by the Investor will cause irreparable harm to the Company Group, for which remedies at law will not be adequate and may also cause the Company to incur financial costs, loss of business advantage, liability under confidentiality agreements with third parties, civil damages, and criminal penalties.

For purposes of this Agreement, Confidential Information includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic, or any other form or medium, relating directly or indirectly to: business processes, data analytics processes, analyses, practices, methods, policies, plans, publications, documents, research, operations, services, strategies, techniques, agreements, contracts, terms of agreements, transactions, potential transactions, negotiations, pending negotiations, know-how, trade secrets, computer programs, computer software, applications, operating systems, software design, web design, work-in-process, databases, device configurations, data, embedded data, data compilations, metadata, technologies, manuals, records, articles, systems, system elements, neutral networks, training sets, parameters, rules, ensemble methods, generated code, decision trees, material, sources of material, supplier information, vendor information, financial information, results, accounting information, accounting records, legal information, marketing information, advertising information, pricing information, credit information, design information, payroll information, staffing information, personnel information, executive lists, developments, reports, internal controls, security procedures, graphics, drawings, sketches, market studies, sales information, revenue, costs, formulae, notes, communications, algorithms, product plans, designs, styles, models, ideas, audiovisual programs, inventions, unpublished patent applications, original works of authorship, discoveries, experimental processes, experimental results, specifications, customer information, customer lists, client information, client lists, manufacturing information, factory lists, distributor lists, buyer lists, and information of the Company Group or its businesses or any existing

or prospective customer, supplier, investor, or other associated third party, or of any other person or entity that has entrusted information to the Company in confidence.

The Investor understands that the above list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used.

The Investor understands and agrees that Confidential Information developed by the Investor in the course of the Investor's service to the Company shall be subject to the terms and conditions of this Agreement as if the Company furnished the same Confidential Information to the Investor in the first instance. Confidential Information shall not include information that is generally available to and known by the public, provided that such disclosure to the public is through no direct or indirect fault of the Investor or person(s) acting on the Investor's behalf.

(b)     Disclosure and Use Restrictions.

(i)     The Investor agrees and covenants:

(A)     to treat all Confidential Information as strictly confidential;

(B)     not to directly or indirectly disclose, publish, communicate, or make available Confidential Information, or allow it to be disclosed, published, communicated, or made available, in whole or part, to any entity or person whatsoever (including other Investors of the Company Group) not having a need to know and authority to know and to use the Confidential Information in connection with the business of the Company Group and, in any event, not to anyone outside of the direct employ of the Company Group, except as required in the performance of any of the Investor's authorized duties to the Company and only after execution of a confidentiality agreement by the third party with whom Confidential Information will be shared; and

(C)     not to access or use any Confidential Information, and not to copy any documents, records, files, media, or other resources containing any Confidential Information, or remove any such documents, records, files, media, or other resources from the premises or control of the Company Group, except as required in the performance of any of the Investor's authorized duties to the Company. The Investor understands and acknowledges that the Investor's obligations under this Agreement regarding any particular Confidential Information begin immediately and shall continue during and after the Investor's service to, or employment by, the Company until the Confidential Information has become public knowledge other than as a result of the Investor's breach of this Agreement or a breach by those acting in concert with the Investor or on the Investor's behalf.

(ii)     Nothing in this Agreement shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation, or order. The Investor shall promptly provide written notice of any such order to an authorized officer of the Company.

2

DocuSign Envelope ID: 4993C637-B420-45E8-9C75-00F1526831E2

(iii)    Nothing in this Agreement prohibits or restricts the Investor (or Investor's attorney) from initiating communications directly with, responding to an inquiry from, or providing testimony before the Securities and Exchange Commission (SEC), the Financial Industry Regulatory Authority (FINRA), any other self-regulatory organization, or any other federal or state regulatory authority.

(iv)    Nothing in this Agreement in any way prohibits or is intended to restrict or impede the Investor from exercising protected rights to the extent that such rights cannot be waived by agreement, or otherwise disclosing information as permitted by law.

(v)    Investor has immunity under the Economic Espionage Act of 1996, as amended by the Defend Trade Secrets Act of 2016. Notwithstanding any other provision of this Agreement:

(A)    This Investor will not be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that is made: (1) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney and solely for the purpose of reporting or investigating a suspected violation of law; or (2) in a complaint or other document that is filed under seal in a lawsuit or other proceeding.

