Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
Brenda P. Funk, Esq.
Texas Bar No. 24012664
Conor P. White, Esq.
Texas Bar No. 24125722
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

ATTORNEYS FOR SCOTT M. SEIDEL, TRUSTEE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 23-30246-mvl-7 |
| WITH PURPOSE, INC., | § | |
| | § | Chapter 7 |
| Debtor. | § | |

**TRUSTEE'S MOTION FOR APPROVAL OF COMPROMISE AND SETTLEMENT
UNDER BANKRUPTCY RULE 9019 WITH THE COLLATERAL AGENT AND WITH
NEUGEBAUER PARTIES AND FOR APPROVAL OF POSTPETITION FINANCING**

TO THE HONORABLE MICHELLE V. LARSON, U.S. BANKRUPTCY JUDGE:

COMES NOW Scott M. Seidel (the "Trustee"), the duly appointed chapter 7 trustee of the

bankruptcy estate (the "Estate") of With Purpose, Inc. (the "Debtor"), the debtor in the above

styled and numbered bankruptcy case (the "Bankruptcy Case"), and files this his *Motion for

Approval of Compromise and Settlement Under Bankruptcy Rule 9019 With the Collateral Agent

and With Neugebauer Parties and for Approval of Postpetition Financing* (the "Motion"),

respectfully stating as follows:

## I.    RELIEF REQUESTED

1.    By this Motion, and pursuant to Bankruptcy Rule 9019 and section 364 of the

Bankruptcy Code, the Trustee requests that the Court approve the *Settlement Agreement* (the

"Agreement")[1] and the settlement evidenced thereby (the "Proposed Settlement"), a copy of which is attached hereto as Exhibit "A," between the Trustee, WPI Collateral Management, LLC, as collateral agent (the "Collateral Agent"); Banzai Advisory Group, LLC ("Banzai Advisory"); Banzai Capital Partners, LLC ("Banzai Capital"); Neugebauer Family Enterprises, LLC ("NFE"); and Toby Neugebauer ("Neugebauer," together with Banzai Advisory, Banzai Capital, and NFE, the "Neugebauer Parties").  Separately, OnPoint Companies, LLC ("OnPoint" and, together with the Collateral Agent and the Neugebauer Parties, the "Estate Defendants"), as the prior collateral agent, is granted a full Estate release under the Proposed Settlement.

2.      This is a litigation case.  The only open questions are also the most important ones: who owns the underlying causes of action, who will help pay to prosecute them, and for whose benefit will they be prosecuted.  These questions have been disputed between the Trustee and the Collateral Agent, most recently when the Collateral Agent and the Neugebauer Parties filed lawsuits in two other courts, which the Trustee has asserted violates the automatic stay.  These and other disputes involving the extent of the Collateral Agent's security interests and the validity of the Foreclosure are resolved by the Proposed Settlement, thus enabling the Estate to monetize its assets while leading to additional significant benefits.  Under the Proposed Settlement, the Estate is paid $2.25 million, which includes $1 million earmarked for future litigation expenses to help monetize the Estate's causes of action.  An additional $2.25 million is advanced as a postpetition loan, secured by first priority liens and security interests against all Estate causes of action.  The Series II Notes are immediately paid down by $2.5 million from these funds.

---

[1] The parties continue to finalize various exhibits that will be attached to the Agreement, which will be filed as soon as they are final.  In no event will the substance thereof be different than what is described in the Agreement and in this Motion.

3.      With respect to the extent of the Collateral Agent's security interests, under the Proposed Settlement, the Trustee recognizes that those security interests extend to causes of action sounding in contract and those sounding in tort stemming from damage or misappropriation of intellectual property, including trade secrets.  Other causes of action, most notably breach of fiduciary duty, remain the Estate's free and clear of the Collateral Agent's interests.  Breach of fiduciary duty claims against Toby Neugebauer are not compromised and remain available for prosecution or sale.

4.      With respect to the Foreclosure, under the Proposed Settlement, the Trustee recognizes that the Debtor's intellectual property was validly foreclosed on, and the Collateral Agent agrees that no causes of action were foreclosed on.  The parties would enter into a joint prosecution agreement and share their causes of action, including those personal to them, providing not only for the sharing of the proceeds of all causes of action but also for certain carveouts to ensure that general unsecured creditors are afforded a potential recovery from any litigation proceeds, while providing an overall mechanism to monetize the causes of action for the benefit of all creditors.

