Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
Brenda P. Funk, Esq.
Texas Bar No. 24012664
Conor P. White, Esq.
Texas Bar No. 24125722
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas  75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

ATTORNEYS FOR SCOTT M. SEIDEL, TRUSTEE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 23-30246-mvl-7 |
| WITH PURPOSE, INC., | § | |
| | § | Chapter 7 |
| Debtor. | § | |

**TRUSTEE'S MOTION FOR APPROVAL OF COMPROMISE AND SETTLEMENT UNDER BANKRUPTCY RULE 9019 AND SALE OF ASSETS**

TO THE HONORABLE MICHELLE V. LARSON, U.S. BANKRUPTCY JUDGE:

COMES NOW Scott M. Seidel (the "Trustee"), the duly appointed chapter 7 trustee of the bankruptcy estate (the "Estate") of With Purpose, Inc. (the "Debtor"), the debtor in the above styled and numbered bankruptcy case (the "Bankruptcy Case"), and files this his *Motion for Approval of Compromise and Settlement Under Bankruptcy Rule 9019 and Sale of Assets* (the "Motion"), respectfully stating as follows:

## I.    INTRODUCTION

1. By this Motion, and pursuant to Bankruptcy Rule 9019 and section 363 of the Bankruptcy Code, the Trustee requests that the Court approve the *Agreement* (the "Agreement") and the settlement evidenced thereby (the "Proposed Settlement"), a copy of which is attached

hereto as Exhibit "A," between the Trustee, GloriFi Acquisitions, LLC ("Agent") and Jackson Investment Group, LLC ("JIG").

2. A little over one year ago, two parties (Neugebauer and Jackson) submitted nearly identical offers to purchase assets from the Estate including litigation claims, and both offers contained provisions to share litigation proceeds with the Estate. In reaction thereto, the Trustee undertook an investigation spanning several months to examine the merits of the claims against the various constituencies associated with the Debtor (directors, officers, investors, and professional firms) to assess which "kicker" would have more value. Having determined that colorable claims existed against many parties, and therefore that a "kicker" from each side would have at least some value, the Trustee determined that an auction process to test the parties and the market would yield the best return.[1] Over the next several months, various parties took issue with the evolving bid procedures. The Court and the parties are familiar with the various twists and turns, thus, they are not repeated here.

3. Importantly, on May 17, 2024, the Court approved bid procedures setting an auction on June 21, 2024 and a sale hearing on June 26, 2024. The very day before, on May 16, 2024, the Collateral Agent and Neugebauer filed the DEGA Complaints[2] asserting a litany of claims related to the downfall of the Debtor. Other parties in interest having previously sought due diligence from the Trustee and having expressed strong interest in participating in the auction immediately advised the Trustee that their valuation of the assets had changed because someone had beaten the Estate to the punch and had asserted Estate claims as their own.

---

[1] A less attractive option was to retain the claims and, given the Estate has insufficient resources to litigate against the various financial heavyweights involved with the Debtor, seek onerous litigation financing.

[2] Capitalized terms used in the Introduction are defined below.

TRUSTEE'S MOTION FOR APPROVAL OF COMPROMISE AND SETTLEMENT UNDER BANKRUPTCY RULE 9019 AND SALE OF ASSETS —Page 2

4. The DEGA Complaints constitute an arrogant disrespect for the automatic stay and the court-approved bid procedures. Appalled, the Trustee immediately demanded the DEGA Complaints be withdrawn. When no withdrawal followed and with the June 21 auction unlikely to succeed due to the DEGA Complaints, the Trustee initiated the Adversary Proceeding asserting claims for willful violation of the automatic stay, declaratory judgment actions regarding property of the Estate, insider preferences, and recharacterization, among others. But the Estate suddenly had to undertake *all* of the risk of prevailing in the Adversary Proceeding in order to even have a competitive auction. Without a good result, bids at auction would be depressed. This appears to have been at least one of the motives behind the filing of the DEGA Complaints – an attempt to corner the Estate where the Collateral Agent and Neugebauer were the only possible future partners of the Estate, by giving back to the Estate what they had wrongfully taken in exchange for releases and preferred treatment.

5. The need to mitigate the Estate's downside in the Adversary Proceeding became critical. The fair auction process was already lost – and, absent a settlement with the Collateral Agent and Neugebauer, the Estate risked findings that the Estate owned only assets and claims for which potential bidders would not pay top dollar given the pendency of the DEGA Complaints. As intended, this led the Trustee into the arms of Neugebauer, as the Trustee had been informed that other interested parties were no longer willing to pay meaningful sums to purchase the Estate's causes of action hijacked by Neugebauer and the Collateral Agent.

