**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KERI FINDLEY,<br><br>Plaintiff,<br><br>-against-<br><br>JAMES ROBERT BREDAHL,<br><br>Defendant. | Case No. 1:23-cv-00884<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

KERI FINDLEY ("Findley"), by and through her attorneys, Wallison & Wallison LLP and Clare Locke LLP, for her Complaint against JAMES ROBERT BREDAHL ("Bredahl"), alleges, on knowledge as to her own actions, and otherwise upon information and belief, as follows:

## PRELIMINARY STATEMENT

1. This is an action for slander *per se* arising out of statements Bredahl made about Findley to non-parties Manuel Rios ("Rios") and Jerry Fadden ("Fadden") on February 6, 2022, over dinner at a restaurant in New York City.

2. Bredahl's statements concerned Findley's supposed misconduct when Bredahl was the chief executive officer of Third Point Reinsurance Ltd. ("Third Point Re") and Findley was a portfolio manager and partner at Third Point LLC ("Third Point"), Third Point Re's investment manager.

3. Specifically, Bredahl stated to Rios and Fadden that Findley had "mismarked her book" at Third Point, "committed fraud," that she is a "criminal," and that he "had to restate [Third Point Re's] earnings because of her." Ms. Findley's "book" in this context refers to the portfolio of investments she managed for Third Point and Third Point Re.

4. Each of these statements was false and either known by Bredahl to be false or

EXHIBIT
224

EXHIBIT
2

Case 1:23-cv-00884-JLR Document 1 Filed 02/02/23 Page 2 of 9

known by him likely to be false.

5. At the time of Bredahl's statements, Rios was the head of insurance at With Purpose, Inc., d/b/a GloriFi ("GloriFi"), a now defunct financial services technology startup; Fadden was the chief financial officer of GloriFi's insurance business.

6. Findley, at the time, was a member of GloriFi's board of directors.

7. Thus, as was foreseeable and plainly intended by Bredahl, Rios believed Bredahl's false statements and reported them to GloriFi's co-founder and chief executive officer, Toby Neugebauer ("Neugebauer"), as well as another co-founder and board member, Nick Ayers ("Ayers").

8. Neugebauer indicated in response that this information caused him to doubt Findley's integrity and fitness to continue serving on GloriFi's board of directors; in a later call with Findley, Neugebauer repeated those concerns; and, on April 4, 2022, Neugebauer removed Findley from GloriFi's board of directors.

9. Thus, as a direct and foreseeable result of Bredahl's defamatory statements to Rios and Fadden, Findley has suffered presumed and actual damage to her reputation, along with mental anguish, distress, mortification, humiliation and embarrassment, in an amount to be proved at trial but in no event less than $100,000.

**THE PARTIES**

10. Findley is an individual who resides in Austin, Texas, and is a citizen of Texas.

11. Bredahl is an individual who resides in Summit, New Jersey, and is a citizen of New Jersey.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), in that this is a civil action between a citizen of Texas and a citizen of New Jersey and the matter in controversy exceeds the sum or value of $75,000 exclusive of interest and costs.

13. Venue is proper in this district under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events giving rise to the claim occurred in this district.

## FACTS

14. From 2009 until February 1, 2017, Findley managed the structured credit trading strategy at Third Point.

15. Third Point is an SEC-registered investment adviser that serves as investment manager for a series of hedge funds and separately managed accounts.

16. One such separately managed account was Third Point Re, a publicly traded reinsurance company at the time.

17. Under that investment management arrangement, Third Point managed all of Third Point Re's investable assets on substantially the same basis and with similar portfolio composition as the hedge funds Third Point managed.

18. Thus, through this investment management relationship, Findley managed Third Point Re's structured credit portfolio.

19. Bredahl joined Third Point Re in February 2012 as its chief financial officer ("CFO") and chief operating officer ("COO"); in 2014 his title changed to president and COO; effective March 1, 2017, he was appointed president and chief executive officer ("CEO"); and in May 2019 his employment at Third Point Re ended.

Case 1:23-cv-00884-JLR Document 1 Filed 02/02/23 Page 4 of 9

20. In September 2015, prompted by a "street sweep," Third Point's structured credit investment portfolio became the subject of an SEC inquiry.

21. Over time the specific concern became whether the investments in that portfolio had been undervalued on Third Point's books.

