# **Keri Findley**

# Combined Deposition Transcript Excerpts

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 9:03 - 9:05 | **Findley, Keri 2024-09-06** | 00:00:04 | **FK-3613.147** |

9:03 Q. So, with that said, will you please state
9:04 your name for the record.
9:05 A. Keri Findley.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 11:20 - 11:25 | **Findley, Keri 2024-09-06** | 00:00:19 | **FK-3613.148** |

11:20 Q. (By Mr. Downton) Is Deposition Exhibit 1
11:21 a copy of the lawsuit you filed against your husband on
11:22 May 26th, 2021?
11:23 A. Okay.
11:24 Q. Yes, it is?
11:25 A. It is, yes.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 12:09 - 12:16 | **Findley, Keri 2024-09-06** | 00:00:25 | **FK-3613.149** |

12:09 Q. And what are the claims that you made
12:10 against him?
12:11 A. It appears to be civil extortion,
12:12 intentional interference with respective economic
12:13 relations, negligent interference with respective
12:14 economic relations, breach of fiduciary duty, invasion
12:15 of privacy, defamation, trespass to personal property,
12:16 conversion of personal property.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 16:06 - 16:10 | **Findley, Keri 2024-09-06** | 00:00:12 | **FK-3613.150** |

16:06 Q. How many other lawsuits have you been a
16:07 party to?
16:08 A. I don't know the answer to that question.
16:09 Q. More than five?
16:10 A. I don't know the answer to that question.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 16:17 - 16:25 | **Findley, Keri 2024-09-06** | 00:00:32 | **FK-3613.151** |

16:17 Q. And what did you sue her for?
16:18 A. She and my ex-husband were calling around
16:19 trying to get me fired and severed from many companies
16:20 that I was involved with.
16:21 Q. So you sued her for defamation?
16:22 A. I don't believe it was defamation. It
16:23 might have been. I believe it was interference.
16:24 Q. Interference with business relationships?
16:25 A. Uh-huh, I believe so.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 17:12 - 17:16 | **Findley, Keri 2024-09-06** | 00:00:22 | **FK-3613.152** |

17:12 Q. Any others?
17:13 A. Yes. I sued somebody who used to work at

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 17:14 a place called Third Point Re.<br>17:15 Q. Do you recall that person's name?<br>17:16 A. Name's Rob Bredahl. | | |
| 17:21 - 17:25 | **Findley, Keri 2024-09-06** | 00:00:11 | **FK-3613.153** |
| | 17:21 Q. (By Mr. Downton) Is this a copy of the<br>17:22 complaint you filed against Mr. Bredahl in 2023?<br>17:23 A. Looks that way.<br>17:24 Q. And you sued him for defamation?<br>17:25 A. Yup. | | |
| 19:09 - 19:13 | **Findley, Keri 2024-09-06** | 00:00:11 | **FK-3613.154** |
| | 19:09 Q. In the lawsuit against Kathleen, did Core<br>19:10 Venture make a cross-claim against you?<br>19:11 A. Yup.<br>19:12 Q. And that was for what?<br>19:13 A. Breaching an NDA. | | |
| 21:05 - 21:21 | **Findley, Keri 2024-09-06** | 00:00:31 | **FK-3613.155** |
| | 21:05 Q. (By Mr. Downton) Do you know a gentleman<br>21:06 named Peter Thiel?<br>21:07 A. I do.<br>21:08 Q. He's someone you've worked with over the<br>21:09 years?<br>21:10 A. No.<br>21:11 Q. You don't work with Mr. Thiel?<br>21:12 A. He's an investor in my fund that does not<br>21:13 -- we don't work together.<br>21:14 Q. Is he the largest investor in your fund?<br>21:15 A. Yes, he is.<br>21:16 Q. What percent of your capital does he<br>21:17 represent or his entities?<br>21:18 A. Today, about -- probably 60.<br>21:19 Q. So, the majority of your fund is<br>21:20 Mr. Thiel's money?<br>21:21 A. Yes. | | |
| 22:20 - 22:24 | **Findley, Keri 2024-09-06** | 00:00:16 | **FK-3613.156** |
| | 22:20 Q. How would you describe what you do for<br>22:21 Mr. Thiel?<br>22:22 A. I don't do anything for Mr. Thiel. I<br>22:23 lend money for a group of investors. I have a duty,<br>22:24 the same duty to Mr. Thiel that I have to the others. | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 23:15 - 23:25 | **Findley, Keri 2024-09-06** | 00:00:58 | **FK-3613.157** |

23:15 Q. How often do you stay at Mr. Thiel's
23:16 house?
23:17 A. I don't know.
23:18 Q. Have you stayed at any of Mr. Thiel's
23:19 properties?
23:20 A. Yes.
23:21 Q. How many?
23:22 A. Seven.
23:23 Q. Where are those seven locations?
23:24 A. Hawaii, Tokyo, Miami, Bel Air, West
23:25 Hollywood, Aspen, Palo Alto.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 24:23 - 25:16 | **Findley, Keri 2024-09-06** | 00:00:48 | **FK-3613.158** |

24:23 Q. Have you ever disparaged Mr. Neugebauer?
24:24 MR. POTTER: Objection; calls for a legal
24:25 conclusion.
25:01 Q. (By Mr. Downton) Have you ever said
25:02 anything bad about Mr. Neugebauer to a third party?
25:03 A. I don't know that definition of bad.
25:04 Q. Have you ever said anything about
25:05 Mr. Neugebauer to a third party that you would be
25:06 unhappy if someone said about you?
25:07 A. Yes.
25:08 Q. So, who have you said something -- and
25:09 that -- that will be for now my definition of bad.
25:10 Okay?
25:11 A. Okay.
25:12 Q. Who have you said something bad about
25:13 Mr. Neugebauer to?
25:14 A. don't recall.
25:15 Q. Multiple people?
25:16 A. Only if asked.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 26:16 - 27:03 | **Findley, Keri 2024-09-06** | 00:00:27 | **FK-3613.159** |

26:16 Q. (By Mr. Downton) So, the seven
26:17 properties of Mr. Thiel, you stayed overnight at all
26:18 those properties?
26:19 A. Yes.
26:20 Q. And sometimes, he's there when you stay
26:21 there?
26:22 A. Sometimes.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 26:23 Q. And sometimes, you stay there when he's | | |
| | 26:24 not there? | | |
| | 26:25 A. I have stayed at his houses when he is | | |
| | 27:01 not there many times. | | |
| | 27:02 Q. Would you call him a friend? | | |
| | 27:03 A. No. | | |
| 27:04 - 27:10 | **Findley, Keri 2024-09-06** | 00:00:17 | **FK-3613.160** |
| | 27:04 Q. You just happened to stay at his houses | | |
| | 27:05 all over the world even though he's not your friend and | | |
| | 27:06 you don't work with him? | | |
| | 27:07 A. His husband is my friend. | | |
| | 27:08 Q. How long have you been friends with his | | |
| | 27:09 husband? | | |
| | 27:10 A. Somewhere around ten years. | | |
| 27:20 - 28:06 | **Findley, Keri 2024-09-06** | 00:00:26 | **FK-3613.161** |
| | 27:20 Q. Have you ever stayed at one of | | |
| | 27:21 Mr. Thiel's property when the children were present? | | |
| | 27:22 A. Yes. | | |
| | 27:23 Q. You know all of their names? | | |
| | 27:24 A. Yes. | | |
| | 27:25 Q. And they know your name? | | |
| | 28:01 A. Some of them. | | |
| | 28:02 MR. POTTER: Objection; speculation, | | |
| | 28:03 relevance. | | |
| | 28:04 Q. (By Mr. Downton) Do they have a | | |
| | 28:05 different name they call you? | | |
| | 28:06 A. They call me Keri. | | |
| 32:18 - 33:03 | **Findley, Keri 2024-09-06** | 00:00:22 | **FK-3613.162** |
| | 32:18 Q. So, you would describe your business as | | |
| | 32:19 structured credit? | | |
| | 32:20 A. Structured finance, structured credit, | | |
| | 32:21 something like that. | | |
| | 32:22 Q. And is that still your business today? | | |
| | 32:23 A. Yes. | | |
| | 32:24 Q. So, if we use the term lending as a | | |
| | 32:25 colloquial term, we're -- we're really -- structured | | |
| | 33:01 credit or structured finance would be a more technical | | |
| | 33:02 description? | | |
| | 33:03 A. They're the same thing. | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 33:04 - 33:11 | **Findley, Keri 2024-09-06** | 00:00:30 | **FK-3613.163** |

33:04 Q. Would you say that all lending is
33:05 structured finance?
33:06 A. I mean, philosophically, yes. You know,
33:07 I think that most people would see a difference between
33:08 loans with operating risk, which would be called
33:09 corporate lending, and loans without operating risk,
33:10 which is more what I do, which is more called
33:11 structured finance or structured credit.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 36:09 - 36:18 | **Findley, Keri 2024-09-06** | 00:00:19 | **FK-3613.146** |

36:09 Q. (By Mr. Downton) Can you explain what
36:10 you do in structured finance in a way that the judge
36:11 and jury and me can understand?
36:12 MR. POTTER: Objection; speculation. As
36:13 to what he can understand. Go ahead.
36:14 A. Yeah, I don't know what you or a judge or
36:15 a jury can understand.
36:16 Q. (By Mr. Downton) Well, do your best.
36:17 Explain what you do.
36:18 A. I lend money.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 36:25 - 37:10 | **Findley, Keri 2024-09-06** | 00:00:34 | **FK-3613.2** |

36:25 Q. What are the range of loans you make to
37:01 individuals?
37:02 A. We'd be here all day if you want to go
37:03 through that, but we can if you'd like to.
37:04 Q. Yeah, I want a dollar range.
37:05 A. Oh, you asked size? Sorry.
37:06 I have made loans to individuals probably
37:07 from, like, $2,000 to a hundred million dollars.
37:08 Q. Yeah. What is the total size of your
37:09 fund?
37:10 A. Tacora Fund I is about $350 million.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 37:16 - 38:01 | **Findley, Keri 2024-09-06** | 00:00:27 | **FK-3613.3** |

37:16 Q. Do you have any commitments from anyone
37:17 for Tacora Fund II?
37:18 A. Yes.
37:19 Q. Is Mr. Thiel one of those people?
37:20 A. I have not spoken to him about Tacora
37:21 Fund II yet.
37:22 Q. Have you spoken to his husband?

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

37:23 A. No.
37:24 Q. Have you spoken to anyone that works for
37:25 or with any of his entities?
38:01 A. No.

| 38:02 - 38:07 | **Findley, Keri 2024-09-06** | 00:00:15 | **FK-3613.4** |
|---|---|---|---|

38:02 Q. I didn't write it down. How much is
38:03 Tacora Fund I again?
38:04 A. About $350 million.
38:05 Q. And about 200 of that is from Mr. Thiel?
38:06 A. I think it's 240 or somewhere in that
38:07 range.

| 38:13 - 38:16 | **Findley, Keri 2024-09-06** | 00:00:13 | **FK-3613.5** |
|---|---|---|---|

38:13 Q. And what is its annual rate of return?
38:14 A. About 52 percent.
38:15 Q. And that's the firm lending money?
38:16 A. Uh-huh.

| 39:04 - 39:11 | **Findley, Keri 2024-09-06** | 00:00:28 | **FK-3613.6** |
|---|---|---|---|

39:04 Q. (By Mr. Downton) Do you know what usury
39:05 is?
39:06 A. Usury is different in every single state
39:07 and there are laws in every single state, and I have
39:08 applied -- and I have abided by all state laws.
39:09 Q. And you still can make a 52 percent
39:10 annual return loaning money to people?
39:11 A. Yes.

| 48:02 - 48:13 | **Findley, Keri 2024-09-06** | 00:00:34 | **FK-3613.7** |
|---|---|---|---|

48:02 Q. Now, how did you meet Joe Lonsdale?
48:03 A. When I was lending money to
48:04 venture-backed businesses starting in 2013, I needed to
48:05 meet all the people around the table for those
48:06 businesses and Joe was one of those people.
48:07 Q. Where were you living at the time?
48:08 A. New York City.
48:09 Q. In 2018 where were you living?
48:10 A. San Francisco.
48:11 Q. And 8VC's office was in San Francisco at
48:12 the time?
48:13 A. Yes.

| 49:02 - 49:08 | **Findley, Keri 2024-09-06** | 00:00:11 | **FK-3613.8** |
|---|---|---|---|