(B)    If the Investor files a lawsuit for retaliation by the Company for reporting a suspected violation of law, the Investor may disclose the Company's trade secrets to the Investor's attorney and use the trade secret information in the court proceeding if the Investor (1) files any document containing the trade secret under seal; and (2) does not disclose the trade secret, except pursuant to court order.

(c)    <u>Duration of Confidentiality Obligations</u>. The Investor understands and acknowledges that the Investor's obligations under this Agreement with regard to any particular Confidential Information shall commence immediately upon the Investor first having access to such Confidential Information (whether before or after the Investor begins service to, or employment by, the Company) and shall continue until such time as such Confidential Information has become public knowledge other than as a result of the Investor's breach of this Agreement or breach by those acting in concert with the Investor or on the Investor's behalf.

2.    <u>Proprietary Rights</u>.

(a)    <u>Work Product</u>. The Investor acknowledges and agrees that all writings, works of authorship, technology, inventions, discoveries, ideas, and other work product of any nature whatsoever, that are created, prepared, produced, authored, edited, amended, conceived, or reduced to practice by the Investor individually or jointly with others during the period of the Investor's service to the Company and relating in any way to the business or contemplated business, research, or development of the Company (regardless of when or where the Work Product is prepared or whose equipment or other resources is used in preparing the same) and all printed, physical, and electronic copies, all improvements, rights, and claims related to the foregoing, and other tangible embodiments thereof (collectively, "**Work Product**"), as well as any and all rights in and to copyrights, trade secrets, trademarks (and related goodwill), mask works, patents, and other intellectual property rights therein arising in any jurisdiction throughout the world and all related rights of priority under international conventions with respect thereto, including all pending and future applications and registrations therefor, and continuations, divisions, continuations-in-part,

DocuSign Envelope ID: 4993C637-B420-45E8-8C75-90F1526331E2

reissues, extensions, and renewals thereof (collectively, "**Intellectual Property Rights**"), shall be the sole and exclusive property of the Company.

For purposes of this Agreement, Work Product includes, but is not limited to, Company Group information, including business processes, data analytics processes, analyses, practices, methods, policies, plans, publications, documents, research, operations, services, strategies, techniques, agreements, contracts, terms of agreements, transactions, potential transactions, negotiations, pending negotiations, know-how, trade secrets, computer programs, computer software, applications, operating systems, software design, web design, work-in-process, databases, device configurations, data, embedded data, data compilations, metadata, technologies, manuals, records, articles, systems, system elements, neutral networks, training sets, parameters, rules, ensemble methods, generated code, decision trees, material, sources of material, supplier information, vendor information, financial information, results, accounting information, accounting records, legal information, marketing information, advertising information, pricing information, credit information, design information, payroll information, staffing information, personnel information, executive lists, developments, reports, internal controls, security procedures, graphics, drawings, sketches, market studies, sales information, revenue, costs, formulae, notes, communications, algorithms, product plans, designs, styles, models, ideas, audiovisual programs, inventions, unpublished patent applications, original works of authorship, discoveries, experimental processes, experimental results, specifications, customer information, customer lists, client information, client lists, manufacturing information, factory lists, distributor lists, and buyer lists.

(b)    Work Made for Hire; Assignment. The Investor acknowledges that, at all times of Investor's service to the Company, to the extent permitted by law, all of the Work Product consisting of copyrightable subject matter is "work made for hire" as defined in the Copyright Act of 1976 (17 U.S.C. § 101), and such copyrights are therefore owned by the Company. To the extent that the foregoing does not apply, the Investor hereby irrevocably assigns to the Company, for no additional consideration, the Investor's entire right, title, and interest in and to all Work Product and Intellectual Property Rights therein, including the right to sue, counterclaim, and recover for all past, present, and future infringement, misappropriation, or dilution thereof, and all rights corresponding thereto throughout the world. Nothing contained in this Agreement shall be construed to reduce or limit the Company's rights, title, or interest in any Work Product or Intellectual Property Rights so as to be less in any respect than that the Company would have had in the absence of this Agreement.