## II.      <u>PROCEDURAL BACKGROUND</u>

5.      On February 8, 2023 (the "<u>Petition Date</u>"), the Debtor filed its voluntary petition for relief, thereby initiating the Bankruptcy Case and creating the Debtor's bankruptcy estate (the "<u>Estate</u>").

6.      The Trustee is the duly appointed trustee of the Debtor and the Estate.

7.      On May 20, 2024, the Collateral Agent filed its *Motion to Lift Stay to Pursue Additional Claims* [Bankr. Docket No. 199].

8.      On May 22, 2024, the Collateral Agent filed its *Motion for Relief From the Automatic Stay to Foreclose on Contractual Claims and Misappropriation Claims* [Bankr. Docket No. 201] (collectively, the "Lift Stay Motions").

9.      On May 30, 2024, the Trustee filed his *Complaint* against the Estate Defendants, thereby initiating Adversary Proceeding No. 24-03038-mvl pending before the Court (the "Adversary Proceeding"), as amended by his *Amended Complaint* filed on June 21, 2024.

10.     In the Adversary Proceeding, the Collateral Agent and the Neugebauer Parties have filed a *Motion to Dismiss* [Adv. Docket No. 16].  All Defendants have filed affirmative defenses and counterclaims against the Estate [Adv. Docket Nos. 45 and 47, respectively].

11.     The Court has jurisdiction over this Motion under 28 U.S.C. § 1334.  Such jurisdiction is core under 28 U.S.C. § 157(b)(2).

### III.    FACTUAL BACKGROUND

12.     The Debtor, under the name GloriFi, aimed to provide a comprehensive package of financial products including credit cards, banking, insurance, mortgage, and brokerage services to 100 million Americans looking for such services from a company that shared their ideals and values.  Management of the Debtor, including Neugebauer, quickly realized that the development of the technology, intellectual property, marketing, transaction execution and support, and regulatory compliance processes required in such a vast array of consumer-facing operations would require a not insubstantial amount of capital.  Significant sums were raised, but the Debtor ultimately failed.

13.     Underpinning this Bankruptcy Case is a dispute as to which persons or entities were responsible for the demise of the Debtor which, at one point, was allegedly worth in excess of $1.6 billion.  The founder of the Debtor, Neugebauer, asserts that various wealthy early investors of the

Debtor allegedly conspired to steal the Debtor's trade secrets and intellectual property and to start competing businesses, also breaching various contracts in the process and, with respect to certain such individuals, breaching their fiduciary duties to the Debtor. Certain or all of these potential defendants, however, point the finger at Neugebauer, alleging that he mismanaged the Debtor, attempted to obtain the business for himself, and otherwise drove the Debtor into the ground, including as alleged and reported by the Wall Street Journal in an article whose publishing all but sealed the Debtor's fate, in that it made it all but impossible for the Debtor to continue raising the large funds that were needed to complete the Debtor's financial services products and bring them to market.

14.    As the Trustee has otherwise informed the Court and the principal parties, he and his professionals have undertaken a detailed and comprehensive analysis of the Debtor's books and records and potential causes of action owned by the Estate. In sum, the Trustee believes that colorable causes of action exist against everyone that the proverbial finger has been pointed at, including Neugebauer and the early investors. As the Trustee has also informed the Court, that there may be colorable causes of action is not the end of the inquiry. For one thing, the defendants are very wealthy and are known to fight litigation claims. In other words, for the Trustee to litigate the Estate's claims, large funds will be needed, which the Estate does not have. Additionally, certain of the causes of action may be mutually exclusive with respect to other causes of action, and the underlying issues are questions of fact that are heavily disputed and on which there is contradictory evidence. Furthermore, it appears that there is only $5 million of liability coverage for the Debtor's directors and officers.