6. Within days of the filing thereof, however, a paradigm shift occurred. Jackson, who previously and understandably wanted clarity, if not certainty, regarding the Estate's ownership over certain assets and claims, committed to supporting the Estate and to assume the risk that the Trustee may not succeed on all the claims in the Adversary Proceeding, leading to the proposed settlement herein. The very trap that Neugebauer had thought he had set for the Trustee,

to force the Trustee into his arms, was instead sprung by Jackson on Neugebauer. The end result is in the best interests of the Estate and will also permit the Estate to vindicate itself with respect to the Adversary Proceeding.

7. As the Court recently observed at a recent status conference, the current dispute is for the "soul of the case." With the JIG Agreement, there is certainty of distributable cash to innocent creditors and material upside (on better terms than the prior 9019). The Trustee has determined that it is in the best interests of the Estate to proceed with the Adversary Proceeding and to permit the Agent (ultimately controlled by Jackson) to pursue the Estate's claims. As to process, after making public the Agent's offer on August 5, 2024 and soliciting higher and better offers from the Collateral Agent without success, it is submitted that the Agent's offer is in the best interests of the Estate.

8. In entering into the Agreement with the Agent, many factors have been considered including, but not limited to: (i) cash consideration and terms of repayment; (ii) strength of proposed litigation claims and sharing of proceeds; (iii) releases/claims allowance; (iv) prior conduct of the parties; and (iv) creditor support. And a considerable portion of the analysis concerns the actions of Neugebauer himself: instead of seeking to explain to the Court or the Trustee why his prior (and then-still pending) offer was higher and/or better, Neugebauer only doubled-down on his war of attrition against the Estate. This served only to prove that the DEGA Complaints to Neugebauer served twin strategic (and ulterior) purposes, as opposed to honest attempts at legal redress: to bully the Trustee into a settlement with him under practical duress, and to use his allegations as propaganda for public consumption to counter what has been publicly alleged against him.

9. The Agreement is straightforward. First, the consideration to the Estate consists of a payment of $6 million (the "Payment") to control the litigation components of the Agreement,

and $100,000 for the sale of certain Estate assets. Second, the Trustee will continue the Adversary Proceeding and will seek redress for the various wrongs alleged therein. Importantly, the proposed Agreement is not contingent on any particular outcome in the Adversary Proceeding. Third, the Trustee and the Agent enter into a Joint Prosecution Agreement which gives the Agent the authority to control and manage Estate claims (including those which the Bankruptcy Court may find to belong to the Estate in the Adversary Proceeding), subject to certain controls retained by the Trustee. Proceeds of the litigation (but not the $6 million Payment) are used to pay litigation counsel, to repay a preference to the Agent with interest, and are further subject to a waterfall to pay creditors of the Estate. For the avoidance of doubt, the $6 million Payment will be used only to pay litigation expenses of future Estate litigation, and not the attorney fees of special counsel to be hired to pursue such litigation. Finally, JIG's proof of claim asserting an unsecured claim in the amount of $10 million is deemed allowed.

10. Accordingly, regardless of the outcome of the Adversary Proceeding or future litigation claims, the Estate will have significant funds to distribute to creditors. Although litigation is inherently risky and uncertain, the return to the Estate under various possible scenarios is better under the Agreement than under any other proposal or alternative offered to the Trustee.

## II. PROCEDURAL BACKGROUND

11. On February 8, 2023 (the "Petition Date"), the Debtor filed its voluntary petition for relief, thereby initiating the Bankruptcy Case and creating the Debtor's bankruptcy estate (the "Estate").

12. The Trustee is the duly appointed trustee of the Debtor and the Estate.

13. On May 20, 2024, the Collateral Agent filed its *Motion to Lift Stay to Pursue Additional Claims* [Bankr. Docket No. 199].

14. On May 22, 2024, the Collateral Agent filed its *Motion for Relief From the Automatic Stay to Foreclose on Contractual Claims and Misappropriation Claims* [Bankr. Docket No. 201] (collectively, the "Lift Stay Motions").

15. On May 30, 2024, the Trustee filed his *Complaint* against the Estate Defendants, thereby initiating Adversary Proceeding No. 24-03038-mvl pending before the Court (the "Adversary Proceeding"), as amended by his *Amended Complaint* filed on June 21, 2024.