22. On October 1, 2018, after thoroughly investigating that theory, the SEC closed its investigation with no charges or finding of wrongdoing by anyone, including Third Point and Findley.

23. Bredahl, the CEO of Third Point Re at the time, was made aware of the SEC's conclusion.

24. Further, Third Point conducted its own investigation of the SEC's concerns over the same period and found no evidence to support them.

25. Bredahl was made aware of that conclusion as well.

26. Indeed, demonstrating the false and frivolous nature of the suggestion otherwise, and the consequent misdirected nature of the SEC's investigation, the SEC was able to conclude its investigation without ever even contacting Findley or her counsel.

27. At no point during her tenure did Findley mismark any of the investments in her portfolio or commit any other violation of law.

28. Nor did Third Point Re ever restate any valuations of its structured credit investments, let alone its "earnings," as Bredahl falsely claimed it had done.

29. Bredahl knew both facts or at the very least knew that any suggestion to the contrary was likely false.

30. As noted, Bredahl, during the relevant period, was the CFO, COO and then CEO of Third Point Re.

Case 1:23-cv-00884-JLR Document 1 Filed 02/02/23 Page 5 of 9

31. In those capacities he participated in the preparation and filing of Third Point Re's Annual Reports on Form 10-K, in which Third Point Re assured investors of the accuracy of its financial statements, including the valuation of its structured credit portfolio.

32. Indeed, Bredahl personally signed Third Point Re's Annual Reports on Form 10-K for 2013, 2017 and 2018, thereby certifying, pursuant to Section 13 and 15(d) of the Securities Exchange Act of 1934, and Exchange Act Rules 13a-14 and 15d-14, that he had reviewed the report and, based on his knowledge, the report did not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the report.

33. Bredahl and Third Point Re made these assurances, moreover, while proclaiming the efforts they made to ensure that its structured credit portfolio was indeed properly marked.

34. In Third Point Re's Annual Reports on Form 10-K, for example, the company assured its investors:

> we perform several processes to ascertain the reasonableness of the valuation of all of our investments comprising our investment portfolio. These processes include (i) obtaining and reviewing weekly and monthly investment portfolio reports from Third Point LLC, (ii) obtaining and reviewing monthly NAV and investment return reports received directly from the Company's third-party fund administrator, which are compared to the reports noted in (i), and (iii) monthly update discussions with Third Point LLC regarding the investment portfolio, including, their process for reviewing and validating pricing obtained from third party service providers

35. Its investment management agreement with Third Point further gave it unfettered audit rights to determine the accuracy of information Third Point provided with respect to its investment of Third Point Re's assets, including the valuation of the structured credit portfolio.

Case 1:23-cv-00884-JLR Document 1 Filed 02/02/23 Page 6 of 9

36. Accordingly, Bredahl had every reason and opportunity to know, and did in fact know, what Third Point itself knew and what the SEC ultimately concluded: that Third Point Re's structured credit portfolio had not been mismarked and that Findley had not engaged in any wrongdoing, criminal or otherwise, in connection therewith.

37. He certainly knew that Third Point Re never restated or had any reason to restate its "earnings" or any other disclosures to its investors concerning its structured credit investments.

38. Despite this, however, Bredahl, on February 6, 2022, stated the opposite to Rios and Fadden over dinner in New York City.

39. Specifically, he stated that Findley, in managing the structured credit portfolio, had "mismarked her book," "committed fraud," that she is a "criminal," and that he "had to restate [Third Point Re's] earnings because of her."

40. Each of those statements was false.

41. These statements, moreover, are defamatory *per se*.

42. Heard together, they charge Findley with a serious crime – i.e., criminal securities fraud.

43. Heard together, they convey dishonesty, unfitness, and a general lack of integrity and character in the performance of Findley's trade, business, and profession, which goes beyond a single instance of wrongdoing.

44. Heard together, these statements plainly are of a type that would tend to injure Findley in her trade, business or profession.

45. In fact, that is precisely what occurred.

46. Rios believed Bredahl's charges.

Case 1:23-cv-00884-JLR Document 1 Filed 02/02/23 Page 7 of 9

47. Consequently, foreseeably, and as plainly intended by Bredahl in making the knowingly false charges in the first place, Rios reported them to his bosses at GloriFi, Neugebauer and Ayers.