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 49:02 Q. How well do you know Mr. Lonsdale? | | **FK-3613.8** |
| | 49:03 A. Well. | | |
| | 49:04 Q. Do you consider him a friend? | | |
| | 49:05 A. Yes. | | |
| | 49:06 Q. And you still do business with him, | | |
| | 49:07 right? | | |
| | 49:08 A. To this day, yes. | | |
| 49:16 - 49:22 | **Findley, Keri 2024-09-06** | 00:00:19 | **FK-3613.9** |
| | 49:16 Q. Do you have any investment in 8VCor any | | |
| | 49:17 of Mr. Lonsdale's entities? | | |
| | 49:18 A. Yes. | | |
| | 49:19 Q. And how much do you have invested? | | |
| | 49:20 A. Less than a million dollars. | | |
| | 49:21 Q. And for you, is that a large investment? | | |
| | 49:22 A. No. | | |
| 50:04 - 50:15 | **Findley, Keri 2024-09-06** | 00:00:30 | **FK-3613.10** |
| | 50:04 Q. (By Mr. Downton) Okay. I'm -- I'm not | | |
| | 50:05 asking for your net worth. I'm trying to figure out | | |
| | 50:06 your range of investment size. So, one million is not | | |
| | 50:07 a large investment for you. What is an -- | | |
| | 50:08 A. No, I said less than a million. | | |
| | 50:09 Q. Okay. What is an average-size investment | | |
| | 50:10 for you? | | |
| | 50:11 A. I don't know. I'd have to go add them | | |
| | 50:12 all up. | | |
| | 50:13 Q. What is a large investment for you? | | |
| | 50:14 A. Five to $7 million would be a large | | |
| | 50:15 single investment for me. | | |
| 52:07 - 52:11 | **Findley, Keri 2024-09-06** | 00:00:11 | **FK-3613.11** |
| | 52:07 Q. Are you familiar with a company called | | |
| | 52:08 Strive? | | |
| | 52:09 A. I've heard of it. | | |
| | 52:10 Q. You know Vivek Ramaswamy? | | |
| | 52:11 A. I do. | | |
| 53:01 - 53:12 | **Findley, Keri 2024-09-06** | 00:00:20 | **FK-3613.12** |
| | 53:01 Q. Did you interact with Mr. Ramaswamy at | | |
| | 53:02 all in connection with GloriFi? | | |
| | 53:03 A. Yes. | | |
| | 53:04 Q. Do you still interact with Mr. Ramaswamy | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 53:05 at all today?<br>53:06 A. Today, no.<br>53:07 Q. Has he ever invested in any of your<br>53:08 funds?<br>53:09 A. No.<br>53:10 Q. Have you ever invested in any of his<br>53:11 businesses?<br>53:12 A. No. | | |
| 54:15 - 54:19 | **Findley, Keri 2024-09-06** | 00:00:20 | **FK-3613.13** |
| | 54:15 Q. I'll tell you that -- well, do you know<br>54:16 if Mr. Thiel invested in Strive?<br>54:17 A. I believe I am aware that some entity<br>54:18 that Mr. Thiel is affiliated with has invested in<br>54:19 Strive, but I do not know which one. | | |
| 56:20 - 56:24 | **Findley, Keri 2024-09-06** | 00:00:14 | **FK-3613.14** |
| | 56:20 Q. Okay. Back to 2018, General Catalyst.<br>56:21 What did you start with General Catalyst?<br>56:22 A. The fund we started was called Grenet.<br>56:23 Q. And Grenet was a structured finance fund?<br>56:24 A. Yes. | | |
| 58:07 - 58:18 | **Findley, Keri 2024-09-06** | 00:00:39 | **FK-3613.15** |
| | 58:07 Q. How long were you the CEO of Grenet?<br>58:08 A. Probably about two years.<br>58:09 Q. Was Grenet successful?<br>58:10 A. Ish.<br>58:11 Q. What were Grenet's returns over those two<br>58:12 years?<br>58:13 A. I mean, we didn't have any losses or<br>58:14 impairments and I don't know how Gallatin Point marked<br>58:15 it, but when you have an SMA, you're not responsible<br>58:16 for operations, finance, accounting, valuation,<br>58:17 treasury, and so, Gallatin Point took care of that, so<br>58:18 I don't know. | | |
| 60:23 - 61:10 | **Findley, Keri 2024-09-06** | 00:00:53 | **FK-3613.16** |
| | 60:23 Q. What did you do after Grenet?<br>60:24 A. Well, I mean, after is us and Gallatin<br>60:25 Point -- I mean, me and Gallatin Point were starting to<br>61:01 approach Gallatin Point's investors and talk to them<br>61:02 about converting the SMA into a fund. | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

61:03 Q. And did you convert it into a fund?
61:04 A. No.
61:05 Q. Why not?
61:06 A. I had dinner at Mr. Thiel's house and he
61:07 said that I wasn't -- that doing this with a private
61:08 equity fund wasn't going to necessarily have the best
61:09 outcome, and then he offered to invest in the
61:10 equivalent, but in a different and new entity.

| 61:14 - 61:16 | **Findley, Keri 2024-09-06** | 00:00:06 | **FK-3613.17** |
|---|---|---|---|

61:14 Q. So, he said, "I will invest so you can
61:15 start your own fund separate from them?"
61:16 A. Yeah.

| 61:17 - 61:24 | **Findley, Keri 2024-09-06** | 00:00:18 | **FK-3613.18** |
|---|---|---|---|

61:17 Q. And you accepted?
61:18 A. Well, first, I went back to Gallatin
61:19 Point and asked them if that, like, what they thought.
61:20 I didn't want to upset them.
61:21 And they said, you know, "A bird in hand
61:22 is better than a bird not in hand. You should take it
61:23 and we'll figure out a way to do business down the
61:24 line."

| 62:10 - 62:15 | **Findley, Keri 2024-09-06** | 00:00:21 | **FK-3613.19** |
|---|---|---|---|

62:10 Q. How much did he initially -- well, what
62:11 -- what was the name of the fund you started?
62:12 A. It's Ta -- called Tacora.
62:13 Q. And did he -- how much did he initially
62:14 commit to invest?
62:15 A. I don't know.

| 65:15 - 67:03 | **Findley, Keri 2024-09-06** | 00:01:31 | **FK-3613.20** |
|---|---|---|---|

65:15 Q. Did you ever make investments for Mr.
65:16 Thiel prior to starting the fund?
65:17 A. I had recommended investments to Mr.
65:18 Thiel.
65:19 Q. How many investments did you recommend to
65:20 Mr. Thiel?
65:21 A. Don't recall.
65:22 Q. More than 50?
65:23 A. Less.
65:24 Q. More than ten?

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

65:25 A. I don't know.
66:01 Q. How many of your recommendations did he
66:02 accept?
66:03 A. No idea.
66:04 Q. Were there any he did not accept?
66:05 A. No idea.
66:06 Q. You don't know if there's a single
66:07 recommendation you made to Mr. Thiel that he did not
66:08 accept?
66:09 A. Don't know.
66:10 Q. Never asked him?
66:11 A. I said, "Hey, you should look at this,"
66:12 and it's not a recommendation. It's not, like, a
66:13 write-up. It's not like a, you know, "You should look
66:14 at this." I don't know what happens from there.
66:15 Q. Except with GloriFi?
66:16 A. No.
66:17 Q. Well, did you talk to Mr. Thiel about
66:18 making investments in GloriFi?
66:19 A. I spoke to Mr. Thiel about dollars of
66:20 capital that Tacora would want to backstop for GloriFi.
66:21 Q. Okay. So, that would be done through
66:22 Tacora?
66:23 A. Yeah.
66:24 Q. And would those be tied to the credit
66:25 card receivables?
67:01 A. Yes.
67:02 Q. And also insurance surplus?
67:03 A. Yes.

| | | | |
|---|---|---|---|
| 67:19 - 68:04 | **Findley, Keri 2024-09-06** | 00:00:21 | **FK-3613.21** |

67:19 Q. Are you familiar with the Columbier
67:20 Acquisition Corp?
67:21 A. Yes.
67:22 Q. Am I pronouncing that correctly?
67:23 A. Columbier.
67:24 Q. Is -- is that a SPAC?
67:25 A. Yes.
68:01 Q. Are you on the board of it?
68:02 A. It doesn't exist anymore.
68:03 Q. What entity did it merge with?

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

68:04 A. I think it's called Public Square.

| 69:16 - 70:02 | **Findley, Keri 2024-09-06** | 00:00:32 | **FK-3613.22** |
|---|---|---|---|

69:16 Q. What were your obligations as a board
69:17 member for Columbier?
69:18 MR. POTTER: Objection; calls for a legal
69:19 opinion, but to the extent you know as a layperson, I
69:20 guess you can answer.
69:21 A. I don't.
69:22 Q. (By Mr. Downton) You don't know what
69:23 your responsibilities were as a Columbier board member?
69:24 A. I was on the audit committee.
69:25 Q. Do you consider yourself an audit
70:01 committee financial expert?
70:02 A. No.

| 70:23 - 71:11 | **Findley, Keri 2024-09-06** | 00:00:31 | **FK-3613.23** |
|---|---|---|---|

70:23 Q. Did you recommend that GloriFi consider
70:24 entering into a merger with Columbier?
70:25 A. No.
71:01 Q. Did GloriFi, to your knowledge, ever
71:02 consider a merger with Columbier?
71:03 A. Yes.
71:04 Q. Were you on the board of Columbier at the
71:05 time?
71:06 A. Yes.
71:07 Q. Did you disclose that to GloriFi?
71:08 A. Yes.
71:09 Q. Who did you disclose that to?
71:10 A. The board. And I believe Mr. Joiner, who
71:11 was not on the board was on the board call.

| 71:14 - 71:19 | **Findley, Keri 2024-09-06** | 00:00:22 | **FK-3613.24** |
|---|---|---|---|

71:14 Q. How did you first learn about GloriFi?
71:15 A. Joe Lonsdale made an introduction between
71:16 me and Toby Neugebauer.
71:17 Q. Do you recall when that was?
71:18 A. My best recollection is sometime in
71:19 October or November of 2021.

| 78:22 - 79:01 | **Findley, Keri 2024-09-06** | 00:00:09 | **FK-3613.25** |
|---|---|---|---|

78:22 Q. Have you met Nick Ayers before the
78:23 November 29th, 2021 meeting?

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 78:24 A. No.<br>78:25 Q. Had you ever spoken to him?<br>79:01 A. No. | | |
| 80:04 - 80:06 | **Findley, Keri 2024-09-06**<br>80:04 Q. Have you ever stayed at Mr. Neugebauer's<br>80:05 house?<br>80:06 A. No. | 00:00:05 | **FK-3613.26** |
| 80:13 - 80:23 | **Findley, Keri 2024-09-06**<br>80:13 Q. Did you sign an NDA with GloriFi?<br>80:14 A. Probably.<br>80:15 Q. I'm going to give you what we've marked<br>80:16 as Exhibit 4. The beginning page is an e-mail from<br>80:17 you, it's an e-mail chain, but the top one is from you<br>80:18 to Mr. Isler (phonetic), Mr. Neugebauer, and<br>80:19 Mr. Crawford on November 30th, 2021.<br>80:20 Do you see that?<br>80:21 (Deposition Exhibit No. 4 was marked for<br>80:22 identification.)<br>80:23 A. Yep. | 00:00:38 | **FK-3613.27** |
| 81:11 - 81:13 | **Findley, Keri 2024-09-06**<br>81:11 Q. Okay. So, is this the NDA that you<br>81:12 signed with GloriFi?<br>81:13 A. Looks like it. | 00:00:05 | **FK-3613.28** |
| 81:14 - 81:16 | **Findley, Keri 2024-09-06**<br>81:14 Q. And have you complied with your<br>81:15 obligations under this NDA since that time?<br>81:16 A. I believe so. | 00:00:13 | **FK-3613.29** |
| 82:08 - 82:10 | **Findley, Keri 2024-09-06**<br>82:08 Q. So, you don't recall when you agreed to<br>82:09 join GloriFi's board?<br>82:10 A. No. | 00:00:04 | **FK-3613.30** |
| 83:06 - 83:08 | **Findley, Keri 2024-09-06**<br>83:06 Q. (By Mr. Downton) How many boards have<br>83:07 you sat on in your career?<br>83:08 A. My guess is somewhere between 15 and 20. | 00:00:36 | **FK-3613.31** |
| 83:09 - 83:11 | **Findley, Keri 2024-09-06**<br>83:09 Q. So, do you have a layperson's<br>83:10 understanding of the fiduciary duties of board members? | 00:00:13 | **FK-3613.32** |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 83:11 A. I mean, I don't know the legal. | | |
| 83:24 - 84:24 | **Findley, Keri 2024-09-06** | 00:01:22 | **FK-3613.33** |
| | 83:24 Q. (By Mr. Downton) Do you have an<br>83:25 understanding that you have fiduciary duties to the<br>84:01 entity when you're on the board?<br>84:02 MR. POTTER: Same objection.<br>84:03 A. I believe it's to the shareholders, but I<br>84:04 -- I could be wrong, but that's what I believe.<br>84:05 Q. (By Mr. Downton) And so, that's how you<br>84:06 have operated in your board service across 15 to 20<br>84:07 companies with keeping in mind your obligations to the<br>84:08 shareholders?<br>84:09 A. Always.<br>84:10 Q. Have you ever thought about whether you<br>84:11 had obligations to debtholders of companies when<br>84:12 you're on a board?<br>84:13 MR. POTTER: Objection -- (inaudible).<br>84:14 A. My best understanding is that I believe,<br>84:15 until the company is insolvent, you have an obligation<br>84:16 to shareholders. If that were ever to change, you then<br>84:17 would be running the company for the maximum benefit of<br>84:18 the creditor. But, again, that is just my layperson's<br>84:19 understanding. And no other company I've ever been on<br>84:20 the board of during the time I was there has had any<br>84:21 insolvency issues.<br>84:22 Q. (By Mr. Downton) Did you think GloriFi<br>84:23 was insolvent at any time when you were on the board?<br>84:24 A. No. | | |
| 85:12 - 85:16 | **Findley, Keri 2024-09-06** | 00:00:08 | **FK-3613.34** |
| | 85:12 Q. Was Glori -- did you sign a board<br>85:13 agreement with GloriFi?<br>85:14 A. I believe I did.<br>85:15 Q. Was it standard?<br>85:16 A. I believe it was relatively standard. | | |
| 86:11 - 87:07 | **Findley, Keri 2024-09-06** | 00:00:50 | **FK-3613.35** |
| | 86:11 Q. So, at some point, you were offered a<br>86:12 board position at GloriFi, right?<br>86:13 A. Yes.<br>86:14 Q. Who made that to you?<br>86:15 A. Tony Neugebauer. | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 86:16 Q. And did he make it on the phone, in | | |
| | 86:17 person, or by e-mail? | | |
| | 86:18 A. On the phone. | | |
| | 86:19 Q. Did he tell you why he wanted you as a | | |
| | 86:20 board member? | | |
| | 86:21 A. No. | | |
| | 86:22 Q. Did you accept immediately? | | |
| | 86:23 A. Yes. | | |
| | 86:24 Q. Did you tell him why you wanted to be on | | |
| | 86:25 the board? | | |
| | 87:01 A. I've told him that I found -- yes. | | |
| | 87:02 Q. What did you tell him? | | |
| | 87:03 A. That I found the mission inspiring. | | |
| | 87:04 Q. And how would you describe GloriFi's | | |
| | 87:05 mission? | | |
| | 87:06 A. To help with the hundred million | | |
| | 87:07 Americans who don't like their banking options. | | |
| 88:12 - 88:18 | **Findley, Keri 2024-09-06** | 00:00:23 | **FK-3613.36** |
| | 88:12 Q. Did you understand that there was going | | |
| | 88:13 to be a bank that was a separate entity than With | | |
| | 88:14 Purpose, Inc? | | |
| | 88:15 A. At some point I came to that | | |
| | 88:16 understanding. | | |
| | 88:17 Q. Did you think that was problematic? | | |
| | 88:18 A. I don't recall. | | |
| 89:10 - 89:15 | **Findley, Keri 2024-09-06** | 00:00:23 | **FK-3613.37** |
| | 89:10 Q. Do you recall any conversations with Mr. | | |
| | 89:11 Neugebauer about the bank being a separate entity? | | |
| | 89:12 A. I remember a time at his house with | | |
| | 89:13 lawyers from Wachtell talking about changes in the | | |
| | 89:14 structure, but I don't remember from what to what. And | | |
| | 89:15 I don't remember when that happened. | | |
| 90:07 - 90:10 | **Findley, Keri 2024-09-06** | 00:00:11 | **FK-3613.38** |
| | 90:07 Q. Do you understand that Toby and Melissa | | |
| | 90:08 Neugebauer were going to be the initial owners of the | | |
| | 90:09 bank? | | |
| | 90:10 A. I believe I learned that at some point. | | |
| 90:21 - 91:11 | **Findley, Keri 2024-09-06** | 00:00:37 | **FK-3613.39** |
| | 90:21 Q. (By Mr. Downton) Did -- did you ever | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