(c)    Further Assurances; Power of Attorney. During and after the Investor's service to the Company, the Investor agrees to reasonably cooperate with the Company at the Company's expense to (i) apply for, obtain, perfect, and transfer to the Company the Work Product and Intellectual Property Rights in the Work Product in any jurisdiction in the world; and (ii) maintain, protect, and enforce the same, including, without limitation, executing and delivering to the Company any and all applications, oaths, declarations, affidavits, waivers, assignments, and other documents and instruments as shall be requested by the Company. The Investor hereby irrevocably grants the Company power of attorney to execute and deliver any such documents on the Investor's behalf in the Investor's name and to do all other lawfully permitted acts to transfer the Work Product to the Company and further the transfer, issuance, prosecution, and maintenance of all Intellectual Property Rights therein, to the full extent permitted by law, if the Investor does not promptly cooperate with the Company's request (without limiting the rights the Company shall have in such circumstances by operation of law). The power of attorney is coupled with an interest and shall not be impacted by the Investor's subsequent incapacity.

(d)    Moral Rights. To the extent any copyrights are assigned under this Agreement, the Investor hereby irrevocably waives, to the extent permitted by applicable law, any and all claims the Investor may now or hereafter have in any jurisdiction to all rights of paternity, integrity, disclosure, and withdrawal and any other rights that may be known as "moral rights" with respect to all Work Product and all Intellectual Property Rights therein.

(e)    No License. The Investor understands that this Agreement does not, and shall not be construed to, grant the Investor any license or right of any nature with respect to any Work Product or Intellectual Property Rights or any Confidential Information, materials, software, or other tools made available to the Investor by the Company.

(f)    Prior Inventions. Attached hereto as Exhibit A is a list describing all inventions, original works of authorship, developments, improvements and trade secrets that were made by the Investor prior to Investor's service to the Company, relate to the Company's proposed business, products or research and development, and are owned in whole or in part by the Investor, ("Prior Inventions"); or, if no such list is attached or if Exhibit A is unsigned, the Investor represents that there are no such Prior Inventions. The Investor agrees that the Investor will not incorporate, or permit to be incorporated, any Prior Invention into a Company product, process or service without the Company's prior written consent. Nevertheless, if, in the course of the Investor's service to the Company, the Investor incorporates into a Company product, process or service a Prior Invention, the Investor hereby grants to the Company a nonexclusive, royalty-free, fully paid-up, irrevocable, perpetual, transferable, sublicensable, worldwide license to reproduce, make derivative works of, distribute, perform, display, import, make, have made, modify, use, sell, offer to sell, and exploit in any other way such Prior Invention as part of or in connection with such product, process or service, and to practice any method related thereto.

(g)    Exception to Assignments. The Investor understands that the provisions of this Agreement requiring assignment of Work Product to the Company do not apply to any Work Product that the Investor has developed entirely on the Investor's own time without using the Company's equipment, supplies, facilities, trade secret information or Confidential Information (an "Other Invention") except for those Other Inventions that either (i) relate at the time of conception or reduction to practice of such Other Invention to the Company's business, or actual or demonstrably anticipated research or development of the Company or (ii) result from any work that the Investor has performed for the Company. The Investor will advise the Company promptly in writing of any Work Product that the Investor believes constitutes an Other Invention and is not otherwise disclosed on Exhibit A. The Investor agrees that the Investor will not incorporate, or permit to be incorporated, any Other Invention owned by the Investor or in which the Investor has an interest into a Company product, process or service without the Company's prior written consent. Notwithstanding the foregoing sentence, if, in the course of the Investor's service to, or employment by, the Company, the Investor incorporates into a Company product, process or service an Other Invention owned by the Investor or in which the Investor has an interest, the Investor hereby grants to the Company a nonexclusive, royalty-free, fully paid-up, irrevocable, perpetual, transferable, sublicensable, worldwide license to reproduce, make derivative works of, distribute, perform, display, import, make, have made, modify, use, sell, offer to sell, and exploit in any other way such Other Invention as part of or in connection with such product, process or service, and to practice any method related thereto.

(h)    Former Employer Information. The Investor agrees that the Investor will not, during the Investor's service to, or employment by, the Company, improperly use, disclose, or induce the Company to use any confidential or proprietary information or trade secrets of any former or concurrent employer or other person or entity. The Investor further agrees that the

DocuSign Envelope ID: 4993C637-B420-45E8-9C75-90F1526831E2

Investor will not bring onto the premises of the Company any confidential or proprietary information or trade secrets belonging to any such employer, person or entity unless consented to in writing by both the Company and such employer, person or entity.