15.    In sum, because of the difficulty, risk, and delay in the Estate monetizing its causes of action—which appear to be the only property of the Estate—and because there are generally

two warring parties each with large resources, the Trustee determined that the best way for the Estate to monetize these assets was to sell them at auction to the highest bidder. This has been the direction of this Bankruptcy Case for the past year. Namely, and after months of review and numerous consultations with interested parties, the Trustee filed his *Amended Motion for Entry of (I) An Order (A) Approving Bid and Noticing Procedures, (B) Scheduling an Auction and Hearing, and (C) Granting Related Relief; and (II) An Order (A) Approving Sale of Debtor Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, and (B) Granting Related Relief* (the "Bid Procedures Motion") [Bankr. Docket No. 186] on April 10, 2024. On May 17, 2024, the Court entered the *Order (A) Approving Bid and Noticing Procedures and (B) Scheduling an Auction and Hearing, and (C) Granting Related Relief* (the "Bid Procedures Order") [Bankr. Docket No. 197].

16.     Looming over these disputes and issues, however, was the fundamental question of what claims and causes of action the Estate owned, or which of the claims and causes of action, if any, were owned by the Collateral Agent as a result of the prepetition Foreclosure (defined below). And, even if the Foreclosure did not transfer title to any claims and causes of action from the Debtor to the Collateral Agent, the question still remained of whether the Collateral Agent had any valid or perfected security interests against any causes of action.

17.     In May 2022, the Debtor, with the assistance of OnPoint, commenced an offering of secured, convertible series 2 notes (the "Series 2 Notes"). From May 13, 2022 through November 10, 2022, individuals and entities, including insiders of the Debtor, purportedly provided $36,015,552 to the Debtor. The Trustee has alleged that at least $22 million of the $36 million was raised from insiders of the Debtor. Effective September 30, 2022, the Debtor entered into that certain Collateral Agency Agreement (the "CAA") with the holders of the Series 2 Notes

and the Collateral Agent as well as that certain Guarantee and Collateral Agreement (the "GCA")

with the Collateral Agent.

18.     Other than seeking avoidance of the grant of security interests or the perfection of

security interests in the GCA as a potential insider preference, the Trustee does not generally

dispute that the Collateral Agent had valid and perfected security interests in the Intellectual

Property of the Debtor, consisting of copyrights, patents, trade secrets, and the like (but a dispute

does exist regarding the Debtor's trademarks).  The broader dispute concerns causes of action

resulting from the alleged misappropriation of the Debtor's Intellectual Property, where the

Trustee asserts that the Collateral Agent did not have any security interests while the Collateral

Agent asserts that it did.

19.     This dispute is, in turn, best described as follows.  First, the Trustee agrees that

there are various claims and causes of action for breach of contract, resulting from breaches of

confidentiality and other contractual provisions binding principal parties to the Debtor and each

other.  These causes of action would likely be "general intangibles" under the Uniform

Commercial Code, with respect to which the Collateral Agent has perfected security interests.

Second, the Estate holds claims and causes of action that are "commercial tort claims," including

for breach of fiduciary duty, that would not be subject to the Collateral Agent's security interests.

20.     The third type of claims and causes of action, however, is the most complicated.

This category of claims relates to tort claims stemming from the alleged damage of, or theft of, the

Debtor's intellectual property.  Normally, these would be "commercial tort claims" under the

Uniform Commercial Code, which are not listed or detailed in the CGA and would therefore not

be subject to the Collateral Agent's security interests.  However, the CGA defines "intellectual

property," which the Collateral Agent has perfected security interests against, as:

the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including the Copyrights, the Copyright Licenses, the Patents, the Patent Licenses, the Trademarks and the Trademark Licenses, <u>and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.</u>

21.     The Collateral Agent argues that this description is sufficient to both attach and perfect security interests in what are otherwise commercial tort claims, with respect to Intellectual Property rights at least.  The Trustee disagrees, arguing that a commercial tort claim is a commercial tort claim regardless of the label that one puts on it, the same as one cannot perfect a security interest in a deposit account by labeling the deposit account as a receivable.

22.     Not only is the extent of the Collateral Agent's security interests in causes of action in dispute, but whether the Collateral Agent foreclosed on any of the Debtor's causes of action is likewise in dispute.  Namely, on January 5, 2023, OnPoint issued a letter (the "<u>Foreclosure Notice</u>") pursuant to which OnPoint allegedly foreclosed on certain assets of the Debtor (the "<u>Foreclosure</u>") in exchange for a credit bid of $7.5 million.  Of additional relevance, Hunter Bywaters, as the sole director of the Debtor at that time, on January 6, 2023 signed that certain *Consent of Board of Directors* (the "<u>Foreclosure Consent</u>") purporting to consent to the Foreclosure on behalf of the Debtor, the effectiveness of which the Trustee disputes, including because certain Debtor-side authorizations for such a consent were not obtained.