16. In the Adversary Proceeding, the Collateral Agent and the Neugebauer Parties have filed a *Motion to Dismiss* [Adv. Docket No. 16]. All Defendants have filed affirmative defenses and counterclaims against the Estate [Adv. Docket Nos. 45 and 47, respectively].

17. The Court has jurisdiction over this Motion under 28 U.S.C. § 1334. Such jurisdiction is core under 28 U.S.C. § 157(b)(2).

### III. FACTUAL BACKGROUND

18. The Debtor, under the name GloriFi, aimed to provide a comprehensive package of financial products including credit cards, banking, insurance, mortgage, and brokerage services to 100 million Americans looking for such services from a company that shared their ideals and values. Management of the Debtor, including Neugebauer, quickly realized that the development of the technology, intellectual property, marketing, transaction execution and support, and regulatory compliance processes required in such a vast array of consumer-facing operations would require a substantial amount of capital. Significant sums were raised, but the Debtor ultimately failed.

19. Underpinning this Bankruptcy Case is a dispute as to which persons or entities were responsible for the demise of the Debtor which, at one point, was allegedly worth in excess of $1.6 billion. The founder of the Debtor, Neugebauer, asserts that various wealthy early investors of the Debtor allegedly conspired to steal the Debtor's trade secrets and intellectual property and to start

competing businesses, also breaching various contracts in the process and, with respect to certain such individuals, breaching their fiduciary duties to the Debtor. Certain or all of these potential defendants, however, point the finger at Neugebauer, alleging that he mismanaged the Debtor, attempted to obtain the business for himself, and otherwise drove the Debtor into the ground.

20. As the Trustee has otherwise informed the Court and the principal parties, he and his professionals have undertaken a detailed and comprehensive analysis of the Debtor's books and records and potential causes of action owned by the Estate. In sum, the Trustee believes that colorable causes of action exist against everyone that the proverbial finger has been pointed at, including Neugebauer and the early investors. As the Trustee has also informed the Court, that there may be colorable causes of action is not the end of the inquiry. For one thing, the defendants are very wealthy and are known to fight litigation claims. In other words, for the Trustee to litigate the Estate's claims, millions may be needed, which the Estate does not have. Additionally, certain of the causes of action may be mutually exclusive with respect to other causes of action, and the underlying issues are questions of fact that are heavily disputed and on which there is contradictory evidence. Furthermore, it appears that there is only $5 million of liability coverage for the Debtor's directors and officers.

21. In sum, because of the difficulty, risk, and delay in the Estate monetizing its causes of action, and because there are generally two warring parties each with large resources, the Trustee determined that the best way for the Estate to monetize these assets was to sell them at auction to the highest bidder. This has been the direction of this Bankruptcy Case for the past year. Namely, and after months of review and numerous consultations with interested parties, the Trustee filed his *Amended Motion for Entry of (I) An Order (A) Approving Bid and Noticing Procedures, (B) Scheduling an Auction and Hearing, and (C) Granting Related Relief; and (II) An Order (A) Approving Sale of Debtor Assets Free and Clear of All Liens, Claims, Encumbrances,*

*and Interests, and (B) Granting Related Relief* (the "Bid Procedures Motion") [Bankr. Docket No. 186] on April 10, 2024. On May 17, 2024, the Court entered the *Order (A) Approving Bid and Noticing Procedures and (B) Scheduling an Auction and Hearing, and (C) Granting Related Relief* (the "Bid Procedures Order") [Bankr. Docket No. 197].

22. As the Trustee's auction and sale motion was being prosecuted, and after the Neugebauer Parties' objections to the same were overruled, the Collateral Agent and the Neugebauer Parties unilaterally filed two lawsuits, the filing of which fundamentally changed the dynamics of this case. On May 17, 2024, the Collateral Agent and the Neugebauer Parties filed a *Complaint* commencing civil cause no. 1:24-cv-02148-ELR in the Northern District of Georgia (the "GA Complaint"), and the Neugebauer Parties filed a *Complaint* commencing civil cause no. 1:24-cv-00599-CFC filed in the District of Delaware (the "DE Complaint," and, together with the GA Complaint, the "DEGA Complaints").