48. Neugebauer indicated in response that Bredahl's charges caused him to question Findley's integrity and suitability for service on GloriFi's board, a seat she had occupied only for a little over two months at that point.

49. Moreover, in a subsequent call with Findley, Neugebauer expressed those concerns to her directly, causing Findley mental anguish, distress, mortification, humiliation and embarrassment.

50. Thereafter, on April 4, 2022, only four months into her tenure, Neugebauer removed Findley from GloriFi's board of directors.

**CLAIM FOR RELIEF**

51. Findley repeats and re-alleges the allegations set forth in paragraphs 1 through 50 above, as if fully set forth herein.

52. On February 6, 2022, Bredahl published statements to Rios and Fadden as alleged above.

53. Those statements are false.

54. Those statements are slanderous *per se* in that they accused Findley of criminal securities fraud, a serious crime, and convey a general lack of character, probity and integrity in the performance of her trade, profession and business, such that the statements are of a type that would tend to injure Findley in that trade, profession and business.

55. Those statements, as alleged above, did in fact injure Findley in her trade, profession and business, and further inflicted mental anguish, distress, mortification, humiliation

Case 1:23-cv-00884-JLR Document 1 Filed 02/02/23 Page 8 of 9

and embarrassment, the actual and presumed harm from which should be valued at an amount to be proved at trial but no less than $100,000.

56. As alleged above, Bredahl knew that the SEC had closed its investigation of Third Point's structured credit portfolio without charges or any indication of wrongdoing; he knew that Third Point's own investigation into the matter found no evidence of wrongdoing; he knew that Third Point Re never restated the valuations of its structured credit investments or took any other remedial measure that would have been required had Findley in fact undermarked the structured credit portfolio; he knew that Third Point Re, under his leadership, had an obligation and the ability to discover, report and correct any possible wrongdoing with regard to the management of its structured credit portfolio; he knew that, had there been any basis to the charge that Findley "unmarked her book," "committed fraud," is a "criminal," or caused Third Point Re to have to restate its earnings, he would have known about it and taken appropriate remedial measures in response; and he knew he had no information to indicate that Findley in fact had "undermarked her book" or "committed fraud" or is a "criminal."

57. Consequently, when stating that Findley had "mismarked her book," "committed fraud," is a "criminal," and that Third Point Re "had to restate its earnings because of her," Bredahl knew those statements were false or at the very least likely false.

58. Because Bredahl plainly intended that his statements to Rios and Fadden would be republished to GloriFi's executive management team or, at a bare minimum, Bredahl knew his statements about Findley were false and that he was speaking to financial executives who worked at a firm where Findley was on the board of directors, Bredahl intended or, at a bare minimum, was highly aware that his statements would be relayed to others at GloriFi.

Case 1:23-cv-00884-JLR Document 1 Filed 02/02/23 Page 9 of 9

59. By reason of the foregoing, Bredahl is liable for slander *per se* and actual and presumed damages therefore in the amount of no less than $100,000, plus interest and costs.

60. Bredahl is also liable for punitive damages because he made his statements about Findley with the deliberate intent to injure her, he made them out of hatred, ill will, and spite, and he made them with willful, wanton, and reckless disregard of Findley's rights.

**WHEREFORE**, Keri Findley requests judgment against James Robert Bredahl as follows:

A. An award of damages in favor of Findley in an amount to be determined at trial, but in no event less than $100,000, plus interest and costs.

B. An award of punitive damages in favor of Findley in an amount to be determined at trial.

C. Granting Findley such other and further relief as the Court deems just and proper.

Dated: New York, New York
February 2, 2023

WALLISON & WALLISON LLP

/s/ Jeremy Wallison

Jeremy Wallison, Esq.
20 East 69th Street, Suite 5A
New York, New York 10021
212.292.1011
jw@wallisonllp.com

CLARE LOCKE LLP

Thomas A. Clare, P.C. (*pro hac vice* forthcoming)
Dustin A. Pusch (*pro hac vice* forthcoming)
Nicholas J. Brechbill
James E. O'Toole (*pro hac vice* forthcoming)
10 Prince Street
Alexandria, VA 22314
Telephone: 202.628.7401
tom@clarelocke.com
dustin@clarelocke.com
nick@clarelocke.com
james@clarelocke.com

*Attorneys for Plaintiff*