90:22 have any concerns that Mr. Neugebauer breached any
90:23 fiduciary duties connected to the bank?
90:24 A. I don't recall.
90:25 Q. Do you have any concerns today that Mr.
91:01 Neugebauer breached any fiduciary duties connected to
91:02 the bank?
91:03 A. I don't recall.
91:04 Q. Well, no, I'm asking you sitting here
91:05 today, if you --
91:06 A. And I don't remember the facts and
91:07 circumstances and I would need to review them all.
91:08 Q. Have you ever, to your recollection,
91:09 thought there were issues with Mr. Neugebauer connected
91:10 to the bank?
91:11 A. I don't recall.

| 92:03 - 92:07 | **Findley, Keri 2024-09-06** | 00:00:12 | **FK-3613.40** |
|---|---|---|---|

92:03 Q. (By Mr. Downton) So, do you recall any
92:04 conversations about a corporate structure involving a
92:05 separate banking entity owned by Toby and Melissa
92:06 Neugebauer beyond that it existed?
92:07 A. No.

| 93:06 - 93:18 | **Findley, Keri 2024-09-06** | 00:00:54 | **FK-3613.41** |
|---|---|---|---|

93:06 Q. So, up until -- was April 1st, 2022 your
93:07 last day on the board?
93:08 A. Yes.
93:09 Q. So, at any time prior to April 1st, 2022,
93:10 do you recall any conversations concerning assets being
93:11 owned by the banking entity versus the With Purpose,
93:12 Inc. entity?
93:13 A. So, I believe, when I joined the board,
93:14 the bank was going to be owned by GloriFi. At some
93:15 point -- and I could be wrong -- but at some point, I
93:16 believe that changed. And then, there were delays.
93:17 So, I don't know which assets were going to be when,
93:18 where, and I believe it was in flux.

| 94:09 - 94:15 | **Findley, Keri 2024-09-06** | 00:00:27 | **FK-3613.42** |
|---|---|---|---|

94:09 Q. Have you ever heard a presentation where
94:10 anyone talked about how GloriFi's not going to code
94:11 everything itself, it's going to license software for
94:12 lots of other entities that do a really good job with

| DESIGNATION | SOURCE | | | DURATION | ID |
|---|---|---|---|---|---|
| | 94:13 | | their niche? | | |
| | 94:14 | A. | I believe I saw a presentation that would | | |
| | 94:15 | | have, in some way, said as such. | | |
| 97:25 - 99:02 | **Findley, Keri 2024-09-06** | | | 00:01:14 | **FK-3613.43** |
| | 97:25 | Q. | Okay. Did you ever hear Mr. Ayers | | |
| | 98:01 | | participate in a marketing presentation, other than the | | |
| | 98:02 | | -- the first day that you don't recall? | | |
| | 98:03 | A. | Yes. | | |
| | 98:04 | Q. | When do you recall him giving a marketing | | |
| | 98:05 | | presentation? | | |
| | 98:06 | A. | I believe they were calls with Toby and | | |
| | 98:07 | | Nick. | | |
| | 98:08 | Q. | Would they usually do them together? | | |
| | 98:09 | A. | They were usually both on the ones I was | | |
| | 98:10 | | on, they were both on the phone or the call in some | | |
| | 98:11 | | way, shape, or form. | | |
| | 98:12 | Q. | Okay. Going back to Exhibit 5, Page 9 | | |
| | 98:13 | | has a screen -- this is kind of small, but it's a | | |
| | 98:14 | | computer screen showing various entities. | | |
| | 98:15 | A. | Yup. | | |
| | 98:16 | Q. | Are those entities that GloriFi | | |
| | 98:17 | | contracted with? | | |
| | 98:18 | A. | Maybe. | | |
| | 98:19 | Q. | You don't know? | | |
| | 98:20 | A. | No. | | |
| | 98:21 | Q. | Do you know if GloriFi had software | | |
| | 98:22 | | service contracts with these entities? | | |
| | 98:23 | A. | I don't know. | | |
| | 98:24 | Q. | Do you know if the technology that | | |
| | 98:25 | | GloriFi licensed from these entities represented the | | |
| | 99:01 | | Lego blocks that GloriFi was putting together? | | |
| | 99:02 | A. | No idea. | | |
| 99:07 - 99:11 | **Findley, Keri 2024-09-06** | | | 00:00:14 | **FK-3613.164** |
| | 99:07 | Q. | Did you -- do you recall from the | | |
| | 99:08 | | presentations if there was discussions surrounding what | | |
| | 99:09 | | each of these entities would do for GloriFi? | | |
| | 99:10 | A. | I don't know if this was actual or | | |
| | 99:11 | | aspirational. | | |
| 99:17 - 100:07 | **Findley, Keri 2024-09-06** | | | 00:00:35 | **FK-3613.44** |
| | 99:17 | Q. | Do you know if these entities are | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

99:18 softwares or service companies?
99:19 A. I don't know.
99:20 Q. Same question about the entities on the
99:21 next page. Do you know if these are softwares or
99:22 service companies?
99:23 A. I have no idea.
99:24 Q. Do you know if they provided services for
99:25 GloriFi?
100:01 A. I don't know.
100:02 Q. It's not something you ever asked about
100:03 as a board member?
100:04 A. No.
100:05 Q. As a board member, did you have an
100:06 understanding of how GloriFi would operate?
100:07 A. No.

| 100:14 - 101:01 | **Findley, Keri 2024-09-06** | 00:00:35 | **FK-3613.45** |
|---|---|---|---|

100:14 Q. Well, you said GloriFi's mission was to
100:15 provide banking options to a hundred million
100:16 dissatisfied people, right?
100:17 A. That's what I said.
100:18 Q. All right. Did you have an understanding
100:19 as to how GloriFi was --
100:20 A. They were going to have the financial
100:21 service products available to consumers that their
100:22 current bank already had.
100:23 Q. And did you have an understanding as to
100:24 how GloriFi was going to be able to offer those
100:25 products?
101:01 A. Some of them.

| 102:18 - 103:05 | **Findley, Keri 2024-09-06** | 00:00:14 | **FK-3613.46** |
|---|---|---|---|

102:18 Q. Do you know how GloriFi planned to offer
102:19 checking/savings accounts?
102:20 A. No.
102:21 Q. Debit cards?
102:22 A. No.
102:23 Q. Global deposit capture?
102:24 A. No.
102:25 Q. Direct deposit?
103:01 A. No.
103:02 Q. Realtime payments?