       (i)    <u>Third Party Information</u>. The Investor recognizes that the Company has received and, in the future, will receive from third parties their confidential or proprietary information, subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. The Investor agrees to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out the Investor's work for the Company consistent with the Company's agreement with such third party.

3.    <u>Security</u>.

       (a)    <u>Security and Access</u>. The Investor agrees and covenants (i) to comply with all Company Group security policies and procedures as in force from time to time including without limitation those regarding computer equipment, telephone systems, voicemail systems, facilities access, monitoring, key cards, access codes, Company Group intranet, internet, social media and instant messaging systems, computer systems, email systems, computer networks, document storage systems, software, data security, encryption, firewalls, passwords and any and all other Company Group facilities, IT resources, and communication technologies ("**Facilities and IT and Access Resources**"); (ii) not to access or use any Facilities and IT and Access Resources except as authorized by Company; and (iii) not to access or use any Facilities and IT and Access Resources in any manner after the termination of the Investor's service to, or employment by, the Company, whether termination is voluntary or involuntary. The Investor agrees to notify the Company promptly in the event the Investor learns of any violation of the foregoing by others, or of any other misappropriation or unauthorized access, use, reproduction or reverse engineering of, or tampering with any Facilities and IT and Access Resources or other Company Group property or materials by others.

       (b)    <u>Exit Obligations</u>. Upon (i) voluntary or involuntary termination of the Investor's service to, or employment by, the Company or (ii) the Company's request at any time during the Investor's term of service or employment, the Investor shall (a) provide or return to the Company any and all Company Group property, including keys, key cards, access cards, identification cards, security devices, Company credit cards, network access devices, computers, cell phones, equipment, reports, files, books, compilations, work product, email messages, recordings, thumb drives or other removable information storage devices, hard drives, and data and all Company Group documents and materials belonging to the Company and stored in any fashion, including but not limited to those that constitute or contain any Confidential Information or Work Product, that are in the possession or control of the Investor, whether they were provided to the Investor by the Company Group or any of its business associates or created by the Investor in connection with the Investor's service to, or employment by, the Company; and (b) delete or destroy all copies of any such documents and materials not returned to the Company that remain in the Investor's possession or control, including those stored on any non-Company Group devices, networks, storage locations, and media in the Investor's possession or control.

       (c)    <u>Termination Certification; Address Information</u>. Upon termination of service to, or separation from employment with, the Company, the Investor agrees to immediately sign and deliver to the Company the "Termination Certification" attached hereto as <u>Exhibit B</u>.

4.    <u>Audit; Company Technology Systems</u>. The Investor acknowledges that the Investor has no reasonable expectation of privacy in any computer, technology system, email, handheld device, telephone, or documents that are used to conduct the business of the Company. As such, the Company has the right to audit and search all such items and systems, without further notice to the Investor, to ensure that the Company is licensed to use the software on the Company's devices in compliance with the Company's software licensing policies, to ensure compliance with the Company's policies, and for any other business-related purposes in the Company's sole discretion. The Investor understands that the Investor is not permitted to add any unlicensed, unauthorized, or non-compliant applications to the Company's technology systems and that the Investor shall refrain from copying unlicensed software onto the Company's technology systems or using non-licensed software or websites. The Investor understands that it is the Investor's responsibility to comply with the Company's policies governing use of the Company's documents and the internet, email, telephone, and technology systems to which the Investor will have access in connection with service to, or employment by, the Company.

5.    <u>Publicity</u>. Investor hereby consents to any and all uses and displays, by the Company Group and its agents, of the Investor's name, voice, likeness, image, appearance, and biographical information in, on, or in connection with any pictures, photographs, audio, and video recordings, digital images, websites, television programs, and advertising, other advertising, sales, and marketing brochures, books, magazines, other publications, CDs, DVDs, tapes, and all other printed and electronic forms and media throughout the world, at any time during or after the period of the Investor's service to, or employment by, the Company, for all legitimate business purposes of the Company Group ("**Permitted Uses**"). Investor hereby forever releases the Company Group and its directors, officers, Investors, and agents from any and all claims, actions, damages, losses, costs, expenses, and liability of any kind, arising under any legal or equitable theory whatsoever at any time during or after the period of the Investor's service to, or employment by, the Company, in connection with any Permitted Use.