23.     The Foreclosure Notice purported to foreclose on what it defined as the Debtor's "Software" and its "Software Assets."  The Collateral Agent asserts that this includes causes of action, both related to breach of contract as "general intangibles" and those tort claims related to damage to, or theft of, intellectual property.  The Trustee strongly disagrees, asserting that only "Software" and "Software Assets" were foreclosed on, if anything.  And, the Trustee questions the validity and effectiveness of the Foreclosure at all, arguing that the Debtor was not in default to

the Series II Notes, that these notes were not accelerated, and that the Collateral Agent did not

obtain consent from the required number of Series II Note holders to proceed with the Foreclosure.

24.     As the Trustee's auction and sale motion was being prosecuted, and after the

Neugebauer Parties' objections to the same were overruled, the Collateral Agent and the

Neugebauer Parties unilaterally filed two lawsuits, the filing of which fundamentally changed the

dynamics of this case.   On May 17, 2024, the Collateral Agent and the Neugebauer Parties filed a

*Complaint* commencing civil cause no. 1:24-cv-02148-ELR in the Northern District of Georgia

(the "GA Complaint"), and the Neugebauer Parties filed a *Complaint* commencing civil cause no.

1:24-cv-00599-CFC filed in the District of Delaware (the "DE Complaint," and, together with the

GA Complaint, the "DEGA Complaints").

25.     The Trustee has asserted that the filing of the DEGA Complaints violated the

automatic stay because the Collateral Agent and the Neugebauer Parties were asserting control

over property of the Estate by prosecuting the Estate's causes of action.   With respect to the

Collateral Agent, any causes of action that it has rests on its assumption that it validly foreclosed

on causes of action by virtue of the Foreclosure—which the Trustee strongly disputes.   If the

Collateral Agent did not foreclose on causes of action, then it clearly does not own any causes of

action, and all causes of action remain vested in the Estate, meaning that the Collateral Agent has

violated the automatic stay.   With respect to the Neugebauer Parties, the Trustee does not dispute

that Neugebauer holds at least one cause of action that is personal to him (for defamation) and that

is therefore not subject to the automatic stay.   With respect to the remaining claims that he has pled

in the DEGA Complaints, however, and with respect to the remaining Neugebauer Parties—who

are alleged creditors or equity holders—any alleged damages are derivative of the Debtor's injuries

and any resulting causes of action are therefore property of the Estate under Fifth Circuit precedent.

26.     Hence the filing by the Trustee of the Adversary Proceeding: to resolve all of these disputes related to ownership of various causes of action by seeking declaratory relief as to who owns the causes of action pled in the DEGA Complaints; to test the validity and extent of the Collateral Agent's security interests against certain claims; to test the validity and extent of the Foreclosure; to seek to avoid the attachment and perfection of the Collateral Agent's security interests as insider preferences; to hold the Collateral Agent and the Neugebauer Parties accountable for their violations of the automatic stay and to obtain resulting damages; and for related relief.

27.     The Defendants have denied the Trustee's allegations and they have denied any liability to the Estate.  The Court has bifurcated the Adversary Proceeding as between liability and damages, and has set the trial on liability to commence on July 24, 2024.  The parties have participated in extensive discovery, including document discovery and the depositions of Neugebauer and Bywaters, while other depositions have been set.  The Parties anticipate requesting that the Court abate discovery in the Adversary Proceeding and continue the trial thereof to a date that is after the date on which the Court considers the approval of the Proposed Settlement.

28.     Separately, on July 10, 2024, the Debtor, under the control of Neugebauer, filed a motion to convert the Bankruptcy Case from Chapter 7 to Chapter 11 (the "Motion to Convert"). The Trustee will object to the Motion to Convert and considers it an unprecedented further attempt by Neugebauer to interfere with the Trustee's duties, unprecedented in that the Motion to Convert was filed after almost 18 months in Chapter 7, after the Trustee did not proceed as Neugebauer wanted him to, and after the Trustee filed the Adversary Proceeding and sought sanctions and

damages against the Neugebauer Parties and the Collateral Agent (whom the Trustee believes that

Neugebauer also now controls).