23. The Trustee has asserted that the filing of the DEGA Complaints violated the automatic stay because the Collateral Agent and the Neugebauer Parties were asserting control over property of the Estate by prosecuting the Estate's causes of action. With respect to the Collateral Agent, any causes of action that it has rests on its assumption that it validly foreclosed on causes of action by virtue of the Foreclosure—which the Trustee strongly disputes. If the Collateral Agent did not foreclose on causes of action, then it clearly does not own any causes of action, and all causes of action remain vested in the Estate, meaning that the Collateral Agent has violated the automatic stay. With respect to the Neugebauer Parties, the Trustee does not dispute that Neugebauer holds at least one cause of action that is personal to him (for defamation) and that is therefore not subject to the automatic stay. With respect to the remaining claims that he has pled in the DEGA Complaints, however, and with respect to the remaining Neugebauer Parties—who

are alleged creditors or equity holders—any alleged damages are derivative of the Debtor's injuries and any resulting causes of action are therefore property of the Estate under Fifth Circuit precedent.

24. Hence the filing by the Trustee of the Adversary Proceeding: to resolve all of these disputes related to ownership of various causes of action by seeking declaratory relief as to who owns the causes of action pled in the DEGA Complaints; to test the validity and extent of the Collateral Agent's security interests against certain claims; to test the validity and extent of the Foreclosure; to seek to avoid the attachment and perfection of the Collateral Agent's security interests as insider preferences; to hold the Collateral Agent and the Neugebauer Parties accountable for their violations of the automatic stay and to obtain resulting damages; and for related relief.

25. The Adversary Proceeding is temporarily abated pending the resolution of the Trustee's efforts to resolve or monetize the Estate's causes of action, although the Trustee anticipates seeking the prompt lifting of said abatement.

26. Separately, on July 10, 2024, the Debtor, under the control of Neugebauer, filed a motion to convert the Bankruptcy Case from Chapter 7 to Chapter 11 (the "Motion to Convert"). The Trustee will object to the Motion to Convert and considers it an unprecedented further attempt by Neugebauer to interfere with the Trustee's duties, unprecedented in that the Motion to Convert was filed after almost 18 months in Chapter 7, after the Trustee did not proceed as Neugebauer wanted him to, and after the Trustee filed the Adversary Proceeding and sought sanctions and damages against the Neugebauer Parties and the Collateral Agent (whom the Trustee believes that Neugebauer also now controls).

27. With a hiatus to consider settlement with the Collateral Agent/Neugebauer and thereafter having received an offer from the Agent, and with direction from this Court regarding parties' requirement to file proposals by dates certain, the Trustee believes that a *de facto* auction

process has commenced and concluded, and that the market for the Estate claims has been exhausted.[3] The Estate claims and the future of the Bankruptcy Case is ripe to be decided.

### IV.     PROPOSED SETTLEMENT & SALE

28. Parties are cautioned to review the Agreement in detail, as it contains the precise terms and provisions thereof. Nevertheless, the following is a summary of the key provisions of the Agreement:

- The Adversary Proceeding and objections to the Lift Stay Motions and the Motion to Convert will be pursued by the Trustee.

- Agent pays $6 million to the Estate in exchange for the Joint Prosecution Agreement.

- Agent pays $100,000 to the Estate to purchase, as-is where-is, the Debtor's and the Estate's rights in the name "GloriFi" and equity in any subsidiaries, which the Trustee submits are property of the Estate free and clear of any claim, lien, interest or encumbrance.

- Agent and the Trustee enter into the Joint Prosecution Agreement whereunder Agent has discretion to litigate Estate claims and manage and control the same, subject to certain controls retained by the Trustee.

- From litigation proceeds, litigation counsel is paid and Agent receives a preference payment of $6 million plus interest at 1% per month compounded monthly. A waterfall divides remaining litigation proceeds, between Agent and the Estate.

- No parties are released and no causes of action are being sold.

- Claim No. 45 in the Bankruptcy Case becomes allowed, but without issue preclusion concerning the allowance of other Series I noteholder claims or concerning the allowance of an Series II noteholder claims.

29. In this manner, the Trustee believes that the Estate will have several million dollars available to distribute to creditors even if none of the claims and causes of action of the Estate succeed.

---

[3] The Trustee does not rule out considering higher and better offers submitted after the filing of this Motion and reserves the right to withdraw the Motion at any time, for any reason, prior to Bankruptcy Court approval.