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 103:03 A. No.<br>103:04 Q. Mortgages?<br>103:05 A. No. | | |
| 103:06 - 103:09 | **Findley, Keri 2024-09-06** | 00:00:06 | **FK-3613.47** |
| | 103:06 Q. Insurance?<br>103:07 A. Yes.<br>103:08 Q. How did GloriFi plan to offer insurance?<br>103:09 A. Through a reciprocal. | | |
| 105:11 - 105:14 | **Findley, Keri 2024-09-06** | 00:00:08 | **FK-3613.48** |
| | 105:11 Q. Mr. Ayers is listed as Vice President and<br>105:12 Chairman -- I'm sorry, Vice Chairman and President.<br>105:13 Do you know if that's accurate?<br>105:14 A. I do not. | | |
| 108:11 - 108:16 | **Findley, Keri 2024-09-06** | 00:00:17 | **FK-3613.49** |
| | 108:11 Q. Did Peter Thiel ever talk to you about<br>108:12 his initial investment in GloriFi?<br>108:13 A. No.<br>108:14 Q. At any point in time, have you ever<br>108:15 discussed GloriFi with Mr. Thiel?<br>108:16 A. Directly, I don't believe so. | | |
| 109:19 - 110:02 | **Findley, Keri 2024-09-06** | 00:00:15 | **FK-3613.50** |
| | 109:19 Have you ever discussed GloriFi with Jeff<br>109:20 Sprecher?<br>109:21 A. I don't recall.<br>109:22 Q. Have you ever discussed GloriFi with Ken<br>109:23 Griffin?<br>109:24 A. I've never spoken to Ken Griffin.<br>109:25 Q. Have you ever discussed GloriFi with Ed<br>110:01 Millet (phonetic)?<br>110:02 A. I've never spoken to Ed Millet. | | |
| 112:18 - 112:24 | **Findley, Keri 2024-09-06** | 00:00:20 | **FK-3613.51** |
| | 112:18 Q. And do you recall if you had a discussion<br>112:19 with Mr. Thiel about GloriFi towards the end of '21?<br>112:20 A. I don't believe I did.<br>112:21 Q. Were you at his house for New Years?<br>112:22 A. Yes.<br>112:23 Q. Do you recall when you left afterward?<br>112:24 A. My best guess is it was the 3rd. | | |
| 115:12 - 115:20 | **Findley, Keri 2024-09-06** | 00:00:20 | **FK-3613.52** |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 115:12 Q. So, let me show you what we're going to<br>115:13 mark as Exhibit 8.<br>115:14 (Deposition Exhibit No. 8 was marked for<br>115:15 identification.)<br>115:16 Q. (By Mr. Downton) This is a action by<br>115:17 unanimous written consent by the board of directors,<br>115:18 January 3rd, 2022.<br>115:19 Have you seen this document before?<br>115:20 A. I don't recall. | | **FK-3613.52** |
| 116:02 - 116:13 | **Findley, Keri 2024-09-06** | 00:00:42 | **FK-3613.53** |
| | 116:02 Q. So, does this help you recall if you were<br>116:03 a director as of the beginning of 2022?<br>116:04 A. No.<br>116:05 Q. Still not sure?<br>116:06 A. No. Mr. Neugebauer told people I joined<br>116:07 the board before I had accepted joining the board.<br>116:08 Q. And you accepted joining the board on a<br>116:09 phone call with Mr. Neugebauer?<br>116:10 A. Well, I conditionally accepted.<br>116:11 Q. What was the condition?<br>116:12 A. The condition was economics that made<br>116:13 sense and a ND&L policy in place. | | |
| 117:02 - 117:20 | **Findley, Keri 2024-09-06** | 00:00:43 | **FK-3613.54** |
| | 117:02 Q. (By Mr. Downton) Looking at Exhibit 8,<br>117:03 the bottom paragraph said:<br>117:04 "Approval of convertible promissory note<br>117:05 financing, whereas the Board is determined that it's in<br>117:06 the best interest of the company and it's stockholders<br>117:07 to raise up to $40 million pursuant to a convertible<br>117:08 note financing."<br>117:09 Do you see that?<br>117:10 A. I do.<br>117:11 Q. Do you recall discussions in early<br>117:12 January 2022 about a capital raise of up to $40<br>117:13 million?<br>117:14 A. I do not recall.<br>117:15 Q. You don't recall anything?<br>117:16 A. I -- I don't remember a capital raise of<br>117:17 up to $40 million.<br>117:18 Q. Do you recall reviewing this unanimous | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 117:19 written consent?<br>117:20 A. I -- I don't recall. | | |
| 118:15 - 118:18 | **Findley, Keri 2024-09-06**<br>118:15 Q. What do you recall in early 2022 about<br>118:16 communications concerning a potential GloriFi capital<br>118:17 raise?<br>118:18 A. That we were going to run out of money. | 00:00:13 | **FK-3613.55** |
| 119:03 - 119:11 | **Findley, Keri 2024-09-06**<br>119:03 Q. (By Mr. Downton) You said you didn't<br>119:04 recall a capital raise of up to $40 million. Was there<br>119:05 a dollar amount --<br>119:06 A. (Speaking simultaneously) January I said.<br>119:07 Q. Oh, okay. Was there a dollar amount that<br>119:08 you recall in January?<br>119:09 A. No, it was never formal. It was just we<br>119:10 need to raise money, we need to raise money, we need to<br>119:11 raise money. | 00:00:20 | **FK-3613.56** |
| 119:12 - 119:15 | **Findley, Keri 2024-09-06**<br>119:12 Q. Who was in charge of raising the money?<br>119:13 MR. POTTER: Objection; vague as to what<br>119:14 role you're asking, but go ahead.<br>119:15 A. I believe Toby. | 00:00:11 | **FK-3613.57** |
| 119:20 - 120:18 | **Findley, Keri 2024-09-06**<br>119:20 Q. (By Mr. Downton) You don't recall any<br>119:21 conversations with either Mr. Ayers or Mr. Neugebauer<br>119:22 regarding Mr. Ayers' role in fundraising?<br>119:23 A. I believe that Mr. Ayers had a prior<br>119:24 relationship with some of the investors.<br>119:25 Q. Do you recall being on phone calls where<br>120:01 Mr. Ayers told the company that he was able to raise<br>120:02 the money necessary to keep the company operational?<br>120:03 MR. RUKAVINA: Objection; foundation.<br>120:04 A. I do believe I was on a phone call where<br>120:05 Mr. Ayers said that his relationships and some of the<br>120:06 investors would be willing to invest more, yes.<br>120:07 Q. (By Mr. Downton) Do you remember when<br>120:08 that phone call was?<br>120:09 A. I believe it was as early as January and<br>120:10 as late as March. | 00:01:20 | **FK-3613.58** |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 120:11 Q. Multiple phone calls?<br>120:12 A. Yes.<br>120:13 Q. Do you recall daily phone calls that<br>120:14 GloriFi held every morning?<br>120:15 A. I remember the existence of them, yes.<br>120:16 Q. Do you remember participating in a number<br>120:17 of them?<br>120:18 A. I do. | | |
| 122:08 - 122:15 | **Findley, Keri 2024-09-06** | 00:00:19 | **FK-3613.59** |
| | 122:08 Q. And you said you participated generally,<br>122:09 one to three times per week?<br>122:10 A. Yes.<br>122:11 Q. And do you recall the substance of the<br>122:12 communications at those meetings?<br>122:13 A. Usually, just around-the-horn-type of<br>122:14 updates where every business lead would give one to<br>122:15 three minutes on what was going on. | | |
| 122:16 - 123:08 | **Findley, Keri 2024-09-06** | 00:00:55 | **FK-3613.60** |
| | 122:16 Q. Would you speak at those meetings?<br>122:17 A. I believe if I had an update or I was<br>122:18 asked a question, I would answer it or speak.<br>122:19 Q. What topics would you give updates on?<br>122:20 MR. POTTER: Objection as the timeline<br>122:21 you're asking.<br>122:22 A. Over the three months I was on the board,<br>122:23 you know, we had conversations about updates having to<br>122:24 do with insurance or conversations with updates having<br>122:25 to do with potential credit card partners, or updates<br>123:01 having to do with banking services.<br>123:02 Q. Is it fair to say the areas you focused<br>123:03 on as a board member were credit cards, insurance, and<br>123:04 the audit?<br>123:05 A. No. I would also say that it had to do<br>123:06 with, I mean, mortgage is, like, kind of, my<br>123:07 background, and so, I helped a lot -- I probably helped<br>123:08 more on the mortgage than anything else. | | |
| 126:06 - 126:18 | **Findley, Keri 2024-09-06** | 00:00:28 | **FK-3613.61** |
| | 126:06 Q. (By Mr. Downton) Do you recall<br>126:07 discussions about limitations imposed by the side<br>126:08 letters? | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 126:09 MR. POTTER: Same objections.<br>126:10 A. Yes.<br>126:11 Q. (By Mr. Downton) What do you recall<br>126:12 about those discussions?<br>126:13 A. That we would have to get investor<br>126:14 approval.<br>126:15 Q. And do you recall what the investors<br>126:16 would have to approve?<br>126:17 A. I believe there was an issuance of debt<br>126:18 approval needed. | | |
| 127:05 - 128:02 | **Findley, Keri 2024-09-06** | 00:00:59 | **FK-3613.62** |
| | 127:05 Q. Did you ever speak with Cason Carter<br>127:06 about GloriFi?<br>127:07 A. While I was on the board, I believe I did.<br>127:08 Q. Did you ever speak to Cason Carter about<br>127:09 GloriFi's attempts to raise additional capital?<br>127:10 A. I believe so, yes.<br>127:11 Q. What do you recall about those<br>127:12 conversations?<br>127:13 A. I don't recall specifics, but I remember<br>127:14 him wanting to -- to chat.<br>127:15 Q. And he worked for Citadel, right?<br>127:16 A. I don't know which entity he works for,<br>127:17 but he works for Ken Griffin and some si -- some<br>127:18 entity.<br>127:19 Q. And Ken Griffin is the CEO of Citadel?<br>127:20 A. I believe so.<br>127:21 Q. Do you remember if Mr. Carter indicated<br>127:22 whether or not Mr. Griffin or any entity associated<br>127:23 with him would invest additional funds in GloriFi?<br>127:24 A. I do remember those conversations, yes.<br>127:25 Q. What do you recall?<br>128:01 A. That Mr. Griffin was -- was willing to<br>128:02 invest additional funds in GloriFi. | | |
| 128:03 - 128:07 | **Findley, Keri 2024-09-06** | 00:00:13 | **FK-3613.63** |
| | 128:03 Q. Do you recall any conditions that<br>128:04 Mr. Griffin placed on his willingness to lend<br>128:05 additional funds?<br>128:06 A. I believe he wanted standard corporate<br>128:07 governance in exchange for more funds. | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 128:12 - 128:21 | **Findley, Keri 2024-09-06** | 00:00:22 | **FK-3613.64** |
| | 128:12 Q. (By Mr. Downton) Do you recall a<br>128:13 conversation with Mr. Carter where he indicated to you<br>128:14 that Mr. Griffin wanted Mr. Neugebauer replaced as CEO?<br>128:15 A. I don't recall.<br>128:16 Q. You don't know one way or the other or<br>128:17 you don't think that happened?<br>128:18 A. I don't remember one way or the other. I<br>128:19 remember that conversation happening. I remember<br>128:20 conversations with Mr. Carter. I don't remember if<br>128:21 those were the same conversations. | | |
| 130:23 - 131:01 | **Findley, Keri 2024-09-06** | 00:00:10 | **FK-3613.65** |
| | 130:23 You said the Series I investors had an<br>130:24 understanding that Mr. Neugebauer would never be CEO,<br>130:25 right?<br>131:01 A. I -- I didn't use the word never. | | |
| 134:19 - 135:06 | **Findley, Keri 2024-09-06** | 00:00:45 | **FK-3613.66** |
| | 134:19 Q. All right. Let's look back at Exhibit 5<br>134:20 that we looked at earlier, which is dated December 9th,<br>134:21 2021. So, this is right after everyone had invested in<br>134:22 Series I, right?<br>134:23 A. I don't know the date of the closing of<br>134:24 Series I.<br>134:25 Q. Okay. And if you turn over to Page 21,<br>135:01 we looked at it earlier.<br>135:02 A. (Complying.)<br>135:03 Yes.<br>135:04 Q. It lists Mr. Neugebauer as the CEO,<br>135:05 doesn't it?<br>135:06 A. I am aware it says that. | | |
| 135:11 - 135:12 | **Findley, Keri 2024-09-06** | 00:00:03 | **FK-3613.67** |
| | 135:11 Q. And you're copied, too, right?<br>135:12 A. Yes. | | |
| 135:23 - 136:14 | **Findley, Keri 2024-09-06** | 00:00:41 | **FK-3613.68** |
| | 135:23 Q. Did you get an e-mail back from anyone<br>135:24 saying, "Hey, this is wrong. It says that Toby<br>135:25 Neugebauer is the CEO?"<br>136:01 A. I don't know that anybody on this list<br>136:02 opened this e-mail. | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

136:03 Q. Okay. Well, Nick Ayers is on this list,
136:04 right?
136:05 A. I don't know that Nick Ayers opened this
136:06 e-mail.
136:07 Q. Do you know how many marketing
136:08 presentations GloriFi sent out listing Mr. Neugebauer
136:09 as CEO?
136:10 A. I do not.
136:11 Q. Have you ever seen a marketing
136:12 presentation from GloriFi that does not list Mr.
136:13 Neugebauer as CEO?
136:14 A. I don't know.

| | | | |
|---|---|---|---|
| 138:02 - 138:14 | **Findley, Keri 2024-09-06** | 00:00:40 | **FK-3613.69** |

138:02 Q. And for a credit card program, you need
138:03 to have capital?
138:04 A. Yes.
138:05 Q. Did you have discussions with people at
138:06 GloriFi as to who could provide that capital?
138:07 A. Well, I believe it was supposed to be the
138:08 bank, but given the delay in the bank, they needed an
138:09 interim solution.
138:10 Q. Did you suggest an interim solution?
138:11 A. I said I could provide a backstop for
138:12 that solution, but the idea was that a backstop would
138:13 be needed for some of the, let's call it, service
138:14 providers.

| | | | |
|---|---|---|---|
| 139:01 - 139:25 | **Findley, Keri 2024-09-06** | 00:01:04 | **FK-3613.70** |

139:01 Q. So, did you tell GloriFi that Tacora
139:02 could provide the money?
139:03 A. I did.
139:04 Q. Not Peter Thiel?
139:05 A. Tacora.
139:06 Q. Did you ever tell anyone at GloriFi that
139:07 Peter Thiel would provide the money for the credit card
139:08 program?
139:09 A. I mean, Tacora has Peter Thiel's money,
139:10 so, if the word was used interchangeably, that's
139:11 obviously possible.
139:12 Q. Do you often use Peter interchangeably
139:13 for Tacora?

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 139:14 A. When he was the only investor, we -- we<br>139:15 would, at times. When we got -- when other investors<br>139:16 closed then we nev -- we never used him<br>139:17 interchangeably.<br>139:18 Q. In January 2022, was Peter the only<br>139:19 investor?<br>139:20 A. Peter and I were the only investors.<br>139:21 Q. When did that change?<br>139:22 A. I don't recall.<br>139:23 Q. Did it change before you were off<br>139:24 GloriFi's board?<br>139:25 A. I don't believe so. | | |
| 149:23 - 150:05 | **Findley, Keri 2024-09-06** | 00:00:40 | **FK-3613.71** |
| | 149:23 Q. Were you assisting GloriFi in obtaining<br>149:24 funding for the surplus notes for insurance?<br>149:25 A. I believe I was -- I offered GloriFi a<br>150:01 backstop in case they could not raise more capital for<br>150:02 the surplus note.<br>150:03 Q. And was that a backstop of Peter Thiel?<br>150:04 A. It was a backstop from Tacora, which at<br>150:05 the time was only Peter Thiel's money, I believe. | | |
| 150:15 - 150:22 | **Findley, Keri 2024-09-06** | 00:00:25 | **FK-3613.72** |
| | 150:15 Q. So you didn't ever specifically ask him<br>150:16 is it okay with you if I use your money for GloriFi<br>150:17 credit card receivables?<br>150:18 A. I don't believe I've ever asked him is it<br>150:19 okay if I use your money for anything.<br>150:20 Q. It's not a sign you would need to get on<br>150:21 the phone with him before you did?<br>150:22 A. No. | | |
| 150:23 - 151:09 | **Findley, Keri 2024-09-06** | 00:00:37 | **FK-3613.73** |
| | 150:23 Q. Did you introduce Omeed Malik to Toby?<br>150:24 A. I believe Toby asked me to.<br>150:25 Q. Do you know what became of those<br>151:01 conversations?<br>151:02 A. I believe there were a handful of<br>151:03 different calls and then at some point, I believe Toby<br>151:04 chose DHC.<br>151:05 Q. Did you favor moving forward with Omeed's<br>151:06 SPAC? | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

151:07 A. I -- when Toby chose DHC, I had never met
151:08 DHC, so I would -- could not have favored one over the
151:09 other.

| | | | |
|---|---|---|---|
| 153:17 - 154:04 | **Findley, Keri 2024-09-06** | 00:00:44 | **FK-3613.74** |

153:17 Q. Is there an entity that had some
153:18 involvement with GloriFi called TigerRisk or something
153:19 like that?
153:20 A. That sounds correct.
153:21 Q. Who was the president of TigerRisk?
153:22 A. Rob Bredahl.
153:23 Q. Is that the same Rob Bredahl that you
153:24 filed a lawsuit against?
153:25 A. Yes.
154:01 Q. Was he also at Third Point?
154:02 A. He was -- I believe he was the CEO of an
154:03 entity called Third Point Reinsurance. That was not
154:04 Third Point, but it was obviously affiliated.

| | | | |
|---|---|---|---|
| 154:18 - 156:21 | **Findley, Keri 2024-09-06** | 00:03:37 | **FK-3613.75** |