6.    <u>Non-Disparagement</u>. The Investor agrees and covenants that the Investor will not at any time make, publish, or communicate to any person or entity or in any public forum any defamatory or disparaging remarks, comments, or statements concerning the Company Group or its businesses, or any of its Investors, officers, and existing and prospective customers, suppliers, investors, and other associated third parties. This Section does not, in any way, restrict or impede the Investor from exercising the Investor's protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order. The Investor shall promptly provide written notice of any such order to an authorized officer of the Company Group within two days of receiving such order, but in any event sufficiently in advance of making any disclosure to permit the Company to contest the order or seek confidentiality protections, as determined in the Company's sole discretion.

7.    <u>Acknowledgment</u>. The Investor acknowledges and agrees that the services to be rendered by the Investor to the Company are of a special and unique character; that the Investor will obtain knowledge and skill relevant to the Company's industry, methods of doing business, and marketing strategies by virtue of the Investor's service to, or employment by, the Company; and that the terms and conditions of this Agreement are reasonable under these circumstances. The Investor further acknowledges that the opportunity to purchase stock of the Company pursuant to the Stock Purchase Agreement is conditioned on the Investor's covenants and agreements contained in this Agreement. The Investor will not be subject to undue hardship by reason of the Investor's full compliance with the terms and conditions of this Agreement or the Company's enforcement thereof; and this Agreement is not a contract and shall not be construed as a commitment by either of the Parties to continue an employment or other relationship for any certain period of time. **If the Investor is an employee of the Company, nothing in this Agreement shall be construed to in any way terminate, supersede, undermine, or otherwise modify the at-will**

DocuSign Envelope ID: 4993C637-B420-45E6-9C75-90F1526831E2

**status of the employment relationship between the Company and the Investor, pursuant to which either the Company or the Investor may terminate the employment relationship at any time, with or without cause, with or without notice.**

8.    <u>Successors and Assigns</u>. The Company may assign this Agreement to any subsidiary or corporate affiliate in the Company Group or otherwise, or to any successor or assign (whether direct or indirect, by purchase, merger, consolidation, or otherwise) to all or substantially all of the business or assets of the Company. This Agreement shall inure to the benefit of the Company Group and permitted successors and assigns. The Investor may not assign this Agreement or any part hereof. Any purported assignment by the Investor shall be null and void from the initial date of purported assignment.

9.    <u>Remedies</u>. The Investor acknowledges that the Company's Confidential Information and the Company's ability to reserve it for the exclusive knowledge and use of the Company Group is of great competitive importance and commercial value to the Company, and that improper use or disclosure of the Confidential Information by the Investor will cause irreparable harm to the Company Group, for which remedies at law will not be adequate. In the event of a breach or threatened breach by the Investor of any of the provisions of this Agreement, the Investor hereby consents and agrees that the Company shall be entitled to seek, in addition to other available remedies, a temporary or permanent injunction or other equitable relief against such breach or threatened breach from any court of competent jurisdiction, without the necessity of showing any actual damages or that monetary damages would not afford an adequate remedy, and without the necessity of posting any bond or other security. The aforementioned equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages, or other available forms of relief. The Investor further acknowledges that each member of the Company Group is an intended third-party beneficiary of this Agreement.

10.    <u>Arbitration</u>. Any dispute, controversy, or claim arising out of or related to this Agreement or any breach of this Agreement, and any alleged violation of federal, state, or local statute, regulation, common law, or public policy, shall be submitted to and decided by binding arbitration. Arbitration shall be resolved exclusively by binding arbitration pursuant to the rules of the then-prevailing Employment Arbitration Rules of JAMS (the "**Rules**") and the United States Arbitration Act, 9 U.S.C. §§1-16 (the "**Act**"), with arbitration to occur at Dallas, Texas. This paragraph will control over any conflict between this paragraph and the Act or the Rules. The Parties agree that the arbitrator will have the primary power to decide any question about the arbitrability of any claim, dispute or other difference between them, and judgment on the award rendered by the arbitrator may be enforced by any court having jurisdiction thereof in Dallas, Texas. The arbitrator shall be selected by mutual agreement of the Parties, if possible. If the Parties fail to reach agreement upon the appointment of an arbitrator within thirty (30) days following receipt by one Party of the other Party's notice of desire to arbitrate, the arbitrator shall be selected from a list or lists of persons submitted by JAMS. The arbitrator must be an attorney licensed to practice law by the State Bar of Texas. The Parties agree that all matters subject to arbitration, including the arbitration itself, shall remain confidential. The Parties waive all rights to have their disputes heard or decided by a jury or in a court trial and the right to pursue any class or collective action or representative claims against each other in court, arbitration, or any other proceeding. Any arbitral award determination shall be final and binding upon the Parties.