## IV.   <u>PROPOSED SETTLEMENT</u>

29.   Parties are cautioned to review the Agreement in detail, as it contains the precise

terms and provisions of the Proposed Settlement.  Nevertheless, the following is a summary of the

key provisions of the Agreement:

- The validity of the Foreclosure is compromised by the Trustee agreeing that the Collateral Agent validly foreclosed on the Debtor's software and software assets only, and the Collateral Agent agreeing that it did not foreclose on any causes of action, such that the Estate owns whatever causes of action the Debtor held.  The credit bid at the Foreclosure is reduced from $7.5 million to $4 million, thus still providing the Estate with a reduction of secured debt by $4 million.

- The extent of the Collateral Agent's security interests is compromised by the Trustee agreeing that the security interests extend to causes of action sounding in contract and causes of action sounding in tort when related to damage to, or misappropriation of, intellectual property, and the Collateral Agent agreeing that it holds no security interests against all other commercial tort claims, including for breaches of fiduciary duty.

- The Adversary Proceeding is resolved by final agreed judgment as to ownership of causes of action, and all other relief requested—including to avoid the Collateral Agent's security interests, and for damages for violations of the automatic stay—is dismissed with prejudice.

- The secured claims of the Series II Note holders are allowed and the Estate grants the Defendants releases with respect to the Adversary Proceeding and otherwise. However, Neugebauer is <u>not</u> released with respect to any breach of fiduciary duty claims and causes of action and the Trustee reserves the right to try to sell (or prosecute) the Estate's claims against Neugebauer.  Thus, the overall benefit and to the Estate includes the liquidation of the claims against Neugebauer, in connection with which the Trustee has discretion.

- The Collateral Agent pays $2.25 million to the Estate as free and clear funds, which it is expected will pay all Chapter 7 administrative claims and provide $1 million to fund litigation expenses.  Additionally, the Collateral Agent funds a postpetition loan to the Estate, secured by first priority liens and security interests against all property of the Estate, except the settlement payment.  The initial loan is $2.25

million, but it is anticipated that additional funds will be sought in the future to help pay for the litigation.

- The Trustee pays $2.5 million to the Series II Note holders, to be applied to their claims, thus resulting in a reduction of secured debt.

- The Trustee, the Collateral Agent, and the Neugebauer Parties enter into a joint prosecution agreement under which they pool their respective causes of action and jointly prosecute the same, employing the same counsel (who would be paid from future funding and litigation recoveries and not directly by the Estate), and specifying a waterfall that ensures that general unsecured creditors will share in any litigation recoveries. The Trustee retains his rights in all respects, including with respect to any potential settlements, and the Court retains jurisdiction over all such matters.

- The motions for relief from the automatic stay and the Motion to Convert become moot and are withdrawn or dismissed.

30.    In this manner, the Trustee believes that the Estate will have the certainty that it needs regarding ownership of causes of action, as well as the funding that it needs to monetize its causes of action, all while avoiding the continuing risks, large expenses, and delays of litigation, for the primary purpose of monetizing its causes of action for the benefit of all creditors.

## V.    DISCUSSION

31.    Bankruptcy Rule 9019 provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." FED. R. BANKR. P. 9019(a). Under that Rule, the Court should approve a settlement only if it is "fair and equitable and in the best interests of the estate." *In re Foster Mortgage Corp.*, 68 F.3d 914, 917 (5th Cir. 1995). The factors to consider include "(1) the probability of success in the litigation, with due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and (3) all other factors bearing on the wisdom of the compromise." *Id*. Such other factors include the reasonable views of creditors, although such views are not binding, and "the extent to which the settlement is truly the product of arms-length

bargaining, and not of fraud or collusion." *Id*. at 918. *See also Official Comm. Of Unsecured Creditors v. Cajun Elec. Power Coop. Inc. (In re Cajun Elec. Power Coop. Inc.)*, 119 F.3d 349, 356 (5th Cir. 1997); *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 559, 602 (5th Cir. 1960).