TRUSTEE'S MOTION FOR APPROVAL OF COMPROMISE AND SETTLEMENT UNDER BANKRUPTCY RULE 9019 AND SALE OF ASSETS —Page 10

## V. DISCUSSION

### A. Agreement Should be Approved

30. Bankruptcy Rule 9019 provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." FED. R. BANKR. P. 9019(a). Under that Rule, the Court should approve a settlement only if it is "fair and equitable and in the best interests of the estate." *In re Foster Mortgage Corp.*, 68 F.3d 914, 917 (5th Cir. 1995). The factors to consider include "(1) the probability of success in the litigation, with due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and (3) all other factors bearing on the wisdom of the compromise." *Id*. Such other factors include the reasonable views of creditors, although such views are not binding, and "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Id.* at 918. *See also Official Comm. Of Unsecured Creditors v. Cajun Elec. Power Coop. Inc. (In re Cajun Elec. Power Coop. Inc.)*, 119 F.3d 349, 356 (5th Cir. 1997); *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 559, 602 (5th Cir. 1960).

31. The Court need not conduct a mini-trial on the underlying claims; rather, the Court "must apprise itself of the relevant facts and law so that it can make an informed and intelligent decision." *In re Age Ref. Inc.*, 801 F.3d 530, 541 (5th Cir. 2015) (internal quotation omitted). The settlement need not result in the best possible outcome for the Estate, but must not "fall beneath the lowest point in the range of reasonableness." *Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991). Finally, the Trustee is entitled to employ his reasonable business judgment in proposing a settlement, and that judgment is entitled to reasonable deference from the Court where, as here, the proposed settlement is not between insiders:

> The Trustee's decision to settle must represent the interests of the bankruptcy estate and its creditors and is reviewed under the 'business judgment rule.' Under the business judgment rule, the challenging party must establish that the course of action chosen by the fiduciary was outside the parameters of what a rational and reasonably informed businessperson might select. The business judgment rule creates a presumption in favor of the fiduciary.

*In re Woodberry*, 629 B.R. 239, 243 (Bankr. E.D. Mich. 2021) (internal quotations omitted).

32. The Trustee believes that the Proposed Settlement is fair, equitable, and in the Estate's best interests, for at least the following reasons:

- Of critical concern to the Trustee was the potential outcome of the Adversary Proceeding. In the event of an adverse outcome there, the Estate's prospects at monetizing the claims would likely be diminished, *e.g.* if the DEGA Complaints were somehow found to be appropriate, buyers would pay less than they otherwise might have for the Estate's remaining claims. The Trustee's case is strong, but litigation is risky. The Proposed Settlement does not depend on the outcome of that litigation, thus providing a key aspect of the consideration to the Estate.

- At a minimum, regardless of the outcome of the Adversary Proceeding, Estate claims for breach of fiduciary duty against Neugebauer will be pursued, as will certain other claims. Based on the Trustee's investigation to date, those claims have material value, and there is $5 million of D&O insurance in place.

- The Trustee believes the claims in the Adversary Proceeding are strong, and that the Estate will largely prevail. This will permit Agent to assert any and all of the claims in the DEGA Complaints. And, the Trustee believes that the Court will award the Trustee substantial attorney's fees and expenses for the violations of the automatic stay through the DEGA Complaints.

- The Agreement provides sufficient funds to pay Chapter 7 administrative claims in full, and only to the extent otherwise allowed, which benefits all unsecured creditors. Without any additional recovery, and estimating administrative claims at $1.5 million, some $4.5 million will be left in the Estate for litigation expenses (but not fees) and distribution to creditors—in additional to potential significant recoveries from the Agent's pursuit of Estate causes of action.

- The Agreement contemplates that litigation counsel will be compensated from any litigation recovery. Accordingly, the remainder of the Payment after administrative costs is earmarked only for future litigation expenses and distribution to creditors.

- The terms of the Agent's preference are reasonable, and are less than what ordinary litigation funding would cost, including because of the pending disputes regarding the ownership of the Estate's causes of action.

- The Proposed Settlement and Agreement were negotiated at arm's length, through extensive negotiations and discussions, primarily by legal counsel. There are no undisclosed agreements or understandings.

- There exist colorable litigation claims against many parties involved with the Debtor. The Court need not conduct a mini-trial on these, but the claims against Neugebauer are supported by documentary evidence and witness testimony. An investigation has been conducted regarding these various potential defendants and claims, and the Trustee submits that, at this time, the pursuit of the claims as proposed by Agent are in the best interests of the Estate.