154:18 Q. Did you have an understanding as to what
154:19 Tiger was discussing with GloriFi?
154:20 A. I believe they were assisting GloriFi
154:21 with setting up the insurance entities, potentially
154:22 licing [sic], and potentially setting up insurance
154:23 programs and then capital having to do with -- related
154:24 to insurance.
154:25 Q. So they were a possible source for the
155:01 surplus notes?
155:02 A. I believe they were looking to source the
155:03 surplus notes. I don't believe they had the capital
155:04 themselves.
155:05 Q. In your lawsuit, you allege that
155:06 Mr. Bredahl made comments about you to Mr. Neugebauer.
155:07 Is that accurate?
155:08 A. I do. I did elect that, yes.
155:09 Q. What is the basis of your belief that
155:10 Mr. Bredahl made comments about you to Mr. Neugebauer?
155:11 A. Mr. Neugebauer brought it up to me in
155:12 either February or March of 2022, and Manny Rios and
155:13 somebody named Connor -- I believe his name was Connor,
155:14 but I could be wrong, verified those comments to me

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

155:15 after Mr. Neugebauer bro- -- brought them up.
155:16 Q. And those were allegations that you had
155:17 materially and intentionally misstated the marks on
155:18 your book to obtain larger compensation, right?
155:19 A. That is what -- that is what Toby
155:20 Neugebauer told me that Mr. Bredahl had said to him.
155:21 Q. And in your lawsuit, you say that that is
155:22 the reason you were terminated from GloriFi's board,
155:23 correct?
155:24 A. Mr. Neugebauer said he was deciding
155:25 whether to terminate me because of that allegation. I
156:01 don't know why I was ultimately terminated, but when
156:02 someone says to you, I'm considering terminating you
156:03 and then does -- I'm considering terminating you for
156:04 this reason and then does, you -- you -- you are left
156:05 with the impression that was probably why.
156:06 Q. And at the point of time -- well, did Mr.
156:07 Neugebauer ask you to resign from the board first?
156:08 A. I don't recall, but that sounds correct.
156:09 Q. Did you resign or did he terminate you?
156:10 A. I believe he terminated me.
156:11 Q. And at the time, you were willing to stay
156:12 on the board?
156:13 A. "Willing" is a strong word. I believed I
156:14 had a duty to the shareholders to -- to not abandon a
156:15 board seat in a contentious situation.
156:16 Q. And who were the shareholders at that
156:17 point in time?
156:18 A. The shareholders that I was in touch with
156:19 were Cason Carter, Vivek Ramaswamy, Steve Goertz and
156:20 Andy Rolfes, Nick Ayers, Joe Lonsdale, Scott Nolan, and
156:21 there may have been others.

| 158:04 - 159:13 | **Findley, Keri 2024-09-06** | 00:02:05 | **FK-3613.76** |
|---|---|---|---|

158:04 Q. So, at the time you were terminated, you
158:05 thought that had a negative impact on you financially
158:06 such that you filed a lawsuit to recover your damages,
158:07 right?
158:08 A. I filed a lawsuit to stop the behavior,
158:09 whether, you know, I lost shares because of it is
158:10 irrelevant. I filed a lawsuit because if somebody was

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

158:11 saying those things about you and they weren't true,
158:12 you would fight them as well. And I think anybody
158:13 would -- would fight somebody who was making up lies
158:14 about them.
158:15 Q. And the way to fight is by filing a
158:16 lawsuit telling them you're defaming me, stop?
158:17 A. It's a good deterrent for people in the
158:18 future.
158:19 Q. But in the lawsuit, you did say you were
158:20 damaged because of it?
158:21 A. I was.
158:22 Q. And the damage was being removed from
158:23 GloriFi's board?
158:24 A. The damage was a compensation, because
158:25 none of my shares ever vested. At that time, they had
159:01 a one point something billion dollars SPAC transaction.
159:02 And, so, yes, the shares that I would have received in
159:03 GloriFi would have had value at that time.
159:04 Q. And I know you resolved that. Did you
159:05 resolve it through a -- I'm sorry, that's a bad
159:06 question.
159:07 You resolved your lawsuit with
159:08 Mr. Bredahl. Did you resolve it through a confidential
159:09 settlement?
159:10 A. I did.
159:11 Q. And so I assume you're not willing to
159:12 discuss that.
159:13 A. Nope.

| 161:13 - 161:25 | **Findley, Keri 2024-09-06** | 00:01:03 | **FK-3613.77** |
|---|---|---|---|

161:13 Q. Do you ever recall on the morning phone
161:14 calls with employees representing that Peter was going
161:15 to fund $50 million credit cards?
161:16 A. I believe I would have said my fund,
161:17 which is if -- which is backed by Peter and myself.
161:18 Q. So you wouldn't have just said Peter?
161:19 You would have said your fund backed by Peter?
161:20 A. I would have used the word Tacora.
161:21 Q. Do you recall sending any e-mails to
161:22 anyone at GloriFi about Tacora?
161:23 A. I may have.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 161:24 Q. Just not sure one way or the other?<br>161:25 A. No. | | |
| 164:04 - 164:18 | **Findley, Keri 2024-09-06** | 00:00:30 | **FK-3613.78** |
| | 164:04 Q. How many times did you talk to Cason<br>164:05 Carter during the time of GloriFi?<br>164:06 A. I don't recall.<br>164:07 Q. More than five?<br>164:08 A. Don't recall.<br>164:09 Q. More than ten?<br>164:10 A. Don't recall.<br>164:11 Q. More than 20?<br>164:12 A. Don't recall.<br>164:13 Q. What about Vivek Ramaswamy?<br>164:14 A. Don't recall.<br>164:15 Q. More than five?<br>164:16 A. Don't recall.<br>164:17 Q. More than ten?<br>164:18 A. Don't recall. | | |
| 165:18 - 165:22 | **Findley, Keri 2024-09-06** | 00:00:13 | **FK-3613.79** |
| | 165:18 Q. Do you communicate by text message?<br>165:19 A. I do.<br>165:20 Q. Do you have an iPhone or a different type<br>165:21 of phone?<br>165:22 A. I have an iPhone. | | |
| 166:23 - 167:21 | **Findley, Keri 2024-09-06** | 00:00:56 | **FK-3613.80** |
| | 166:23 Q. Have you searched your phone for those<br>166:24 messages or given your phone to your attorney to<br>166:25 search?<br>167:01 A. Yeah. I got a new phone at some point<br>167:02 and there was an issue with when I got a new phone,<br>167:03 everything is gone.<br>167:04 Q. Okay. Do you know if your iCloud got<br>167:05 searched?<br>167:06 A. I have had my iCloud searched and that<br>167:07 got -- when I got a new phone, there was an issue with<br>167:08 the transfer, and I don't have access to messages from<br>167:09 before. I believe it's July of '22.<br>167:10 Q. Okay. Do you know in any of your<br>167:11 previous lawsuits if your attorneys maintained images<br>167:12 of your phone? | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 167:13 A. That -- | | |
| | 167:14 MR. POTTER: Don't disclose anything | | |
| | 167:15 that's attorney-client privilege that you've talked to | | |
| | 167:16 your attorneys about discovery or anything else. | | |
| | 167:17 I'll represent to you that we've looked | | |
| | 167:18 at her phone, her e-mail, and everything else, so if | | |
| | 167:19 you've got any questions about documents, you can | | |
| | 167:20 direct them to me. | | |
| | 167:21 A. (No response.) | | |
| 168:11 - 169:01 | **Findley, Keri 2024-09-06** | 00:00:48 | **FK-3613.81** |
| | 168:11 Q. (By Mr. Downton) This is a January 21st | | |
| | 168:12 e-mail from Omeed Malik that's attaching a Colombier | | |
| | 168:13 draft LOI. | | |
| | 168:14 Do you recall reviewing this document? | | |
| | 168:15 A. I don't recall. | | |
| | 168:16 Q. As your role -- in your role as a board | | |
| | 168:17 member of Colombier, would you have reviewed this | | |
| | 168:18 document? | | |
| | 168:19 A. I would have recused myself. | | |
| | 168:20 Q. All right. So did you, in fact, formally | | |
| | 168:21 recuse yourself at Colombier? | | |
| | 168:22 A. I told them that I didn't want to be | | |
| | 168:23 involved with anything having to do with GloriFi, yes | | |
| | 168:24 Q. And did you also recuse yourself on the | | |
| | 168:25 GloriFi side of things? | | |
| | 169:01 A. Yes. | | |
| 181:02 - 181:11 | **Findley, Keri 2024-09-06** | 00:00:18 | **FK-3613.82** |
| | 181:02 Q. Did you ever have any conversations with | | |
| | 181:03 anyone at DHC? | | |
| | 181:04 A. Yes. | | |
| | 181:05 Q. Who did you talk with at DHC? | | |
| | 181:06 A. I believe there were two or three | | |
| | 181:07 partners, and I believe I spoke to all of them. | | |
| | 181:08 Q. Does Chris Gardner sound familiar? | | |
| | 181:09 A. That does. | | |
| | 181:10 Q. Tom Morgan? | | |
| | 181:11 A. That sounds familiar. | | |
| 186:16 - 187:04 | **Findley, Keri 2024-09-06** | 00:00:40 | **FK-3613.83** |
| | 186:16 Q. (By Mr. Downton) What was your role in | | |
| | 186:17 connection with GloriFi's audit? | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 186:18 A. I believe I was on the audit committee. | | |
| | 186:19 Q. Were you the only director on the audit | | |
| | 186:20 committee? | | |
| | 186:21 A. The only director, yes. | | |
| | 186:22 Q. Who else was on the audit committee? | | |
| | 186:23 A. I don't know who else was on the official | | |
| | 186:24 committee. | | |
| | 186:25 Q. Did you interact directly with GloriFi's | | |
| | 187:01 accounting firm? | | |
| | 187:02 A. Yes. | | |
| | 187:03 Q. And do you recall who that was? | | |
| | 187:04 A. I believe their name was Crow. | | |
| 188:21 - 189:04 | **Findley, Keri 2024-09-06** | 00:00:29 | **FK-3613.84** |
| | 188:21 Q. Sunday -- Saturday, February 26th, 2022 | | |
| | 188:22 and it says, Crow is close to wrapping up their audit. | | |
| | 188:23 As a result, they have requested a meeting with you, | | |
| | 188:24 Keri, on Thursday to complete the required audit | | |
| | 188:25 committee communications. Do you see that? | | |
| | 189:01 A. I do. | | |
| | 189:02 Q. Did you meet with Crow in early March | | |
| | 189:03 2022 as requested? | | |
| | 189:04 A. Don't recall. | | |
| 195:05 - 195:12 | **Findley, Keri 2024-09-06** | 00:01:10 | **FK-3613.85** |
| | 195:05 (Deposition Exhibit No. 23 was marked for | | |
| | 195:06 identification.) | | |
| | 195:07 Q. (By Mr. Downton) This is an e-mail chain | | |
| | 195:08 between you and Mr. Neugebauer. The top one's dated | | |
| | 195:09 March 8th, 2022. The subject is, Credit card. I'll | | |
| | 195:10 give you a minute to review it. | | |
| | 195:11 A. (Reviewing document.) | | |
| | 195:12 Okay. | | |
| 196:10 - 196:19 | **Findley, Keri 2024-09-06** | 00:00:28 | **FK-3613.86** |
| | 196:10 Q. So when you say, I mean, couldn't you put | | |
| | 196:11 up a penny and be the buyer, are you talking about the | | |
| | 196:12 buyer of the credit card receivables? | | |
| | 196:13 A. Yes. | | |
| | 196:14 Q. And then, you say, And we finance the | | |
| | 196:15 rest. Is that you and Peter? | | |
| | 196:16 A. That -- at that point, I -- there may | | |
| | 196:17 have been other investors in Tacora, I'm not sure. | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

196:18 But, yes, the idea was that we were the backstop, but
196:19 we were not going to be the buyer.

| 198:13 - 198:21 | **Findley, Keri 2024-09-06** | 00:00:30 | **FK-3613.87** |
|---|---|---|---|

198:13 Q. Do you recall attending a board meeting
198:14 in March 2022 where the first topic was the fundraising
198:15 update?
198:16 A. I don't recall specifics.
198:17 Q. Do you recall any board meeting in the
198:18 first half of March 2022 at all?
198:19 A. Yes.
198:20 Q. Just one?
198:21 A. The first half of '22, yes.

| 199:02 - 199:16 | **Findley, Keri 2024-09-06** | 00:00:37 | **FK-3613.88** |
|---|---|---|---|

199:02 Q. What do you recall about the discussion
199:03 of fundraising at the board meeting in the first half
199:04 of March of 2022?
199:05 A. That the capital was available.
199:06 Q. Were there any conditions on the capital?
199:07 A. Yes.
199:08 Q. What were the conditions?
199:09 A. Standard corporate governance as we
199:10 discussed.
199:11 Q. Including a new CEO?
199:12 A. And a full C-suite, yes.
199:13 Q. What was Mr. Neugebauer's reaction to
199:14 being told there needed to be a new CEO as one of the
199:15 conditions of funding?
199:16 A. Not great.

| 199:17 - 199:21 | **Findley, Keri 2024-09-06** | 00:00:16 | **FK-3613.89** |
|---|---|---|---|

199:17 Q. Can you expand on "not great"? What do
199:18 you recall him saying?
199:19 A. I remember him calling me a bunch of
199:20 names, getting very short, and him screaming at me
199:21 additionally.

| 200:06 - 200:11 | **Findley, Keri 2024-09-06** | 00:00:15 | **FK-3613.90** |
|---|---|---|---|