EXCEPT AS PROVIDED BY THE RULES AND THIS AGREEMENT, ARBITRATION SHALL BE THE SOLE, EXCLUSIVE AND FINAL REMEDY FOR ANY DISPUTE BETWEEN THE PARTIES. ACCORDINGLY, EXCEPT AS PROVIDED FOR BY THE RULES AND THIS AGREEMENT, NEITHER PARTY WILL BE PERMITTED TO PURSUE COURT ACTION REGARDING CLAIMS THAT ARE SUBJECT TO ARBITRATION. NOTWITHSTANDING, THE ARBITRATOR WILL NOT HAVE THE AUTHORITY TO DISREGARD OR REFUSE TO ENFORCE

ANY LAWFUL COMPANY POLICY, AND THE ARBITRATOR SHALL NOT ORDER OR REQUIRE THE COMPANY TO ADOPT A POLICY NOT OTHERWISE REQUIRED BY LAW.

NOTHING IN THIS AGREEMENT OR IN THIS PROVISION IS INTENDED TO WAIVE THE PROVISIONAL RELIEF REMEDIES AVAILABLE AS A MATTER OF LAW OR UNDER THE RULES. EITHER PARTY MAY APPLY TO A COURT OF COMPETENT JURISDICTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, OR OTHER INTERIM OR CONSERVATORY RELIEF, AS NECESSARY, WITHOUT BREACH OF THIS AGREEMENT AND WITHOUT ABRIDGEMENT OF THE POWERS OF THE ARBITRATOR.

THIS AGREEMENT DOES NOT PROHIBIT THE INVESTOR FROM PURSUING AN ADMINISTRATIVE CLAIM WITH A LOCAL, STATE OR FEDERAL ADMINISTRATIVE BODY SUCH AS THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION AND THE NATIONAL LABOR RELATIONS BOARD. THIS AGREEMENT DOES, HOWEVER, PRECLUDE THE INVESTOR FROM PURSUING COURT ACTION REGARDING ANY SUCH CLAIM, TO THE EXTENT PERMITTED BY LAW.

EACH PARTY'S PROMISE TO RESOLVE CLAIMS BY ARBITRATION IN ACCORDANCE WITH THIS AGREEMENT, RATHER THAN THROUGH THE COURTS, IS CONSIDERATION FOR THE OTHER PARTY'S LIKE PROMISE. THE INVESTOR'S PURCHASE OF COMPANY STOCK UNDER THE STOCK PURCHASE AGREEMENT IS CONDITIONED ON THE INVESTOR'S PROMISE TO ARBITRATE CLAIMS.

11.      <u>Governing Law; Jurisdiction and Venue</u>. This Agreement, for all purposes, shall be construed in accordance with the laws of Texas without regard to conflicts-of-law principles. Any action or proceeding by either Party to enforce this Agreement shall be brought only in any state or federal court located in the state of Texas, county of Dallas. The Parties hereby irrevocably submit to the exclusive jurisdiction of such courts and waive the defense of inconvenient forum to the maintenance of any such action or proceeding in such venue.

12.      <u>Entire Agreement</u>. Unless specifically provided herein, this Agreement, the Stock Purchase Agreement (including its exhibits) and that certain stockholders agreement, dated the date hereof (including its exhibits) executed in connection therewith contain all of the understandings and representations between the Investor and the Company pertaining to the subject matter hereof and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter. The Parties mutually agree that this Agreement can be specifically enforced in court and can be cited as evidence in legal proceedings alleging breach of this Agreement.

13.      <u>Modification and Waiver</u>. No provision of this Agreement may be amended or modified unless such amendment or modification is agreed to in writing and signed by the Investor and by Toby R. Neugebauer, the "Founder" of the Company, or an officer of the Company (other than the Investor) duly authorized by the Board of Directors of the Company. No waiver by either of the Parties of any breach by the other Party hereto of any condition or provision of this Agreement to be performed by the other Party hereto shall be deemed a waiver of any similar or dissimilar provision or condition at the same or any prior or subsequent time, nor shall the failure of or delay by either of the Parties in exercising any right, power, or privilege hereunder operate as a waiver thereof to preclude any other or further exercise thereof or the exercise of any other such right, power, or privilege.