32.     The Court need not conduct a mini-trial on the underlying claims; rather, the Court "must apprise itself of the relevant facts and law so that it can make an informed and intelligent decision." *In re Age Ref. Inc.*, 801 F.3d 530, 541 (5th Cir. 2015) (internal quotation omitted). The settlement need not result in the best possible outcome for the Estate, but must not "fall beneath the lowest point in the range of reasonableness." *Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991). Finally, the Trustee is entitled to employ his reasonable business judgment in proposing a settlement, and that judgment is entitled to reasonable deference from the Court where, as here, the proposed settlement is not between insiders:

> The Trustee's decision to settle must represent the interests of the bankruptcy estate and its creditors and is reviewed under the 'business judgment rule.' Under the business judgment rule, the challenging party must establish that the course of action chosen by the fiduciary was outside the parameters of what a rational and reasonably informed businessperson might select. The business judgment rule creates a presumption in favor of the fiduciary.

*In re Woodberry*, 629 B.R. 239, 243 (Bankr. E.D. Mich. 2021) (internal quotations omitted).

33.     With respect to postpetition financing, "[i]f the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title; (2) secured by a lien on property of the estate that is not otherwise subject to a lien . . ." 11 U.S.C. § 364(c). Here, many of the causes of action that would serve as security for the

proposed postpetition financing provided for in the Agreement are otherwise free and clear assets, and the Trustee is not able to obtain postpetition financing on an unsecured basis.

34.     With respect to priming liens, "[t]he court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—(A) the trustee is unable to obtain such credit otherwise; and (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d).  This is litigation financing.  To state the obvious, no one is going to lend a Chapter 7 trustee funds to litigate causes of action without a first priority lien to any resulting proceeds.  Thus, the Trustee is not able to obtain financing otherwise.  With respect to adequate protection, the Collateral Agent is adequately protected because it has its security interests (which arguably do not even exist absent the Proposed Settlement) that are being primed, which it agrees to, and because the causes of action are far more valuable if there are funds available to litigate them.

35.     Regarding the economics of the proposed financing, at 10% interest compounded quarterly, this is very favorable compared to other litigation financing.  The terms of the initial financing may change in the future if additional litigation financing is obtained; however, future financing is subject to Court approval and must be on market terms.  Even so, the only ones affected by the financing are creditors whose future recoveries will have to pay the interest carry.  But, because the financing will enable the Trustee to prosecute the Estate's causes of action and because the Collateral Agent and the Neugebauer Parties are sharing portions of their potential recoveries with unsecured creditors, the anticipated benefits of the Proposed Settlement far outweigh the interest carry—and the Proposed Settlement has support of large creditors.

36.     The Trustee believes that the Proposed Settlement is fair, equitable, and in the

Estate's best interests, for at least the following reasons:

- The critical issue concerns the potential outcome of the Adversary Proceeding.  If the Trustee loses the Adversary Proceeding, then not only is there no violation of the automatic stay or resulting damages to the Estate, but the real loss will mean that the Estate will be found not to own some of the causes of action that the Trustee has identified and that have been asserted in the DEGA Complaints, to the detriment of unsecured creditors.  In this respect, while the Trustee believes that he will substantially prevail in the Adversary Proceeding, the Defendants' positions and recent depositions demonstrate the risk to the Trustee in the Adversary Proceeding:

| **Extent of Collateral Agent's Security Interests in Causes of Action** | |
|---|---|
| Breach of contract claims as general intangibles. | Collateral Agent argues that breach of contract claims are "general intangibles" under the UCC, which they are and with respect to which the Collateral Agent is perfected.  Open question as to whether a cause of action that is both a contract claim and a tort claim is a general intangible.  This appears to be a matter of first impression. |
| Commercial Tort Claims.  The Trustee has asserted that tort claims, including for misappropriation of trade secrets and theft of intellectual property, are commercial tort claims under the UCC. | List of "Commercial Tort Claims" to the GCA is blank.  The claims were known of as of that time.  The GCA defines "Intellectual Property" as including "all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom."  The Collateral Agent argues that this is sufficient to describe the Commercial Tort Claims.  The Trustee argues that it is not, and that a commercial tort claim cannot be transformed into another category of collateral under the UCC through crafty language.  This is a matter of first impression. |
| Collateral Agent's "proceeds" argument. | Collateral Agent argues that, even if it does not have a security interest in "commercial tort claims," it has a perfected security interest in the "proceeds" of its other collateral, which includes the Intellectual Property.  This appears to be a matter of first impression in this District and in the Fifth Circuit though there may be support from elsewhere. |