- The Collateral Agent and Neugebauer have demonstrated a lack of consideration for this Bankruptcy Court, the bankruptcy process, and the Trustee and his obligations to maximize value by: (i) filing the DEGA Complaints without seeking stay relief; (ii) impairing the Trustee's auction process resulting in a gross waste of resources by the Court and the other parties-in-interest; (iii) filing the Motion to Convert when it became apparent that other parties might top the prior 9019 motion, which contains an alleged plan support agreement obtained on misleading and false information; (iv) publishing a misleading press release and issuing the same to former employees and investors in the Debtor; and (v) attempting to subpoena an attorney whose privilege is controlled solely by the Trustee.

33. With the continued pursuit of the Adversary Proceeding and the consummation of the Agreement, the Trustee is maximizing the value of the estate's causes of action. Following the conclusion of the Adversary Proceeding, the parties in this case will have clarity as to encumbered and unencumbered assets of the Estate. To the extent encumbered and the Court were to lift the automatic stay (which relief the Trustee strongly opposes), the Collateral Agent could pursue the encumbered causes of action. The GloriFi Acquisitions group will have paid $6 million to the Estate to pursue all Estate causes of action, such as those against Mr. Neugebauer, including preference and fraudulent transfer actions, equitable subordination, breach of contract, other non-breach of fiduciary duty causes of action, and encumbered causes of action which remain the subject of the automatic stay and subject to surcharge rights. The Estate and the Agent are also aligned on other Estate causes of action for malpractice that likely would not have been brought under the prior settlement with the Collateral Agent.

### B. Sale of Assets Should be Approved

34. This Court may authorize the sale of the Estate's trademarks and equity in subsidiaries pursuant to Section 363(b)(1) of the Bankruptcy Code. 11 U.S.C. § 363(b)(1). The sale of the assets of a debtor outside the ordinary course of business may be approved by a bankruptcy court when: (i) there is a sound business reason for the sale; (ii) accurate and reasonable notice is provided to interested parties; (iii) the price is fair, reasonable and adequate; and (iv) the sale is made to the purchaser in good faith. *See, e.g., In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Stroud Ford, Inc.,* 163 B.R. 730, 732 (Bankr. M.D. Pa. 1993); *In re Titusville Country Club*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Industrial Valley Refrigeration and Air Conditioning Supplies, Inc.*, 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987). As recognized by the Fifth Circuit, the Trustee is entitled to use his business judgment in determining whether to sell assets outside the ordinary course. *See Institutional Creditors of Continental Air Lines Inc. v. Continental Air Lines Inc. (In re Continental Air Lines Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986).

35. The Trustee submits that no creditor, including the Collateral Agent, has a valid, perfected security interest or lien against the same. To the extent that the Collateral Agent asserts such lien or security interest, it is subject to a *bona fide* dispute because the underlying security agreement expressly excludes applications for trademarks, and because the same are not assignable (including for security purposes) under the Lanham Act. *See, e.g.,* 15 U.S.C. § 1060(a)(1); *Greene v. Ab Coaster Holdings, Inc.*, Nos. 2:10-CV-38, 2:10-CV-234, 2012 WL 4442749, at *9 (S.D. Ohio Sept. 25, 2012); *Patagonia, Inc. v. Anheuser-Busch, LLC*, No. 2:19-CV-02702-VAP-JEMx, 2019 WL 8754735, at *5 (C.D. Cal. Sept. 3, 2019) (citing *Clorox Co. v. Chem. Bank*, 40 U.S.P.Q.2d (BNA) 1098, 1104 (T.T.A.B. 1996)).

## VI. PRAYER

WHEREFORE, PREMISES CONSIDERED, the Trustee respectfully requests that the Court: (i) grant this Motion; (ii) approve the Agreement in all respects, including all transactions contemplated thereby, and ordering that the Agreement shall control according to its terms; (iii) authorize and direct the Trustee to perform all actions required by the Agreement; and (iv) grant the Trustee such other and further relief to which he may be justly entitled.

RESPECTFULLY SUBMITTED this 12th day of August, 2024.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: */s/ Thomas Berghman*
Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
Brenda P. Funk, Esq.
Texas Bar No. 24012664
Conor P. White, Esq.
Texas Bar No. 24125722
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas 75201-6659
Telephone: (214) 855-7500

COUNSEL FOR SCOTT M. SEIDEL, TRUSTEE AND PLAINTIFF

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 12th day of August, 2024, he caused a true and correct copy of this document and the exhibit thereto to be served via the Court's ECF notification system on all parties entitled to notice thereby and, via U.S. Mail First Class, postage pre-paid on all parties listed on the attached service list.

By: */s/ Thomas Berghman*
Thomas D. Berghman, Esq.