200:06 Q. (By Mr. Downton) At the March -- the
200:07 first half of March 2022 board meeting, were you the
200:08 person who conveyed to Mr. Neugebauer that the current
200:09 investors would not invest absent a new CEO being put

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 200:10 in place?<br>200:11 A. That is correct. | | |
| 200:24 - 201:05 | **Findley, Keri 2024-09-06** | 00:00:24 | **FK-3613.91** |
| | 200:24 Q. (By Mr. Downton) Did you realize at that<br>200:25 point in time that GloriFi needed an infusion of<br>201:01 capital by the end of the first quarter?<br>201:02 A. Yes.<br>201:03 Q. And was that discussed in the board<br>201:04 meeting with all the board members?<br>201:05 A. Yes. | | |
| 201:06 - 201:12 | **Findley, Keri 2024-09-06** | 00:00:29 | **FK-3613.92** |
| | 201:06 Q. Did Mr. Neugebauer circulate a proposal<br>201:07 to raise the money from other persons not subject to a<br>201:08 condition of a new CEO during March 2022?<br>201:09 MR. POTTER: Objection; vague. Compound.<br>201:10 A. I remember him saying, I'm the only one<br>201:11 who can be the CEO. This isn't fair to me and Melissa.<br>201:12 I'm just going to go to Midland and raise the money. | | |
| 203:07 - 203:09 | **Findley, Keri 2024-09-06** | 00:00:08 | **FK-3613.93** |
| | 203:07 Q. At some point, do you recall meeting with<br>203:08 Mr. Neugebauer at an FBO in San Francisco?<br>203:09 A. I do. | | |
| 204:19 - 204:22 | **Findley, Keri 2024-09-06** | 00:00:08 | **FK-3613.94** |
| | 204:19 Q. And he responded by proposing a different<br>204:20 term sheet?<br>204:21 A. I told you he responded by calling me<br>204:22 names and screaming at me. | | |
| 204:23 - 205:02 | **Findley, Keri 2024-09-06** | 00:00:11 | **FK-3613.95** |
| | 204:23 Q. And after that, he proposed a different<br>204:24 term sheet?<br>204:25 A. It appears that there's a new term sheet<br>205:01 he raised four days later. I don't know if that was a<br>205:02 response. | | |
| 205:10 - 205:21 | **Findley, Keri 2024-09-06** | 00:00:38 | **FK-3613.96** |
| | 205:10 Q. Okay. So it's your belief that the early<br>205:11 March board meeting happened on March 10th, 2022, based<br>205:12 on the e-mail?<br>205:13 A. Based on the e-mail.<br>205:14 Q. Did Mr. Neugebauer ask to meet with you | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

205:15 in San Francisco?
205:16 A. Yes.
205:17 Q. And did you respond that, I'll be at the
205:18 airport, you can come meet me there if you'd like?
205:19 A. I don't believe that was my response.
205:20 Q. What was your response?
205:21 A. I said that I would make time.

| | | | |
|---|---|---|---|
| 207:03 - 207:14 | **Findley, Keri 2024-09-06** | 00:00:36 | **FK-3613.97** |

207:03 Q. What do you recall about the meeting with
207:04 Mr. Neugebauer in San Francisco?
207:05 A. That he came in wanting me to help him
207:06 fire Nick.
207:07 Q. And why did he say he wanted to fire
207:08 Nick?
207:09 A. Because Nick was unable to raise money on
207:10 the terms that Toby found acceptable.
207:11 Q. And those terms were Mr. Neugebauer, the
207:12 largest shareholder, remaining the CEO?
207:13 A. And other corporate governance and other
207:14 C-suite executives, yes.

| | | | |
|---|---|---|---|
| 207:15 - 207:17 | **Findley, Keri 2024-09-06** | 00:00:12 | **FK-3613.98** |

207:15 Q. Did Mr. Neugebauer object to hiring other
207:16 C-suite executives?
207:17 A. My experience was yes.

| | | | |
|---|---|---|---|
| 209:12 - 210:11 | **Findley, Keri 2024-09-06** | 00:01:18 | **FK-3613.99** |

209:12 Q. In response to Mr. Neugebauer's request
209:13 to fire Mr. Ayers, did you tell Mr. Neugebauer that
209:14 Mr. Ayers could obtain money from Ken Griffin?
209:15 A. I don't remember what I responded.
209:16 Q. Did you tell him that Mr. Ayers was
209:17 playing a game of chicken with Mr. Neugebauer?
209:18 A. I said they were playing a game of
209:19 chicken with each other.
209:20 Q. And the -- the two sides of the game of
209:21 chicken was Mr. Ayers would not bring money unless Mr.
209:22 Neugebauer resigned or brought in a new CEO and Mr.
209:23 Neugebauer wanted money to come in without a new CEO?
209:24 MR. POTTER: Objection; foundation.
209:25 A. I don't -- that's what I was referring
210:01 to.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

210:02 Q. (By Mr. Downton) Okay. What were you
210:03 referring to when you said they were playing a game of
210:04 chicken with each other?
210:05 A. I mean, chicken is literally when people
210:06 get in two cars and start driving towards each other
210:07 when somebody's going to flinch. They weren't
210:08 communicating. They were running around in different
210:09 circles. They weren't having the frank conversations
210:10 they needed to, and I said that I would happily mediate
210:11 so that we don't have a crash.

| 210:13 - 210:20 | **Findley, Keri 2024-09-06** | 00:00:18 | **FK-3613.100** |
|---|---|---|---|

210:13 Prior to the meeting in March that we
210:14 think was March 10th of the board, had you ever
210:15 expressed to Mr. Neugebauer concern about his
210:16 performance as CEO?
210:17 A. Yes.
210:18 Q. When did you do that?
210:19 A. On many occasions. I don't remember the
210:20 dates.

| 211:23 - 212:04 | **Findley, Keri 2024-09-06** | 00:00:25 | **FK-3613.101** |
|---|---|---|---|

211:23 Q. (By Mr. Downton) How did he respond to
211:24 your criticisms?
211:25 A. By getting red in the face, getting
212:01 heated, and screaming at me and calling me names.
212:02 Q. How many times did that happen?
212:03 A. Three months, probably somewhere between
212:04 ten and 30.

| 212:11 - 212:19 | **Findley, Keri 2024-09-06** | 00:00:23 | **FK-3613.102** |
|---|---|---|---|

212:11 Q. Did you tell Mr. Neugebauer at the
212:12 meeting in San Francisco that the way to get out of the
212:13 game of chicken was just to agree to whatever Nick
212:14 wanted and we'll tear it up later?
212:15 A. No.
212:16 Q. So you never used the phrase "we'll tear
212:17 it up later"?
212:18 A. I mean, that's not a phrase I ever
212:19 remember using. But it's possible that I did.

| 212:20 - 212:23 | **Findley, Keri 2024-09-06** | 00:00:11 | **FK-3613.103** |
|---|---|---|---|

212:20 Q. And you don't recall saying anything

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

212:21 substantially similar to just agree to whatever Nick
212:22 wants?
212:23 A. No.

| 212:24 - 213:07 | **Findley, Keri 2024-09-06** | 00:00:39 | **FK-3613.104** |
|---|---|---|---|

212:24 Q. So you said you offered to mediate. Did
212:25 you have a recommendation as to how to escape from the
213:01 game of chicken?
213:02 A. Have a honest and reasonable conversation
213:03 where we come to an agreement on what's possible on
213:04 both sides and see if there's a middle ground.
213:05 Q. At this point, were you aware that DHC
213:06 was in the process of preparing a term sheet?
213:07 A. I don't recall.

| 215:25 - 216:04 | **Findley, Keri 2024-09-06** | 00:00:22 | **FK-3613.105** |
|---|---|---|---|

215:25 Q. Oh. All right. Do you recall telling
216:01 Mr. Neugebauer in March that you thought the world of
216:02 him?
216:03 A. I think he's an incredibly good
216:04 salesperson at times.

| 216:05 - 216:08 | **Findley, Keri 2024-09-06** | 00:00:10 | **FK-3613.106** |
|---|---|---|---|

216:05 Q. Okay. Did you think he was a good CEO?
216:06 A. No.
216:07 Q. For the reasons you've discussed?
216:08 A. Yes.

| 218:24 - 219:14 | **Findley, Keri 2024-09-06** | 00:01:08 | **FK-3613.107** |
|---|---|---|---|

218:24 Q. (By Mr. Downton) Was there any point in
218:25 time where Mr. Neugebauer told you he was willing to
219:01 have someone else replace him as CEO?
219:02 A. Upwards of 50 times, yes.
219:03 Q. When did he say he was willing to have
219:04 someone else replace him as CEO?
219:05 A. Until, I believe, early March, he, you
219:06 know, always said to investors, I know that I won't be
219:07 the -- I know that I won't be the CEO of this company,
219:08 you know. He often reiterated what he had told
219:09 investors, which was that this was an interim gig until
219:10 they found somebody.
219:11 I believe there was another time where I
219:12 spoke to Mr. Neugebauer and he said that he would

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 219:13 happily resign as long as Nick wasn't the one asking.<br>219:14 But I don't remember the dates of those conversations. | | |
| 220:21 - 221:05 | **Findley, Keri 2024-09-06** | 00:00:27 | **FK-3613.108** |
| | 220:21 Q. Was he open to your requests to mediate<br>220:22 the game of chicken between him and Nick?<br>220:23 A. I don't remember. But it never happened.<br>220:24 Q. And, at this point, you're saying you<br>220:25 don't recall if you had awareness of a DHC term sheet<br>221:01 that was in process?<br>221:02 A. At some point I had awareness. I don't<br>221:03 know when that awareness became.<br>221:04 Q. Did that awareness come from Nick Ayers?<br>221:05 A. I don't recall. | | |
| 221:06 - 221:09 | **Findley, Keri 2024-09-06** | 00:00:11 | **FK-3613.109** |
| | 221:06 Q. How did you get awareness that someone<br>221:07 was working on a term sheet with DHC?<br>221:08 A. I don't remember if it was from Nick or<br>221:09 from Toby or from somebody else. | | |
| 221:14 - 221:25 | **Findley, Keri 2024-09-06** | 00:00:37 | **FK-3613.110** |
| | 221:14 Q. Did you have any involvement with<br>221:15 creating the term sheet that DHC presented to<br>221:16 Mr. Neugebauer?<br>221:17 A. I don't recall that.<br>221:18 Q. All right. So that's not something you<br>221:19 discussed with anyone at DHC before they presented it<br>221:20 to Mr. Neugebauer?<br>221:21 A. I mean, I have -- I have no idea what<br>221:22 you're talking about. Did -- did I have conversations<br>221:23 with DHC about things relating to GloriFi? Yes. Is it<br>221:24 possible a question they asked me and an answer I gave<br>221:25 them made it into the term sheet? I guess. | | |
| 226:08 - 226:16 | **Findley, Keri 2024-09-06** | 00:00:21 | **FK-3613.111** |
| | 226:08 Q. Do you ever recall expressing any<br>226:09 concerns to Mr. Neugebauer that someone might try to<br>226:10 seize Peter's money if he invested in GloriFi?<br>226:11 A. I don't recall.<br>226:12 Q. Don't recall one way or the other?<br>226:13 A. No. But I -- that sounds like not a word<br>226:14 I use. | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 226:15 Q. Which word? | | |
| | 226:16 A. Seize. | | |
| 227:07 - 227:08 | **Findley, Keri 2024-09-06** | 00:00:05 | **FK-3613.112** |
| | 227:07 Q. Have you ever spoken to Rick Jackson? | | |
| | 227:08 A. No. | | |
| 228:18 - 229:19 | **Findley, Keri 2024-09-06** | 00:01:36 | **FK-3613.113** |
| | 228:18 Q. Your e-mails with Mr. Neugebauer that we | | |
| | 228:19 just looked at in Exhibit 28, you said you're committed | | |
| | 228:20 on the surplus. | | |
| | 228:21 A. Uh-huh. | | |
| | 228:22 Q. You didn't say, I'm committed if you | | |
| | 228:23 resign as CEO. Why not? | | |
| | 228:24 A. I guess that wasn't my -- I mean, that | | |
| | 228:25 wasn't my fight to fight. I -- we have requirements | | |
| | 229:01 for capital. If he didn't have that much capital, we'd | | |
| | 229:02 have given him money, we don't -- we don't comment. | | |
| | 229:03 Like, Tacora doesn't care who the CEO is. Tacora cares | | |
| | 229:04 what the assets are. And so if the money couldn't come | | |
| | 229:05 in, we would have just seized the assets and moved on | | |
| | 229:06 about all this. I don't really care who runs the | | |
| | 229:07 company as Tacora. | | |
| | 229:08 Q. And if the money had come in from a | | |
| | 229:09 source other than investors connected to Nick Ayers, | | |
| | 229:10 you would have funded it? | | |
| | 229:11 A. If -- I look at it very differently. If | | |
| | 229:12 the insurance entity had my money and had the equity | | |
| | 229:13 and then there was a breach, I would have just seized | | |
| | 229:14 my money and their money. I don't really care who runs | | |
| | 229:15 the company. If the credit cards had the equity needed | | |
| | 229:16 from third parties and it was there and there was a | | |
| | 229:17 breach or a covenant or a default. I would have just | | |
| | 229:18 seized the credit cards. I don't care who runs the | | |
| | 229:19 company. | | |
| 236:14 - 238:18 | **Findley, Keri 2024-09-06** | 00:04:49 | **FK-3613.114** |
| | 236:14 (Deposition Exhibit No. 31 was marked for | | |
| | 236:15 identification.) | | |
| | 236:16 Q. (By Mr. Downton) And this is a term | | |
| | 236:17 sheet. It says, With Purpose Inc., you gave GloriFi | | |
| | 236:18 Inc. 30 million senior secured convertible note. Says | | |
| | 236:19 at the bottom it will expire March 31st at 1:00 p.m., | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