14.      <u>Severability</u>. Should any provision of this Agreement be held by a court of competent jurisdiction to be enforceable only if modified, or if any portion of this Agreement shall be held as unenforceable and thus stricken, such holding shall not affect the validity of the remainder of this

9

DocuSign Envelope ID: 4993C637-B420-45E8-9C75-00F152683.1E2

Agreement, the balance of which shall continue to be binding upon the Parties with any such modification to become a part hereof and treated as though originally set forth in this Agreement. The Parties further agree that any such court is expressly authorized to modify any such unenforceable provision of this Agreement in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, by adding additional language to this Agreement, or by making such other modifications as it deems warranted to carry out the intent and agreement of the Parties as embodied herein to the maximum extent permitted by law. The Parties expressly agree that this Agreement as so modified by the court shall be binding upon and enforceable against each of them. In any event, should one or more of the provisions of this Agreement be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions hereof, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal, or unenforceable provisions had not been set forth herein.

15.     Captions. Captions and headings of the sections and paragraphs of this Agreement are intended solely for convenience and no provision of this Agreement is to be construed by reference to the caption or heading of any section or paragraph.

16.     Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. Delivery of an executed counterpart's signature page of this Agreement by email in portable document format (.pdf), or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document has the same effect as delivery of an executed original of this Agreement.

17.     Survival. Upon the expiration or other termination of this Agreement, the respective rights and obligations of the Parties shall survive such expiration or other termination to the extent necessary to carry out the intentions of the Parties under this Agreement.

18.     Acknowledgement of Full Understanding. THE INVESTOR ACKNOWLEDGES AND AGREES THAT THE INVESTOR HAS FULLY READ, UNDERSTANDS AND VOLUNTARILY ENTERS INTO THIS AGREEMENT, **INCLUDING THAT THE INVESTOR IS WAIVING RIGHT TO A JURY TRIAL**. THE INVESTOR ACKNOWLEDGES AND AGREES THAT THE INVESTOR HAS HAD AN OPPORTUNITY TO ASK QUESTIONS AND CONSULT WITH AN ATTORNEY OF THE INVESTOR'S CHOICE BEFORE SIGNING THIS AGREEMENT.

[SIGNATURE PAGE FOLLOWS]

10

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the Effective Date above.

**COMPANY:**

With Purpose, Inc.

By _Toby R. Neugebauer_____
Name: Toby Neugebauer
Title: Founder

11700 Preston Road, Ste 660-394
Dallas, Texas 75230

**INVESTOR:**

Signature: _____
Print Name: Nick Ayers

3290 Northside Pkwy, Ste 675

Atlanta, GA 30327

*SIGNATURE PAGE TO*

*WITH PURPOSE, INC*

*CONFIDENTIALITY AND PROPRIETARY RIGHTS AGREEMENT*

**EXHIBIT A**

**PRIOR INVENTIONS**

If you have Prior Inventions, please list them in the space below. If you do not have any Prior Inventions or you would like to include additional Prior Inventions on separate pages, check the appropriate box at the bottom of the page.

| Title | Date | Identifying Number or Brief Description |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Check the following as applicable:

_____    All of my Prior Inventions are listed above

_____    I have no Prior Inventions

_____    I have attached additional sheets describing my Prior Inventions

By: _____

DocuSign Envelope ID: 4993C637-B420-45E6-9C75-90F1546931E2

Name: _____

Date: _____

DocuSign Envelope ID: 4993C637-B420-45E8-8C75-90F152693AE2

## EXHIBIT B

### TERMINATION CERTIFICATION

I certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence (including emails), specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items belonging to With Purpose, Inc., its subsidiaries, affiliates, successors or assigns (together, the "**Company**").

I confirm my agreements contained in Section 1 (Confidentiality), Section 2 (Proprietary Rights), Section 3 (Security) and Section 6 (Non-Disparagement) of the Confidentiality and Proprietary Rights Agreement between me and the Company dated as of _____, 2021.

By: _____

Name: _____

Date: _____

Address for Notice:

_____

_____

_____