| Validity of the Foreclosure | |
|---|---|
| Alleged default of the Series II Notes was that the Debtor has ceased its business. The Trustee argues that this did not happen and that there was therefore no default – the Debtor continued to have employees and was exploring disposition of its assets. | • Bywaters executed the Foreclosure Consent agreeing that there was a default.<br>• Bywaters testified at deposition that Debtor had ceased to operate as a fintech bank.<br>• Neugebauer testified at deposition that Debtor ceased business operations late November 2022. |
| The Trustee argues that Bywaters lacked the Class B shareholder's consent to execute the Foreclosure Consent, making it void *ab initio* as an *ultra vires* instrument. | • Bywaters testified at deposition that he did not need Class B consent.<br>• Bywaters testified at deposition that he signed the instrument with the advice of the Debtor's counsel.<br>• Neugebauer testified at deposition that he implicitly gave Class B consent. |
| The Trustee argues that Series II Note holders did not accelerate the Series II Notes and that the requisite percentage of the holders did not authorize the Collateral Agent to foreclose. | • Collateral Agent argues that the Trustee lacks standing to enforce the CAA because the Debtor is not a party to the CAA and because the Collateral Agent's authority is a matter for the Series II Note holders to concern themselves over.<br>• Neugebauer testified at deposition that he gave his tacit or implicit consent which, given his direct and indirect share of the Series II Notes as well as those of the Collateral Agent would have been the requisite consent threshold. |
| Avoidance of the Attachment or Perfection of Security Interests | |
| Ability to avoid as a constructively fraudulent transfer. | Fact question regarding funding of at least one note. There is also a fact question regarding the terms on which the Series II money came in at the time of funding versus the terms papered up as Series II notes, which papering up occurred in some instances months after funding. On the other hand, case law holds that granting a lien to secure prior unsecured indebtedness does not constitute a constructively fraudulent transfer. |
| Ability to avoid as an actually fraudulent transfer. | The Trustee is not aware of any evidence of actual fraud. On the other hand, the circumstances of the CGA execution were suspicious - the Debtor was constantly low on funds, was facing public scrutiny, and was unable to raise funds other than from associates of insiders. A factfinder could find that insiders |

| | knew the Debtor was in trouble and decided to lien up all assets to the detriment of other creditors. Nevertheless, most of the Series II Notes were funded, the Debtor received value, and many of the holders are not insiders. |
|---|---|
| Ability to avoid as an insider preference, which cause of action the Trustee has asserted in the Adversary Proceeding. | The issue comes down to insolvency, which is required for a preference.  There may be a dispute regarding which insolvency test should apply, and expert testimony may be required. Neugebauer testified at deposition that the Debtor was solvent on a balance sheet basis. |

- Pursuant to the above, there is risk that the Trustee may lose his claims related to the extent of the Collateral Agent's security interests in causes of action and the invalidity of the Foreclosure.  If the Trustee prevails, there remains a risk that the Court will conclude that the Collateral Agent has perfected security interests against various Estate causes of action even if it did not foreclose on them, which could complicate a future sale.

- If the Court finds that the Estate does not own certain claims, consideration at a future auction may be affected.  If the Trustee prevails, appeals may create additional uncertainty.  The Court could also grant the Collateral Agent and the Neugebauer Parties relief from the automatic stay to prosecute all causes of action, although the Trustee does not think this likely if the Court otherwise decides the underlying ownership issues in the Trustee's favor.

- There is also the delay of litigation and the costs of litigation to consider.  Costs in this instance have been, and will be, large, and the Defendants appear well funded and not litigation-averse.

- That the Collateral Agent is found to have validly foreclosed on the Debtor's "Software" and "Software Assets" in exchange for a credit bid of $4 million is in the Estate's best interests.  For one, the Trustee would most likely have no ability to monetize these assets were the Estate to obtain them.  And, the credit bid of $4 million is fair and is in line with the discovery that the Trustee has taken to-date. Nor has anyone made the Trustee any offer to purchase these assets, were the Estate to own them.  If the Trustee were to avoid the Foreclosure in full, as he has requested in the Adversary Proceeding, then it is possible that $7.5 million of secured debt to the Series II Note holders would be reinstated.

- Under the Proposed Settlement, the Trustee retains the ability to sell Estate claims against Neugebauer, which the Agreement contemplates would be sold for at least $2 million, or he may prosecute those claims directly, thus providing additional and material benefits.