236:20 Central Time. So I'm going to, for ease of reference,
236:21 refer to this as the Neugebauer term sheet.
236:22 A. Okay.
236:23 Q. So I'll give you a minute to review it.
236:24 And then, the question is: What are the items in this
236:25 term sheet that you found inappropriate?
237:01 A. (Reviewing document.)
237:02 Okay.
237:03 Q. Okay. So what are the items in the term
237:04 sheet you found inappropriate?
237:05 A. I mean, have you read it? Sorry. The
237:06 events in default. The most-favored nation. The asset
237:07 purch and assumption agreement. The marketing
237:08 agreement. And the indemnification.
237:09 Q. Let's take them one at a time. What was
237:10 the issue with the most-favored nation?
237:11 A. I mean, a -- a CEO should put in money on
237:12 terms. He shouldn't be able to ration down his -- his
237:13 price, his anything because another investor got better
237:14 terms later. And that's -- and then, he's the one
237:15 voting through the better terms later to give himself
237:16 better terms. I mean, I would start with that being --
237:17 seeming to be some sort of self-dealing (phonetic).
237:18 Q. Okay. And what's the probable with the
237:19 events of default?
237:20 A. Customary for transactions of this type
237:21 including the termination or resignation for good
237:22 reason by the company CEO. I mean, I've never seen a
237:23 term sheet put out by a CEO where it's his money. And
237:24 then, if he resigns, it's an event of default or he
237:25 gets fired, he gets his money back and puts the company
238:01 in a position where they can't -- they can't fire him.
238:02 Q. You've never seen a term sheet with
238:03 someone puts 30 million into a company and says you
238:04 can't fire me and keep my money?
238:05 A. I've never seen a -- my experience is
238:06 that CEOs put money into their company because they
238:07 believe it's a good investment, and they prove
238:08 themselves through their abilities. I've never seen a
238:09 document where somebody puts money into a company that
238:10 has a myriad of other shareholders and an independent

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

238:11 board and says, if I do a bad job, you can't fire me or
238:12 you have to return my money. No, I have never seen
238:13 that before.
238:14 Q. And have you ever seen a term sheet that
238:15 says, if you raise additional money in the future, I
238:16 get those terms?
238:17 A. Not from the company CEO who then can put
238:18 through worse terms to ration himself down, no.

| 238:24 - 239:10 | **Findley, Keri 2024-09-06** | 00:00:33 | **FK-3613.115** |
|---|---|---|---|

238:24 Q. (By Mr. Downton) It's not unusual for an
238:25 investor to invest and be entitled to terms negotiated
239:01 by subsequent investors. That's not unusual, is it?
239:02 MR. POTTER: Objection; speculation.
239:03 Hypothetical. It's irrelevant.
239:04 A. I've never seen it.
239:05 MR. NEUGEBAUER: Oh, my God.
239:06 Q. (By Mr. Downton) You've never --
239:07 MR. POTTER: For the record, Toby
239:08 Neugebauer saying, "Oh, my God" on the record in
239:09 response to a question in this deposition. Just so the
239:10 record reflects it.

| 240:16 - 241:02 | **Findley, Keri 2024-09-06** | 00:00:34 | **FK-3613.116** |
|---|---|---|---|

240:16 Q. (By Mr. Downton) In your career, have you
240:17 ever seen a term sheet that allows an investor to be
240:18 entitled through a most-favored nation clause to get
240:19 the same terms as a subsequent investor?
240:20 MR. POTTER: Objection; asked and
240:21 answered. Irrelevant hypothetical.
240:22 A. Well, you just changed a very important
240:23 word in your question from "company" to "investment."
240:24 In a company, I have never seen that.
240:25 Q. (By Mr. Downton) But you've seen it in
241:01 other investments?
241:02 A. Yes.

| 241:09 - 243:04 | **Findley, Keri 2024-09-06** | 00:02:16 | **FK-3613.117** |
|---|---|---|---|

241:09 Q. (By Mr. Downton) You mentioned the
241:10 indemnification provisions. You said you considered
241:11 them inappropriate.
241:12 A. Yeah.
241:13 Q. The indemnification says, Customary and

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

241:14 appropriate provisions -- provisions relating to
241:15 indemnity expense reimbursement and related matters.
241:16 Why is it inappropriate?
241:17 A. I mean, at this point, he had just
241:18 threatened to kill one of his investors. So I don't
241:19 know how -- how you square that with asking for
241:20 indemnity. I mean, it's like a very odd thing to have,
241:21 you know, done some of the things, you know, to have
241:22 done some of the things that Toby had done and then
241:23 offer $10 million for indemnity.
241:24 Q. It says, Customary and appropriate
241:25 provisions. Are there not customary indemnification
242:01 provisions?
242:02 A. No. Indemnification is not customary for
242:03 a convertible note term sheet or an investment in a
242:04 company to ask for indemnification.
242:05 Q. You said Mr. Neugebauer threatened to
242:06 kill one of his investors. What are you talking about?
242:07 A. Oh. On -- right around this time, I
242:08 don't know the exact date and time, Toby threatened to
242:09 kill Vivek.
242:10 Q. And he said that to you?
242:11 A. Yes.
242:12 Q. What did he say?
242:13 A. That he was going to go in his safe, get
242:14 his gun -- sorry -- get on his plane, fly to Ohio, and
242:15 kill Vivek. It's not funny obviously.
242:16 Q. Sounds like you find it funny?
242:17 A. No, I'm uncomfortable. It's
242:18 uncomfortable to say it. I -- I laugh sometimes when
242:19 I'm uncomfortable.
242:20 Q. At that time, wasn't Vivek very
242:21 supportive of Mr. Neugebauer as CEO?
242:22 A. I got a call from Mr. Neugebauer where he
242:23 was on the porch, in the back porch, and he said that
242:24 Vivek was trying to steal the company and a bunch of
242:25 the employees, he had said, were sitting around him and
243:01 that Vivek was trying to steal the company. And this
243:02 was all right around the same time. And, at that time,
243:03 he said that he was going to fly to Ohio and kill
243:04 Vivek.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 243:16 - 243:24 | **Findley, Keri 2024-09-06** | 00:00:23 | **FK-3613.118** |

243:16 Q. You know that GloriFi was planning to be
243:17 a broker dealer, right?
243:18 A. I believe it was very far down on the
243:19 road map. But -- but that was not one of the initial
243:20 businesses of GloriFi.
243:21 Q. You don't know if GloriFi was in the
243:22 process of applying for a broker dealer license in
243:23 December when you (inaudible)?
243:24 A. I don't recall.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 243:25 - 244:04 | **Findley, Keri 2024-09-06** | 00:00:13 | **FK-3613.119** |

243:25 Q. Would it surprise you if GloriFi was in
244:01 the process of applying for a broker dealer license in
244:02 December?
244:03 A. Even if they were, then it's unclear to
244:04 me that that competes with Strive.

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 244:15 - 245:14 | **Findley, Keri 2024-09-06** | 00:01:23 | **FK-3613.120** |

244:15 Q. (By Mr. Downton) You also said there was
244:16 a problem with the asset purchase agreement. What was
244:17 the problem with that?
244:18 A. Toby had pledged those assets to -- to
244:19 the investors of the convertible note. They all
244:20 believed and were told that that was their collateral.
244:21 So transferring that would have been an issue. And,
244:22 you know, now that I'm sitting here looking at it, the
244:23 -- the all-asset lien of the company would have also
244:24 been an issue.
244:25 The guarantees from the company's
245:01 subsidiaries would have made any surplus note or credit
245:02 card unable to do, and then an all-asset lien on the
245:03 assets of the company's subsidiaries would, you know,
245:04 kind of -- would double that. So all of those would
245:05 have been issues. And then, the marketing agreement, I
245:06 believe, was another issue.
245:07 Q. And what was the issue with the marketing
245:08 agreement?
245:09 A. We had been asking for a legal analysis
245:10 of the implications and money flows and on marketness,
245:11 I guess is the best way to put it but, like, whether
245:12 that marketing agreement and the money associated with

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

245:13 it was -- was fair and reasonable so that we can vote
245:14 it as a board.

| 247:04 - 248:04 | **Findley, Keri 2024-09-06** | 00:01:27 | **FK-3613.121** |
|---|---|---|---|

247:04 (Deposition Exhibit No. 32 was marked for
247:05 identification.)
247:06 Q. (By Mr. Downton) It's an e-mail from you
247:07 on March 31st, saying, Toby, you have a term sheet from
247:08 DHC that you won't show me. So at this point you had
247:09 not yet seen the term sheet from DHC. Is that true?
247:10 A. That is correct.
247:11 Q. And no person outside of Mr. Neugebauer
247:12 had showed you the term sheet before this time?
247:13 A. I don't believe so.
247:14 Q. Had anyone told you its contents?
247:15 A. I don't believe so.
247:16 Q. How did you know that Mr. Neugebauer had
247:17 a term sheet from DHC?
247:18 A. My recollection is that there was a
247:19 all-hands call with all of the investors that Sunday.
247:20 And we had been told that it was coming. And then --
247:21 and so I knew it was coming. So I was asking about it,
247:22 and I believe Chris told me that he had sent it,
247:23 because at this point, we were all very nervous that
247:24 the company was going to run out of cash, and there was
247:25 this 331 issue around the financials and the potential
248:01 of it being a going concern. And so, at that point,
248:02 you know, Chris was at least keeping me apprised that
248:03 there was a term sheet and that it was executable and
248:04 ready to go.

| 248:05 - 249:06 | **Findley, Keri 2024-09-06** | 00:01:30 | **FK-3613.122** |
|---|---|---|---|

248:05 Q. So Sunday -- I just pulled up a calendar.
248:06 March 27th was a Sunday in 2022. So that's the Sunday
248:07 you referenced?
248:08 A. That sounds correct.
248:09 Q. And now, we're four days later on March
248:10 31st.
248:11 A. Okay.
248:12 Q. So you said Mr. Gardner told you there
248:13 was a term sheet that he had sent out. How did you
248:14 know he was working on one? You said you had been told

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

248:15 it was coming. Who told you?
248:16 A. On that call on Sunday on the all-hands
248:17 call. And I believe there was at least one call on
248:18 that Sunday with employees, and I'm not sure, but I
248:19 think it was a separate call than the call with all the
248:20 investors. I'm not positive. It's possible it was one
248:21 call with DHC on it and B of A and the presentation to
248:22 investors on that Sunday was that the term sheet was
248:23 coming and that Toby was going to put in the first $10
248:24 million of that term sheet under DHC's terms.
248:25 Q. Okay. Which investor told everyone that
249:01 on the call?
249:02 A. It was either the banker at B of A or
249:03 DHC.
249:04 Q. And you said that was on Sunday, March
249:05 27th?
249:06 A. I believe so.

| 249:07 - 249:19 | **Findley, Keri 2024-09-06** | 00:00:46 | **FK-3613.123** |
|---|---|---|---|

249:07 Q. Did you want Toby to sign the term sheet?
249:08 The DHC term sheet, to clarify.
249:09 A. I mean, as of this -- well, one, I think
249:10 he should always have done what he told his investors
249:11 he was going to do. But I don't know if at this point
249:12 I had seen it and knew the terms and therefore I can't
249:13 say I would want him to sign it until I knew what it
249:14 said.
249:15 But the fact that he had said to all of
249:16 his investors that he was going to take the DHC term
249:17 sheet and put in the first $10 million on that, if
249:18 that's what you tell your investors you're going to do,
249:19 in my opinion, that's what you do.

| 249:20 - 250:07 | **Findley, Keri 2024-09-06** | 00:00:28 | **FK-3613.124** |
|---|---|---|---|

249:20 Q. Who was going to put up the other $30
249:21 million?
249:22 A. I don't know.
249:23 Q. Did you have an understanding that Ken
249:24 Griffin was going to put all of it or most of it in?
249:25 A. I don't know.
250:01 Q. Did you have any conversations with Nick
250:02 Ayers regarding who would put in the other money