- The fact of the Motion to Convert plays no part of the Trustee's business judgment in entering into the Proposed Settlement. The Trustee believes that the Court will deny that motion because granting it would be futile. But, the Trustee is mindful that avoiding the expense of discovery and then litigating that motion is beneficial.

- The Proposed Settlement pays sufficient funds to pay Chapter 7 administrative claims, which benefits all unsecured creditors. And, it frees up at least $1 million for litigation. Given the resources of the Estate's defendants, and the heavily factual nature of the underlying allegations, having access to a "war chest" is critical to enticing capable counsel to take the litigation and then to having the resources necessary to prosecute the claims, including for experts.

- The Collateral Agent's payment is sufficient to compensate the Estate for its damages and expenses related to the DEGA Complaints and the alleged violations of the automatic stay.

- The payment of the $2.5 million to the Series II Note holders is fair and reasonable from the Estate's perspective. As the Trustee understands it, this payment is a key and integral condition of the overall Proposed Settlement, necessitated by the internal workings of the Collateral Agent and the Series II Note holders. That is between them. From the Estate's perspective, the overall effect is that unsecured creditors are somewhat diluted (as are the Series II Notes themselves) because the funds used to make the payment are from postpetition financing. However, secured debt still goes down by $2.5 million and approximately $1 million in Chapter 7 administrative claims are paid, and a war chest for litigation is funded. And, because unsecured creditors will only receive a recovery in this case from the causes of action, the overall benefits of the Proposed Settlement—including the funding, the pooling of causes of action, and the resolution of who owns what cause of action—greatly benefit unsecured creditors, and certainly for the relatively small amount of principal and resulting interest carry that they are diluted by (when the dilution is considered in light of the dilution of the Series II Note holders as well, who approve of the Proposed Settlement and therefore of any adjustment in their rights).

- The terms of the proposed postpetition financing are fair and reasonable and are better than market terms that the Trustee is aware of – a future conversion to market terms remains possible, subject to Court approval.

- The Proposed Settlement and Agreement were negotiated at arm's length, through extensive negotiations and discussions, primarily by legal counsel. There are no undisclosed agreements or understandings.

37.    In the end, the Proposed Settlement enables the Estate to begin monetizing its

litigation assets by resolving all disputes regarding the ownership thereof and security interests

thereto, by providing for litigation funding, by compensating the Estate and providing for free and

clear funds, and by pooling resources—all while retaining the ability to monetize claims against

Neugebauer.  After almost 18 months, and with the prospect of additional uncertainty absent a

settlement, this result is in the best interests of the Estate and of its creditors, especially unsecured

creditors.  Ultimately, if the litigation does not lead to a recovery, then creditors are no worse off.

If the litigation does lead to a recovery, then the magnitude of that recovery is likely such that

creditors are made whole and any adjustments, interest, and details of the Proposed Settlement

become irrelevant, and unsecured creditors will not have been worse off for the risks undertaken.

It is for these reasons that the overall benefits of the Proposed Settlement outweigh the costs and

burdens imposed thereunder.

## VI.    <u>PRAYER</u>

WHEREFORE, PREMISES CONSIDERED, the Trustee respectfully requests that the

Court: (i) grant this Motion; (ii) approve the Proposed Settlement and the postpetition financing

provided for therein; (iii) authorize and direct the Trustee to perform all actions required by the

Agreement; and (iv) grant the Trustee such other and further relief to which he may be justly

entitled.

RESPECTFULLY SUBMITTED this 17th day of July, 2024.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: */s/ Thomas Berghman*
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    Thomas D. Berghman, Esq.
    Texas Bar No. 24082683
    Brenda P. Funk, Esq.
    Texas Bar No. 24012664
    Conor P. White, Esq.
    Texas Bar No. 24125722
    MUNSCH HARDT KOPF & HARR, P.C.
    500 N. Akard Street, Suite 4000
    Dallas, Texas 75201-6659
    Telephone: (214) 855-7500

    COUNSEL FOR SCOTT M. SEIDEL,
    TRUSTEE AND PLAINTIFF

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 17th day of July, 2024, he caused a true and correct copy of this document and the exhibit thereto to be served via the Court's ECF notification system on all parties entitled to notice thereby and, via U.S. Mail First Class, postage pre-paid on all parties listed on the attached service list.

By: */s/ Thomas Berghman*
    Thomas D. Berghman, Esq.