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 250:03 required under the DHC term sheet?<br>250:04 A. I don't know.<br>250:05 Q. You don't know if you had any<br>250:06 conversations with Mr. Ayers?<br>250:07 A. I don't. | | |
| 252:09 - 252:14 | **Findley, Keri 2024-09-06** | 00:00:24 | **FK-3613.125** |
| | 252:09 Q. So this week, the week of March 27th,<br>252:10 2022, do you recall asking GloriFi to give you a<br>252:11 release?<br>252:12 A. I believe I said I needed a release<br>252:13 because I could not sign the audit under threat of<br>252:14 litigation. | | |
| 253:21 - 254:09 | **Findley, Keri 2024-09-06** | 00:00:32 | **FK-3613.126** |
| | 253:21 Do you know if Crow sent another<br>253:22 communication in March saying the audit would be done<br>253:23 within a week?<br>253:24 A. Don't recall.<br>253:25 Q. Do you recall at some point in time the<br>254:01 only thing Crow said was pending was meeting with you?<br>254:02 MR. POTTER: Objection; foundation.<br>254:03 Q. (By Mr. Downton) With respect to the<br>254:04 audit committee?<br>254:05 A. I don't recall that. But that's<br>254:06 possible.<br>254:07 Q. Okay. Did you ever have that meeting<br>254:08 with Crow?<br>254:09 A. I don't know. | | |
| 256:16 - 256:24 | **Findley, Keri 2024-09-06** | 00:00:33 | **FK-3613.127** |
| | 256:16 Q. (By Mr. Downton) Do you know why Crow had<br>256:17 not issued its audit as of the time you left the board?<br>256:18 A. So my understanding was that they needed<br>256:19 me to sign off on the audit and I would not sign off on<br>256:20 the audit under threat of litigation. That's what I<br>256:21 had been advised to do and that you cannot -- it is not<br>256:22 acceptable practice to sign off on an audit under<br>256:23 threat of litigation. And so I would not sign off on<br>256:24 the audit under the threat of litigation. | | |
| 256:25 - 257:03 | **Findley, Keri 2024-09-06** | 00:00:08 | **FK-3613.128** |
| | 256:25 Q. Who threatened to sue you? | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 257:01 A. Toby Neugebauer. | | |
| | 257:02 Q. And when did he threaten to sue you? | | |
| | 257:03 A. Multiple times that week. | | |
| 261:09 - 261:11 | **Findley, Keri 2024-09-06** | 00:00:21 | **FK-3613.129** |
| | 261:09 Q. Did you have any conversations with | | |
| | 261:10 anyone at Crow after you left the GloriFi board? | | |
| | 261:11 A. I believe they called me. | | |
| 264:12 - 265:10 | **Findley, Keri 2024-09-06** | 00:00:50 | **FK-3613.130** |
| | 264:12 Q. Did you ever talk with the law firm Locke | | |
| | 264:13 Lord? | | |
| | 264:14 A. I believe I did. | | |
| | 264:15 Q. How many times? | | |
| | 264:16 A. I believe once. | | |
| | 264:17 Q. Do you recall anything about that | | |
| | 264:18 conversation? | | |
| | 264:19 A. Not much, no. Yes, I do actually. | | |
| | 264:20 Q. What do you recall? | | |
| | 264:21 A. He was very focused on Mr. Neugebauer's | | |
| | 264:22 drinking and drug use. | | |
| | 264:23 Q. Did you see Mr. Neugebauer use drugs? | | |
| | 264:24 A. I did. | | |
| | 264:25 Q. What drugs? | | |
| | 265:01 A. A white powder. I don't know what it | | |
| | 265:02 was. | | |
| | 265:03 Q. And when did you see that? | | |
| | 265:04 A. I saw it two times at his house. | | |
| | 265:05 Q. When? | | |
| | 265:06 A. I believe it was December and January of | | |
| | 265:07 2021 to 2022. | | |
| | 265:08 Q. How many times did you go to Mr. | | |
| | 265:09 Neugebauer's house? | | |
| | 265:10 A. My guess is about four. | | |
| 265:11 - 265:17 | **Findley, Keri 2024-09-06** | 00:00:20 | **FK-3613.131** |
| | 265:11 Q. And what did you see him drink? | | |
| | 265:12 A. I saw him pouring liquor into a Red Bull | | |
| | 265:13 can on at least ten occasions in those four times. | | |
| | 265:14 Q. And what time of day would that start? | | |
| | 265:15 A. Ten-ish. | | |
| | 265:16 Q. In the morning? | | |
| | 265:17 A. Uh-huh. | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 265:24 - 266:22 | **Findley, Keri 2024-09-06** | 00:01:00 | **FK-3613.132** |
| | 265:24 Q. You would have answered all of Locke<br>265:25 Lord's questions openly and honestly, right?<br>266:01 A. Of course I would have. And I did have<br>266:02 counsel -- my own counsel on the phone for that as<br>266:03 well.<br>266:04 Q. And so Locke Lord would have had the<br>266:05 benefit of all of your information when they conducted<br>266:06 the investigation into Mr. Neugebauer, right?<br>266:07 A. Well, I believe that conversation was<br>266:08 part of them conducting the investigation into Mr.<br>266:09 Neugebauer.<br>266:10 Q. And so, when they completed their<br>266:11 investigation, you had provided everything they asked<br>266:12 for?<br>266:13 A. I provided everything they asked for.<br>266:14 Q. And when Crow completed its audit, you<br>266:15 provided everything Crow asked for?<br>266:16 A. I don't know that. I don't know if Crow<br>266:17 asked for things that I was unable to provide. That is<br>266:18 possible. I remember my counsel piping up at least<br>266:19 once or twice.<br>266:20 Q. Is there anything you can recall that<br>266:21 Crow asked for that you did not provide?<br>266:22 A. No. | | |
| 267:05 - 268:15 | **Findley, Keri 2024-09-06** | 00:03:12 | **FK-3613.133** |
| | 267:05 Q. (By Mr. Downton) Okay. We have marked as<br>267:06 Exhibit 34 the signed DHC term sheet dated March 31st<br>267:07 2022.<br>267:08 (Deposition Exhibit No. 34 was marked for<br>267:09 identification.)<br>267:10 Q. (By Mr. Downton) Are you able to identify<br>267:11 it?<br>267:12 A. I see that, yes.<br>267:13 Q. And it's signed by Tom Morgan and Toby<br>267:14 Neugebauer?<br>267:15 A. That is what it appears, yes.<br>267:16 Q. And it's got that cross out you reference<br>267:17 where Mr. Gardner's name was crossed out?<br>267:18 A. Yes. | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

267:19 Q. So this is the document you see, right?
267:20 A. Yup.
267:21 Q. Do you think there are any issues with
267:22 this document?
267:23 A. (Reviewing document.)
267:24 I have to read the whole thing.
267:25 I mean, this senior debt is a little bit
268:01 confusing, unless this is the senior debt. No, this is
268:02 not. So I don't really understand that. So I would
268:03 call that something that needs explanation.
268:04 I don't see any other issues with the
268:05 term sheet other than the senior debt being a little
268:06 confusing.
268:07 Q. Fair to say, Mr. Neugebauer swallowed his
268:08 pride and signed a term sheet he didn't like?
268:09 MR. POTTER: Objection; form.
268:10 Speculation.
268:11 A. I mean, I don't know if he liked this
268:12 term sheet or not.
268:13 Q. (By Mr. Downton) But you know he signed
268:14 it?
268:15 A. I mean, I see his signature right there.

| 268:16 - 270:02 | **Findley, Keri 2024-09-06** | 00:01:33 | **FK-3613.134** |
|---|---|---|---|

268:16 Q. Do you know who DHC worked with in
268:17 creating this term sheet?
268:18 A. I do not.
268:19 Q. Do you know if they worked with Nick
268:20 Ayers?
268:21 A. I do not.
268:22 Q. Do you know if they worked with Cason
268:23 Carter?
268:24 A. I'd have no knowledge of that.
268:25 Q. Do you know if they worked with anyone at
269:01 Citadel?
269:02 A. I have no idea.
269:03 Q. And you said you had absolutely zero
269:04 involvement in the creation of this term sheet, right?
269:05 A. I -- I had -- I mean, I don't even know
269:06 what zero involvement means. As I said, if somebody
269:07 calls me and asks me a question, I answer the question

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|

269:08 openly and honestly. If one of those questions ended
269:09 up with something being in this term sheet, that is a,
269:10 you know, kind of low probability, but a possibility.
269:11 Q. Did anyone ever call you and say, We're
269:12 working on a term sheet?
269:13 A. No.
269:14 Q. Did anyone at DHC ever tell you they were
269:15 working on a term sheet?
269:16 A. Sorry. I -- what do you mean your
269:17 previous question?
269:18 Q. The previous question, I felt like it was
269:19 too broad and so I meant to narrow it to specific. Did
269:20 anyone at DHC tell you they were working on a term
269:21 sheet?
269:22 A. So as I said, the Sunday before, there
269:23 was a call, I believe, B of A, DHC employees and
269:24 investors. I believe there were two calls. It may
269:25 have been one. But on that day, I was told that DHC
270:01 was working on a term sheet. I don't know if I was
270:02 told that by DHC or B of A.

| 270:03 - 270:09 | **Findley, Keri 2024-09-06** | 00:00:17 | **FK-3613.135** |
|---|---|---|---|

270:03 Q. Prior to March 27th, had anyone told you
270:04 that DHC was working on a term sheet?
270:05 A. I don't recall that. But anything's
270:06 possible.
270:07 Q. And did any investor tell you they were
270:08 working on their own term sheet?
270:09 A. I don't recall that.

| 270:17 - 270:23 | **Findley, Keri 2024-09-06** | 00:00:17 | **FK-3613.136** |
|---|---|---|---|

270:17 Q. Are you aware of an article about GloriFi
270:18 that was published in the Wall Street Journal in the
270:19 fall of 2022?
270:20 A. I have read it, yes.
270:21 Q. Did you have any communications with
270:22 anyone at the Wall Street Journal?
270:23 A. Ever, yes. About that, no.

| 271:10 - 271:14 | **Findley, Keri 2024-09-06** | 00:00:12 | **FK-3613.137** |
|---|---|---|---|

271:10 Q. (By Mr. Downton) I'm sorry. Are you
271:11 aware of anyone who spoke to someone at the Wall Street
271:12 Journal in connection with the October 2022 article

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 271:13 about GloriFi?<br>271:14 A. No, I am not. | | |
| 271:15 - 271:21 | **Findley, Keri 2024-09-06** | 00:00:17 | **FK-3613.138** |
| | 271:15 Q. Do you know who Bill Burke is?<br>271:16 A. Yes.<br>271:17 Q. Who is Bill Burke?<br>271:18 A. He's a lawyer at Quinn Emanuel.<br>271:19 Q. Do you know if he provided any services<br>271:20 to GloriFi?<br>271:21 A. I don't. | | |
| 271:22 - 271:24 | **Findley, Keri 2024-09-06** | 00:00:08 | **FK-3613.139** |
| | 271:22 Q. Did you have any communications with him<br>271:23 about GloriFi at any point in time?<br>271:24 A. No. | | |
| 272:08 - 273:01 | **Findley, Keri 2024-09-06** | 00:01:05 | **FK-3613.140** |
| | 272:08 Q. Do you know if he had any communications<br>272:09 with GloriFi, whether or not he represented them, while<br>272:10 you were on the board?<br>272:11 A. I'm generally aware of that, because his<br>272:12 partner represent -- has represented me many times and<br>272:13 continues to represent and consult with me on matters<br>272:14 and Tacora.<br>272:15 Q. And so what did you generally aware of<br>272:16 with respect to Quinn Emanuel and GloriFi?<br>272:17 A. I'm generally aware that they were<br>272:18 calling me to see if there may be a conflict.<br>272:19 Q. And did they identify any conflict based<br>272:20 on representation of you?<br>272:21 A. I don't know the answer to that question.<br>272:22 They asked me some questions, I answered them.<br>272:23 Q. Are you aware of an incident involving<br>272:24 Manny Rios and Mr. Neugebauer connected to a P.F.<br>272:25 Chang's?<br>273:01 A. Yes. | | |
| 273:16 - 273:23 | **Findley, Keri 2024-09-06** | 00:00:15 | **FK-3613.141** |
| | 273:16 Q. Did you speak with Manny Rios about it?<br>273:17 A. I don't recall.<br>273:18 Q. Is it possible you spoke with Manny Rios<br>273:19 about it? | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 273:20 A. It is possible.<br>273:21 Q. Have you spoken with Manny Rios since you<br>273:22 left GloriFi?<br>273:23 A. Yes. | | |
| 274:02 - 274:11 | **Findley, Keri 2024-09-06** | 00:00:18 | **FK-3613.142** |
| | 274:02 Q. What is the nature of -- do you have<br>274:03 continuing interaction with Manny Rios?<br>274:04 A. I do.<br>274:05 Q. And what is the nature of that<br>274:06 interaction?<br>274:07 A. I lent money to his next insurance<br>274:08 venture. Sorry. Tacora lent money to his next<br>274:09 insurance venture and I run Tacora.<br>274:10 Q. And is that loan still outstanding?<br>274:11 A. It is. | | |
| 276:01 - 276:06 | **Findley, Keri 2024-09-06** | 00:00:23 | **FK-3613.143** |
| | 276:01 Q. So even though you were working with<br>276:02 GloriFi and Vivek was an investor in GloriFi you talked<br>276:03 with, it's your testimony that neither Mr. Lonsdale nor<br>276:04 Mr. Thiel asked you anything about Strive or Mr.<br>276:05 Ramaswamy before they decided to invest?<br>276:06 A. That is correct. | | |
| 279:19 - 280:03 | **Findley, Keri 2024-09-06** | 00:00:32 | **FK-3613.144** |
| | 279:19 Q. How often do you speak to Mr. Ayers?<br>279:20 A. Every couple of weeks.<br>279:21 Q. And are you -- what's the purpose of<br>279:22 speaking to Mr. Ayers every couple of weeks?<br>279:23 A. We look for things to do together.<br>279:24 Q. Have you had done business together since<br>279:25 leaving GloriFi?<br>280:01 A. Well, Nick is on the board of<br>280:02 PublicSquare Holdings, Colombier, Merge, Republic<br>280:03 Square Holdings, I think that would be it. | | |
| 280:04 - 280:09 | **Findley, Keri 2024-09-06** | 00:00:14 | **FK-3613.145** |
| | 280:04 Q. Have you discussed -- prior to the filing<br>280:05 of the lawsuits, had you discussed GloriFi with Mr.<br>280:06 Ayers after leaving?<br>280:07 A. No.<br>280:08 Q. Not a single time? | | |

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 280:09 A. Mr. Ayers won't discuss it. | | |

| | |
|---|---|
| Designations | 01:33:38 |
| **TOTAL RUN TIME** | **01:33:38** |