

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed June 16, 2025**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| WITH PURPOSE, INC., | § | Case No. 23-30246-MVL7 |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| SCOTT M. SEIDEL, TRUSTEE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | Adv. Pro. No. 24-03038-MVL |
| TOBY NEUGEBAUER; BANZAI ADVISORY GROUP, LLC; BANZAI CAPITAL PARTNERS, LLC; NEUGEBAUER FAMILY ENTERPRISES, LLC; WPI COLLATERAL MANAGEMENT, LLC; and ONPOINT COMPANIES, LLC, | § | |
| | § | |
| Defendants. | § | |

1

## MEMORANDUM OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

This Court issues this Memorandum Opinion containing its findings of fact and conclusions of law with respect to the trial conducted with regard to the *First Amended Complaint* (the "**Complaint**") filed by Plaintiff Scott M. Seidel (the "**Trustee**"), the duly appointed Chapter 7 Trustee, against Defendants Toby Neugebauer, Banzai Advisory Group, LLC ("**Banzai Advisory**"), Banzai Capital Partners, LLC ("**Banzai Capital**"), Neugebauer Family Enterprises, LLC ("**NFE**", together with Mr. Neugebauer, Banzai Advisory, and Banzai Capital, the "**Neugebauer Parties**"), WPI Collateral Management (the "**Collateral Agent**"), and OnPoint Companies, LLC ("**OnPoint**", together with the Neugebauer Parties and the Collateral Agent, the "**Defendants**"). ECF No. 44.[1] This Memorandum Opinion also addresses the *Complaint in Intervention* filed by the Jackson Investment Group ("**JIG**") against the Collateral Agent. ECF No. 90. Finally, the Court addresses the Collateral Agent's *Motion to Lift Stay to Pursue Additional Claims* [Bankruptcy ECF No. 199][2] (the "**Computer Stay Motion**") and its *Motion for Relief from the Automatic Stay to Foreclose on Contractual Claims and Misappropriation Claims* [Bankruptcy ECF No. 201] (the "**Contracts Stay Motion**", collectively the "**Lift Stay Motion**"). The Court conducted a four-day trial from December 9 through December 12, 2024. The Court heard the testimony of seven fact witnesses and two expert witnesses. At the conclusion of the trial, the Court took the matter under advisement and allowed the parties to submit post-hearing briefing. On January 6, 2025, the Collateral Agent [ECF No. 136], the Trustee [ECF No. 135], and JIG [ECF No. 134] all filed post-hearing briefs apprising the Court of their varying positions.

In the months between the filing of this Adversary Proceeding and the trial, the Court conducted a seven day hearing (the "**Conversion Hearing**") on the Debtor's *Amended Motion to*

---

[1] All ECF No. references are herein made with respect to the docket in Adversary Proceeding No. 24-3038-mvl.

[2] "**Bankruptcy ECF**" shall refer to the main bankruptcy docket in Case No. 23-30246-mvl7 (Bankr. N.D. Tex. 2023).

*Convert Bankruptcy Case to Chapter 11 Pursuant to Section 706(a) of the Bankruptcy Code* [Bankruptcy ECF No. 275] (the "**Motion to Convert**") and on the Trustee's *Motion for Approval of Compromise and Settlement Under Bankruptcy Rule 9019 and Sale of Assets* [Bankruptcy ECF No. 258] (the "**Jackson 9019 Motion**"). At the Conversion Hearing, the Court heard testimony from twelve witnesses and the parties prepared witness and exhibit lists with hundreds of exhibits.[3] The Court entered its opinion on the Motion to Convert and the Jackson 9019 Motion (the "**Conversion Opinion**") on January 22, 2023. *See In re With Purpose, Inc.*, No. 23-30246-MVL7, 2025 WL 271469 (Bankr. N.D. Tex. Jan. 22, 2025). At the beginning of this trial, the parties agreed to incorporate all the witness testimony and all the exhibits offered in the Conversion Hearing into the record of this case. Furthermore, the Court hereby incorporates the findings of fact from the Conversion Opinion into this Opinion.

## I.     Jurisdiction and Venue

This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(B), (F), (G), (H), (K), and (O). The bankruptcy court has authority to adjudicate this matter pursuant to United States District Court for the Northern District of Texas Miscellaneous Order No. 33. The Court finds that the parties have consented to this Court's jurisdiction to enter final judgment in this case because there have been no objections as to this Court's jurisdiction either before trial or at trial. *See In re Serta Simmons Bedding, L.L.C.*, 125 F.4th 555, 573-74 (5th Cir. 2024), as revised (Jan. 21, 2025), as revised (Feb. 14, 2025). Venue is proper in this District pursuant to 28 U.S.C. § 1408.

---

[3] The introduced at the Conversion Hearing and admitted as part of the trial can be found at Bankruptcy ECF Nos. 326, 327, 328, 329, 330, 331, 332, 333, 334, 336, 337, 338, 339, 357, and 376.

## II.   Findings of Fact

### a.   The Story of GloriFi

With Purpose, Inc. (the "**Debtor**" or "**GloriFi**") aimed to provide a comprehensive package of financial services to politically conservative Americans. The management of the Debtor understood that to achieve their goal it would take substantial capital. To fund the start-up enterprise, the Debtor planned a series of three capital raises to generate approximately $100 million in cash in a six-month period, the first of which (the "**Founders Round**") was to close in September 2021. The second and third capital raises were to consist of two series of debt in the form of convertible notes issued by the Debtor and guaranteed by subsidiaries and other entities related to the Debtor. These funding rounds were designed to see the Debtor through initial financial product launches.

In the Founders Round, the Debtor offered 2.5 million shares of Class A Common Stock, which raised approximately $2.2 million. NFE contributed an additional $7.5 million for Class B common shares with superior voting rights. In connection with the Founders Round, all investors executed (i) a Confidentiality and Proprietary Rights Agreement with the Debtor; and (ii) a Stockholders Agreement (which was subsequently amended) between and among the Debtor and other stockholders.

On December 3, 2021, the Debtor issued and sold approximately $53 million in aggregate principal amount of convertible notes (the "**Series 1 Notes**"). ECF No. 103-52 at 12. The closing of the Series 1 Note offering round occurred after investors committed to the entire amount of the offering. Side letters were executed between the Debtor and each Series 1 noteholder whose Series 1 Note had a face value of above $500,000 (each, a "**Side Letter**"). ECF No. 103-162. The Side

Letters included controls over future financing and protections for the Debtor's confidential information. ECF No. 103-163.

According to the Debtor's 2021 financials, the Debtor ended 2021 with approximately $38.3 million in cash. ECF No. 103-52 at 11. On January 3, 2022, the board of directors authorized the commencement of a $40 million capital raise in the form of convertible notes. Bankruptcy ECF No. 373-5. On January 20, 2022, the Debtor sent a presentation to certain existing investors entitled "Running of the Rapids" to entice participation in the next round of financing. Bankruptcy ECF No. 331-12.

On February 4, 2022, the Debtor executed a letter of intent (the "**DHC LOI**") with DHC Acquisition Corp. ("**DHC**"), a special purpose acquisition company (a "**SPAC**"), for a business combination of the two parties. ECF No. 103-166. The DHC LOI required that the Debtor have $40 million in cash on its balance sheet at closing, which was projected to occur at the end of March 2022. *Id.* The DHC transaction was valued at over $1.5 billion for investment purposes in consideration to existing equity at closing. *Id.* So long as GloriFi was able to raise $40 million to cover operations until the SPAC transaction closed, DHC would provide GloriFi with around $300 million in funding upon closing. *Id.*

During the last week of March and the first week of April 2022, triggered by the imminent fundraising shortfall, a flurry of activity took place. Board members J. Nicholas Ayers and Keri Findley suggested removing Mr. Neugebauer as CEO of the Debtor with the support of several wealthy investors from the Series 1 fundraising round. On March 27, 2022, Mr. Neugebauer proposed the following terms: a $40 million round of super senior convertible debt financing at a $750 million valuation, with the Neugebauer family leading the round with a $10 million investment. On March 28, 2022, Mr. Ayers and Ms. Findley voted against the proposal.

On March 29, 2022, Mr. Ayers and Ms. Findley were contacted by Brian Joiner for an emergency board meeting to be held on March 30, 2022. Bankruptcy ECF No. 329-86. The subject of the board meeting was the approval of a fundraising term sheet and the transfer of the Debtor's proprietary software system (the "**Tech Stack**") to Mr. Neugebauer. Bankruptcy ECF No. 348 at 184. Mr. Neugebauer proposed loaning $30 million to the Debtor, with $10 million immediately available and another $20 million in the form of a line of credit, but in connection with an agreement whereunder Animo Bancorp (wholly owned by Mr. Neugebauer and his spouse) would purchase certain assets of the Debtor along with a revenue sharing agreement. Bankruptcy ECF No. 329-87. Ms. Findley and Mr. Ayers asked for time to analyze and obtain legal review of the related party proposal from company counsel. Bankruptcy ECF No. 330-1. Mr. Ayers and Ms. Findley abstained from voting on the proposal at a separate board meeting held on March 31, 2022. *Id.* At the same meeting, Ms. Findley commented that there were other financing options available, including a prospective term sheet with DHC for $40 million at a $750 million valuation. *Id.* In the meantime, Mr. Neugebauer called a shareholder meeting where the employee equity owners, together with NFE, approved Mr. Neugebauer's proposal.

On April 2, 2022, Mr. Neugebauer proposed a $10 million capital raise at a valuation of $250 million. Ms. Findley and Mr. Ayers both voted against this capital raise. Mr. Neugebauer expanded the GloriFi board by adding two new board members: Charlie Hamilton and John Norwood. Ms. Findley was subsequently removed from the board on April 3, 2022. On April 5, 2022, GloriFi held a board meeting with Mr. Neugebauer, Mr. Ayers, Mr. Norwood, and Mr. Hamilton in attendance. Bankruptcy ECF No. 330-3. Mr. Neugebauer, Mr. Hamilton, and Mr. Norwood all voted to move forward with the $10 million capital raise at a $250 million valuation. *Id.* Mr. Ayers raised concerns about the arms-length nature of the transaction as well as whether

the deal would violate the terms of the Side Letters given to certain Series 1 Noteholders. *Id.* Mr.
Ayers voted in favor of the proposal with a request that GloriFi's counsel confirm that the proposed
financing would not violate the terms of the Side Letters. *Id.* As a result of this equity raise (the
"**April 2022 Equity Raise**"), the Neugebauer Parties took the position that the Series 1 Notes were
thereby converted into equity.

In this same timeframe, Mr. Neugebauer initiated an emergency shareholder vote to remove
Mr. Ayers from the GloriFi Board. 93% of the shares controlled by parties other than Mr.
Neugebauer voted to remove Mr. Ayers from the board effective April 5, 2022. On April 5, 2022,
Mr. Ayers sent a letter to the board of directors seeking an independent investigation of Mr.
Neugebauer's actions, including as related to: (i) misrepresentations by Mr. Neugebauer that he
would not stay on as CEO; (ii) the lack of fairness with respect to the proposed transfer of GloriFi's
assets to Animo Bancorp; (iii) wrongfully removing Ms. Findley from the board; and (iv) multiple
other issues going to a breach of fiduciary duty by Mr. Neugebauer. Bankruptcy ECF No. 334-3.
On April 12, 2022, Mr. Richard Porter of Kirkland & Ellis LLP sent a letter to the GloriFi board
of directors on behalf of his clients, who were only identified as "holders of over $20 million in
principal amount of Convertible Promissory Notes," which accused GloriFi of a self-interested
transaction between itself and Mr. Neugebauer. Bankruptcy ECF No. 334-6. The letter also
disputed the fact that the transaction qualified as "Next Equity Financing" pursuant to the Side
Letters. *Id.*

Following the allegations of misconduct, Mr. Neugebauer appointed an independent board
member, Alan Carr, to lead an investigation into the alleged misconduct. On April 28, 2022, the
GloriFi board hired Locke Lord LLP to conduct an investigation, which lasted until June 24, 2022.
The investigation delayed the Debtor's 2021 audit. The investigation included a review of the

propriety of Mr. Neugebauer's actions with respect to proposed insider transactions, as well as the work environment at the Debtor and Mr. Neugebauer's behavior as CEO. While the investigation was ongoing, Mr. Neugebauer alleges that he disclosed the investigation to potential investors, which he claims severely hurt GloriFi's fundraising efforts.

At a board meeting on May 5, 2022, Jonathan Pennington, the then chief financial officer of GloriFi, informed the board of directors that "the company had extremely limited cash available to fund its operations" and further "commented that there could be immediate challenges to meet payroll requirements in the near term." Bankruptcy ECF No. 330-5 at 1. At the next board meeting on May 12, 2022, the board of directors authorized the management of the company to raise up to $50 million of additional capital (the "**Series 2 Raise**") through the issuance of senior secured convertible notes (the "**Series 2 Notes**"). ECF No. 120-1. Management was further authorized to upsize the offering by $25 million within 120 days of the commencement of the offering. *Id.* Despite the investigations into the company, GloriFi took the investment to market and started receiving funds from Series 2 investors, the first $1 million coming from Mr. Hamilton on May 13, 2022. By the end of May, the Debtor had received $7.7 million, but the Debtor and its subsidiaries only had around $3.6 million in cash. See ECF No. 98-1 at 32. This excludes $5 million held by one of the Debtor's subsidiaries called GloriFi Reciprocal Insurance Exchange ("**Reciprocal**"), which was capital required to be on hand for issuing insurance policies. *Id.*

On June 24, 2022, Crowe LLP provided to the Debtor its Report of Independent Registered Public Accounting Firm (the "**Crowe Audit**") for the period of May 5, 2021 to December 31, 2021. ECF No. 103-52. The Crowe Audit identified issues regarding the Debtor's ability to operate as a going concern, noting that the Debtor's financial conditions "raise substantial doubt about the Company's ability to continue as a going concern." *Id.* at 3.

Also in June 2022, the Debtor raised another $5.6 million, $2.6 million from OnPoint and $3 million from NFE in Series 2 funds, but yet the Debtor and its subsidiaries had only $800,000 in cash by the end of the month, again excluding the funds held by Reciprocal. *See* ECF No. 98-1 at 32-35. In July 2022, the Debtor transferred the funds held by Reciprocal, raised $4 million from OnPoint and Banzai Capital Partners, and ended the month with less than $4 million in cash. ECF Nos. 103-29 & 103-30.

On July 25, 2022, the Debtor entered into a Business Combination Agreement with DHC Acquisition Corp. As a condition to closing the merger with DHC, the Debtor had to consummate "one or more financing transactions … resulting in GloriFi's receipt of unencumbered cash proceeds of at least $60,000,000", and the Debtor covenanted to use its best efforts to consummate such transactions before September 30, 2022. ECF No. 103-190.

Todd Travers, a co-founder and partner of OnPoint, testified that sometime between July and August 20222, William Izlar, a finance and accounting associate at GloriFi, approached him about OnPoint being the collateral agent for the Series 2 Raise. ECF No. 126 at 219-20. Mr. Travers stated that OnPoint initially declined to become the collateral agent because OnPoint had not historically served in such a role but eventually decided to support the company by accepting the position. *Id.* at 221. The decision to make OnPoint the initial collateral agent for the Series 2 Noteholders was finalized when all of the Series 2 Noteholders signed the Collateral Agency Agreement, which as described below occurred between September and October of 2022.

While this flurry of activity was occurring, the *Wall Street Journal* was investigating the Debtor and Mr. Neugebauer for potential misconduct.[4] Mr. Neugebauer testified that he cooperated with the investigation and gave the Wall Street Journal reporter "every text and every email" he

---

[4] The "source(s)" behind the Wall Street Journal investigation is the subject of veritable dispute.

9

possessed. Bankruptcy ECF No. 361 at 186. Mr. Neugebauer and Cathy Landtroop (the Debtor's former chief marketing officer) both testified that they disclosed the existence of the Wall Street Journal investigation to potential investors and admitted that this greatly hampered the Debtor's ability to raise capital. The *Wall Street Journal* investigation culminated in an article published on October 10, 2022, entitled *How a New Anti-Woke Bank Stumbled: GloriFi CEO Toby Neugebauer won over A-list investors to build a bank for people who consider Wall Street too liberal. Within months it was nearly bankrupt* (the "**WSJ Article**"). *See* Bankruptcy ECF No. 329-52. The WSJ Article was an unflattering portrayal of GloriFi and Mr. Neugebauer, as CEO. The WSJ Article included a description of GloriFi undergoing serious financial troubles and that some employees were concerned about a chaotic working environment and volatile, erratic behavior by Mr. Neugebauer as CEO. *Id.* A week after the WSJ Article was published, Mr. Neugebauer resigned as CEO of GloriFi.

### b.  The Series 2 Notes

Throughout the summer of 2022, various individuals invested in GloriFi pursuant to the Series 2 Raise. However, around the time of their investments, none of the Series 2 investors were issued promissory notes by GloriFi, and GloriFi did not execute security agreements or authorize the filing of any UCC financing statements. The Debtor did not begin this process until September 2022. On September 12th, Mr. Izlar informed Winston & Strawn, one of GloriFi's outside law firms, that the target for closing on the Series 2 Raise was September 15th. ECF No. 108-51. However, only two days later, on September 14th, Mr. Izlar informed Winston & Strawn to put the closing on hold while GloriFi was "getting in touch with" investors about documents [ECF No. 108-51], and Bryan Joiner, a co-founder of GloriFi, reported the following day that the company

was working with vendors to request that they convert "their outstanding payables balance to convertible notes." ECF No. 108-26.

Beginning in September 2022, GloriFi, in conjunction with Winston & Strawn, began to draft the loan and security documents relative to the Series 2 Raise. Winston & Strawn kept detailed records, including an internal tracker, showing when each respective Series 2 Note was drafted and sent out, when it was executed by the Debtor, and when the corresponding security agreement was prepared and executed. ECF Nos. 132-1—132-6.  Winston & Strawn proceeded to gather signatures on the Series 2 Notes, the Collateral Agency Agreement (the "**Agency Agreement**"), and the Guarantee and Collateral Agreement (the "**Security Agreement**") through mid-October 2022.[5]

While each of the Series 2 Notes indicate that they are signed and executed during the period between May 13, 2022, and November 10, 2022, the evidence showed that this is not the case. *See* ECF No. 103-235 at 72. Nearly all the Series 2 Notes from CN2-01 through CN2-20 are backdated to the date of funding by the investor, except for CN2-18, Animo Bancorp's Series 2 Note, and CN2-19, Word B. Wilson Investments, LP's Series 2 Note. The following chart details whether each note was signed, when it was supposed to be issued, and when it was executed by both the lender and the Debtor based upon the evidence adduced at trial:

| Note Number | Principal Amount | Investor | Signed | Issue Date | Date Lender Executed[6] | Date Debtor Executed |
|---|---|---|---|---|---|---|
| CN2-1 | $1,000,000 | Charlie Hamilton | Yes | 5/13/2022 | 10/7/2022 | 10/7/2022 |
| CN2-2 | $750,000 | Matthew Malouf | Yes | 5/13/2022 | 10/4/2022 | 10/7/2022 |
| CN2-3 | $1,000,000 | Jake E. McAlister | Yes | 5/16/2022 | 10/11/2022 | 10/11/2022 |
| CN2-4 | $250,000 | The Peus Family Trust Dated 7/3/2008 | Yes | 5/16/2022 | 10/7/2022 | 10/7/2022 |

---

[5] *See generally* ECF Nos. 108-1, 108-4, 108-7, 108-45, 108-60, 108-89, 108-97, 108-101, 108-105.

[6] Several spots are left blank because the Court has no evidence showing when the note was signed by either party. Therefore, the Court assumes that these notes were signed at or around the date the note was issued. There are two notes (CN2-26 and CN2-31) where a signed note was not introduced into evidence at all. Therefore, the Court does not make any inferences based on when or whether these notes were signed.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| CN2-5 | $1,000,000 | Pfluger Revocable Trust | Yes | 5/17/2022 | 10/7/2022 | 10/7/2022 |
| CN2-6 | $2,000,000 | The Kevin and Kendra Granger Trust | Yes | 5/18/2022 | 10/13/2022 | 10/13/2022 |
| CN2-7 | $100,000 | Margaret Morgan Purvis | Yes | 5/26/2022 | 10/9/2022 | 10/9/2022 |
| CN2-8 | $1,500,000 | Richard H Coats | Yes | 5/26/2022 | 10/7/2022 | 10/7/2022 |
| CN2-9 | $100,000 | Dalton B. Donaldson + Susannah P. Donaldson | Yes | 5/27/2022 | 10/7/2022 | 10/7/2022 |
| CN2-10 | $2,600,000 | OnPoint GloriFi II, LP | Yes | 6/8/2022 | 10/13/2022 | 10/13/2022 |
| CN2-11 | $3,025,000 | Neugebauer Family Enterprises, LLC | Yes | 6/30/2022 | 10/7/2022 | 10/7/2022 |
| CN2-12 | $3,000,000 | Banzai Capital Partners, LLC | Yes | 7/7/2022 | 10/10/2022 | 10/10/2022 |
| CN2-13 | $1,000,000 | OnPoint GloriFi II, LP | Yes | 7/29/2022 | 10/13/2022 | 10/13/2022 |
| CN2-14 | $4,125,000 | Neugebauer Family Enterprises, LLC | Yes | 8/15/2022 | 10/12/2022 | 10/12/2022 |
| CN2-15 | $300,000 | CCR FLP Holdings LP | Yes | 8/15/2022 | 10/9/2022 | 10/9/2022 |
| CN2-16 | $100,000 | J.Paul Manning | Yes | 8/29/2022 | 10/4/2022 | 10/7/2022 |
| CN2-17 | $100,000 | D. Nevill Manning | Yes | 9/1/2022 | 10/4/2022 | 10/7/2022 |
| CN2-18 | $5,840,552 | Animo Bancorp | Yes | 9/8/2022 | 9/9/2022 | 9/9/2022 |
| CN2-19 | $1,000,000 | Word B. Wilson Investments, LP | Yes | 9/13/2022 | 9/13/2022 | 9/13/2022 |
| CN2-20 | $500,000 | OnPoint GloriFi II, LP | Yes | 9/7/2022 | 10/13/2022 | 10/13/2022 |
| CN2-21 | $500,000 | Magic Rise Group Ltd | Yes | 10/31/2022 | | |
| CN2-24 | $750,000 | Neugebauer Family Enterprises, LLC | Yes | 10/6/2022 | | |
| CN2-25 | $200,000 | Lynwood Partners LLC | Yes | 10/17/2022 | 11/3/2022 | 11/3/2022 |
| CN2-26 | $200,000 | DRJ Properties Ltd. | No | 10/21/2022 | | |
| CN2-27 | $275,000 | Neugebauer Family Enterprises, LLC | Yes | 10/14/2022 | | |
| CN2-28 | $750,000 | Neugebauer Family Enterprises, LLC | Yes | 10/20/2022 | | |
| CN2-29 | $300,000 | Moriah Investment Partners | Yes | 10/25/2022 | | |
| CN2-30 | $200,000 | DRJ Properties Ltd. | Yes | 11/3/2022 | | |
| CN2-31 | $1,000,000 | Magic Rise Group Ltd | No | 11/3/2022 | | |
| CN2-32 | $2,000,000 | Spencer Beal | Yes | 11/10/2022 | | |
| CN2-33 | $100,000 | Reemo Family LLC | Yes | 10/17/2022 | | |
| CN2-34 | $175,000 | Charlie Hamilton | Yes | 11/3/2022 | | |
| CN2-35 | $175,000 | Neugebauer Family Enterprises, LLC | Yes | 11/3/2022 | | |
| CN2-36 | $100,000 | JNW Family LP | Yes | 10/17/2022 | | |

Additionally, while the Security Agreement and the Agency Agreement are dated September 30, 2022, the evidence showed that those documents were not fully executed until October 13, 2022. *See* ECF Nos. 108-45 & 108-46; *see also* ECF No. 108-60–ECF No. 108-66.

While the Notes and the Security Agreement were executed closer to October 13, 2022, the Agency Agreement was not fully executed until November 3, 2022, which was a full two and a half weeks after the UCC financing statements were filed. ECF Nos. 108-47 & 108-48.

### c. The Alleged Foreclosure

GloriFi was operational to the public for only a few weeks in October and November 2022. On November 21, 2022, GloriFi announced that it had decided to "begin winding down the company's operations." ECF No. 122-2. On December 11, 2022, Mr. Hamilton engaged Bywaters Company Management, LLC, which agreed to provide the services of Hunter Bywaters as independent director to help wind down the company and prepare it for a potential Chapter 11 bankruptcy filing. ECF No. 103-35. On December 13, 2022, Mr. Neugebauer (the majority stockholder), as representative of stockholders, and Mr. Hamilton, as the sole remaining board member, appointed Mr. Bywaters as an independent director of the Debtor. ECF Nos. 103-39 & 103-40. Around this time, Mr. Hamilton resigned from the board of directors. ECF No. 103-36. Mr. Bywaters' tenure with GloriFi lasted only around 6 weeks and was fraught with disagreements with Mr. Neugebauer as the majority shareholder and principal of certain affiliates. *See* ECF No. T103-103.

On January 4, 2023, an involuntary Chapter 7 proceeding was filed against Animo Services, LLC (a subsidiary of the Debtor). *See Animo Servs., LLC*, 23-30035-mvl7 (Bankr. N.D. Tex. Jan 4, 2023). Immediately thereafter, on January 5, 2023, OnPoint sent, by and through its counsel, its *Notice of Default under Secured Convertible Promissory Note* (the "**Foreclosure Notice**") to the Debtor.  ECF No. 103-69. The only alleged event of default under the Series 2 Notes in the Foreclosure Notice was that GloriFi had ceased doing business. *Id.* In the Foreclosure Notice, under the heading "Notice of Exercise of Collateral Rights Under the Collateral

Agreement," OnPoint states that pursuant to Section 7 of the Security Agreement that it will take

all actions necessary to identify and secure:

> (a) The software that was being developed by or on behalf of the Company for its business (the "Software"), including but not limited to source code, object code, scripts, programming tools, diagrams, documentation, presentations, correspondence and notes relating to the Software, any hardware used in connection with the Software, as well as any other tangible or intangible asset of the Company or its agents related to the Software, wherever located (the "Software Assets"); and (b) any intellectual property associated with the Software, including but not limited to the Intellectual Property (specifically including the intellectual property listed as part of the Collateral in Schedule 5 of the Collateral Agreement, trade secrets, shop rights, work made for hire.

ECF No. 105-12 at 2. Under the heading "Notice of Intention to Exercise Rights Under the

Uniform Commercial Code," the Foreclosure Notice goes on to state that OnPoint intended to

"take possession of the Collateral consisting of the Software and Software Assets" pursuant to

Section 9.609 of the Texas Business and Commerce Code. *Id.* at 2-3. Finally, the Foreclosure

Notice states that unless the Company consents or cures the existing default, that OnPoint "will

accept exclusive ownership of the Software and Software Assets in satisfaction of $7.5 million of

the Total Amount Due, with the remaining secured principal indebtedness of $29.5 million

remaining due and owing" pursuant to Section 9.620 of the Texas Business and Commerce Code.

*Id.* at 3.

OnPoint also drafted the *Consent of Board of Directors* (the "**Bywaters Consent**") and

sent it to Mr. Bywaters. *Id.* at 4. Mr. Bywaters executed the Bywaters Consent on January 6, 2023,

and delivered the same to OnPoint. ECF Nos. 105-13 & 105-14. Therein, Mr. Bywaters

acknowledged that the Debtor was "in default under the [Series 2] Notes and had ceased business

operations." ECF No. 105-14. Furthermore, in the Bywaters Consent, the Debtor consented to

OnPoint "taking control of the Software Assets pursuant to Section 9.609 of the Texas Uniform

Commercial Code as of January 5, 2023[.]" *Id.* The Company also consented to OnPoint's

"acceptance of exclusive title to the Software and Software Assets in satisfaction of $7.5 million of the Total Amount Due, with the remaining secured indebtedness in the principal amount of $29.5 million remaining due and owing[.]" *Id.*

### d.  The Bankruptcy Case

On February 8, 2023, the Debtor filed its voluntary Chapter 7 petition. Bankruptcy ECF No. 1. The Petition was signed by Toby R. Neugebauer, who had once again returned to GloriFi, signing as the Manager of the Debtor. *Id.* Scott M. Seidel was appointed the Chapter 7 Trustee for this case. On February 9, 2023, the Debtor filed its Schedules, therein identifying assets valued at $595,956.41 and liabilities totaling $40,080,301.74. Bankruptcy ECF No. 9. In its original Schedules, the Debtor also identified certain causes of action against third parties, both pending and potential. *Id.* at 36. In particular, the Debtor noted a potential cause of action against OnPoint for potential claims "arising out of the alleged partial foreclosure of the Debtor's Intellectual property." *Id.* at 36-37. The Debtor also lists an existing arbitration against James Nicholas Ayers for breach of confidentiality and proprietary rights agreement, breach of antidisparagement clause, and tortious interference. *Id.* at 36. On March 8, 2023, the Debtor filed its Amended Schedules, therein making limited updates to such causes of action. Bankruptcy ECF No. 31. In both iterations of the Schedules, the value of the causes of action is scheduled as "unknown" and not mathematically included in the total asset valuation. *See id.* at 14-15.   The meeting of creditors was held and concluded on March 10, 2023, with the Trustee determining that there were assets to be administered in this case. Bankruptcy ECF No. 36.

On November 29, 2023, the Trustee filed his *Motion for Entry of (I) an Order, (A) Approving Bid and Noticing Procedures, (B) Scheduling an Auction and Hearing, and (C) Granting Related Relief; and (II) an Order (A) Approving Sale of Debtor Assets Free and Clear of*

*All Liens, Claims, Encumbrances and Interests, and (B) Granting Related Relief* (the "**Sale Motion**") [Bankruptcy ECF No. 151], seeking to sell "all the Debtor's assets including the Causes of Action." Bankruptcy ECF No. 151 at 2. On December 20, 2023, OnPoint filed an objection to the Sale Motion, contending, in part, that the non-litigation assets being sold were not property of the bankruptcy estate because it allegedly foreclosed upon those assets prepetition. Bankruptcy ECF No. 162. A hearing was held on the Sale Motion on December 21, 2023. At the hearing, counsel for the Trustee stated that they resolved OnPoint's objection by proposing a Bankruptcy Rule 9019 settlement agreement with OnPoint that would unwind OnPoint's purported prepetition foreclosure of the assets and restore parties to their pre-foreclosure posture. *See* Bankruptcy ECF No. 165 at 17. As such, the Sale Motion was continued to allow for further agreements to be reached with interested parties prior to the auction. Bankruptcy ECF No. 164.

On February 16, 2024, the Trustee filed his *Motion for Approval of Settlement Agreement with OnPoint Companies, LLC* (the "**OnPoint 9019 Motion**"). Bankruptcy ECF No. 172. If the OnPoint 9019 Motion were approved, OnPoint agreed to tender to the Trustee the assets obtained as a result of the foreclosure and withdraw its objection to the Sale Motion. Bankruptcy ECF No. 172 at 4-5. In exchange, the Trustee would release the scheduled claims against OnPoint in connection with the foreclosure of the Debtor's intellectual property and amend the Sale Motion to carve-out all other claims against OnPoint. *Id.* Finally, if any assets were sold by the Trustee, OnPoint's asserted liens would remain on the assets and the Trustee would be entitled to recover a surcharge of 20% of the proceeds of OnPoint's collateral, up to $160,000. *Id.* J. Nicholas Ayers 2021 Irrevocable Trust, Ayers Family Holdings, LLC, and Keri Findley (collectively, the "**Ayers Parties**"), JIG, and Mr. Neugebauer each filed objections to the OnPoint 9019 Motion. *See* Bankruptcy ECF Nos. 174, 177, and 175. It is worth noting that Mr. Neugebauer objected to the

16

OnPoint 9019 Motion, in part, because he asserted that OnPoint's foreclosure on the assets was wrongful and that the scheduled claims against OnPoint as the collateral agent were worth "tens of millions of dollars." Bankruptcy ECF No. 175 at 5. On March 21, 2024, a status conference was held on the OnPoint 9019 Motion. Bankruptcy ECF No. 184. At the status conference, the Trustee asked the Court to continue the hearing on the OnPoint 9019 Motion so that he could confer with the objecting parties in an attempt to reach a resolution on the objections. *See* Bankruptcy ECF No. 385. On April 5, 2024, due to creditor dissention, the Trustee withdrew the OnPoint 9019 Motion. Bankruptcy ECF No. 185. On April 22, 2024, OnPoint abruptly resigned as the collateral agent and WPI Collateral Management, LLC was appointed as its successor, with J. Paul Manning, a Series 2 Noteholder and longtime friend of Mr. Neugebauer serving as its sole member and manager.

On April 10, 2024, the Trustee filed an amended sale motion (as amended, the "**Bid Procedures Motion**"), which limited the proposed sale to that "of the Estate's litigation assets, namely the Causes of Action." Bankruptcy ECF No. 186 at 3. Both Mr. Neugebauer and the Collateral Agent filed objections to the Bid Procedures Motion. *See* Bankruptcy ECF Nos. 189 & 191. The Collateral Agent objected to the Bid Procedures Motion on the following grounds: (i) the Bid Procedures Motion did not provide sufficient information for any potential purchaser to identify exactly what assets are being sold and whether they are subject to the Collateral Agent's liens; (ii) the Trustee sought to sell the causes of action in bulk and did not delineate between Collateral Agent's causes of action and unencumbered causes of action; (iii) the Bid Procedures Motion did not require a purchaser to allocate the proposed purchase price among the Collateral Agent's causes of action and the unencumbered causes of action; (iv) the Bid Procedures Motion did not provide a mechanism for the Collateral Agent to credit bid its secured claim on its collateral

pursuant to Section 363(f) of the Bankruptcy Code; and (v) the Trustee failed to show that he could

satisfy Section 363(f) of the Bankruptcy Code. Bankruptcy ECF No. 191 at 5-6. Mr. Neugebauer

objected to the Bid Procedures Motion on the following grounds: (i) the Trustee failed to identify

the assets to be sold and thus failed to satisfy the business judgment standard; (ii) the Trustee failed

to provide sufficient notice to parties in interest; (iii) the Trustee's decision to sell the causes of

action rather than pursue an agency agreement with a bidder to pursue the actions robbed value

from many potential causes of action; (iv) the Trustee's failure to list the various causes of action

for sale gave potential bidders insufficient time to solicit and obtain litigation financing for the

purchase of the causes of action; (v) the all-cash reserve price for management causes of action

permitted targets of such causes of action to chill bidding from other parties; and (vi) the bid

procedures order should also prohibit the sale of any foreclosed assets.[7] Bankruptcy ECF No. 189.

The Court held a hearing on May 7, 2024, and subsequently granted the Amended Sale

Motion, authorizing the Trustee to sell causes of action belonging to the estate. Bankruptcy ECF

No. 195. On May 17, 2024, the Court entered its *Order (A) Approving Bid and Noticing*

*Procedures, (B) Scheduling an Auction and Hearing, and (C) Granting Related Relief* (the "**Bid**

**Procedures Order**"), therein establishing June 17, 2024, as the auction date, with bids due on

June 7, 2024. Bankruptcy ECF No. 197.

On May 16, 2024, the Collateral Agent, Mr. Neugebauer, Banzai Capital, Banzai Advisory,

and NFE (collectively, the "**Georgia Plaintiffs**"), filed a complaint in the United States District

Court for the Northern District of Georgia (the "**Georgia Court**") against the Georgia Defendants,[8]

---

[7] This was a markedly different position with regard to the foreclosure than that taken by Mr. Neugebauer only a few weeks prior even though he was represented by the same counsel.

[8] Vivek Ramaswamy, Strive Enterprises, Inc., Strive Asset Management, LLC, Joseph Ricketts, James Nick Ayers, Joseph Lonsdale, Peter Thiel, Jeffrey Sprecher, Richard Jackson, Breanne Harmsen, Jonathan Pennington, Old Glory Intellectual Property Holdings, LLC, Citadel, LLC, The Founders Fund VII, LP, The Founders Fund VII Principals Fund, LP, the Founders Fund VII Entrepreneurs Fund, LP, Keri Findley, Cason Carter, Britt Amos, Jerome T. Fadden,

thereby initiating Civil Proceeding 1:24-cv-02148-ELR pending before that court (the "**Georgia Litigation**"). In the Georgia Litigation, the Georgia Plaintiffs allege the following causes of action: (1) Violation of the Georgia RICO Act: O.C.G.A. § 16-14-4(a); (2) Violation of the Georgia RICO Act: O.C.G.A. § 16-14-4(b); (3) Violation of the Georgia RICO Act: O.C.G.A. § 16-14-1(c); (4) Theft of Trade Secrets Under Georgia Code § 10-1-761, et seq.; (5) Violation of RICO: 18 U.S.C. § 1962(c); (6) Violation of the Lanham Act 15 U.S.C. § 1125; (7) Conspiracy to Breach Contract: Stockholders Agreement; (8) Punitive Damages (O.C.G.A. § 51-12-5.1); (9) Attorneys' Fees and Expenses.

On May 17, 2024, the same day as the entry of the Bid Procedures Order, Mr. Neugebauer, Banzai Capital, Banzai Advisory, and NFE (collectively, the "**Delaware Plaintiffs**," together with the Georgia Plaintiffs, the "**DEGA Plaintiffs**") filed a complaint in the United States District Court for the District of Delaware (the "**Delaware Court**") against the Delaware Defendants,[9] thereby initiating Civil Proceeding 1:24-cv-00599-UNA pending before that court (the "**Delaware Litigation**," together with the Georgia Litigation, the "**DEGA Litigation**"). In the Delaware Litigation, the Delaware Plaintiffs allege the following causes of action: (1) Breach of Contract and Conspiracy to breach Contract: Stockholders Agreement and (2) Violations of RICO: 18 U.S.C. § 1962(c). The complaints in the DEGA Litigation both state that the DEGA Plaintiffs "do

---

Manuel Rios, Seven Talents, LLC, J. Nicholas Ayers 2021 Irrevocable Trust, Ayers Family Holdings LLC, Zing America, Inc., Old Glory Holding Company, Vivek Ramaswamy Investments, LLC, Jackson Investment Group, LLC, GFNCI, LLC, Descante Capital, LLC, and The Lonsdale Family Revocable Trust Dated February 15, 2018 shall be collectively referred to as the "**Georgia Defendants**."

[9] The Founders Fund VII, LP, The Founders Fund VII Principals Fund, LP, the Founders Fund VII Entrepreneurs Fund, LP, Keri Findley, Cason Carter, Britt Amos, Jerome T. Fadden, Manuel Rios, Seven Talents, LLC, J. Nicholas Ayers 2021 Irrevocable Trust, Ayers Family Holdings LLC, Vivek Ramaswamy Investments LLC, Jackson Investment Group, LLC, GFNCI, LLC, Descante Capital, LLC, and The Lonsdale Family Revocable Trust Dated February 15, 2018  shall be collectively referred to as the "**Delaware Defendants**" (and together with the Georgia Defendants, the "**DEGA Defendants**").

not seek any lost equity value in GloriFi or any other damages property of the GloriFi Bankruptcy
Estate. Bankruptcy ECF No. 328-41 at 78; Bankruptcy ECF No. 328-42 at 2.

Despite the ongoing bankruptcy sale process, Mr. Manning testified that he authorized the
filing of the Georgia Litigation on behalf of the Collateral Agent because he felt like nothing was
happening in the bankruptcy. Bankruptcy ECF No. 361 at 40. Mr. Manning admitted that one of
the reasons behind the filing of the Georgia Litigation was to forestall the Trustee's sale of the
causes of action. *Id.* at 41-42. Mr. Manning also indicated that the Georgia Litigation needed to be
filed to avoid problems with alleged statutes of limitations. *Id.* at 45. Neither the Collateral Agent
nor the various Neugebauer-related parties sought relief from the automatic stay prior to filing the
DEGA Complaints, despite the Trustee affirmatively forewarning the parties of his position that
the filing would constitute a violation of the automatic stay.

On May 20 and 22, 2024, after filing the DEGA Litigation, the Collateral Agent filed two
motions to lift stay to pursue additional claims in the Georgia Litigation and foreclose on
contractual claims. Bankruptcy ECF Nos. 199 & 201. It is key to note that none of the DEGA
Plaintiffs ever filed a motion to lift stay to pursue the DEGA Litigation.

On July 21, 2024, the Trustee filed the Complaint against the Collateral Agent, OnPoint,
and the Neugebauer Parties alleging twenty-three causes of action. ECF No. 44. The Complaint
alleges the following causes of action: (1) Declaratory Judgment Regarding Extent of Alleged
Foreclosure; (2) Declaratory Judgment Regarding Validity of Alleged Foreclosure; (3) Permanent
Injunction Against Collateral Agent; (4) Wrongful Foreclosure Under the UCC; (5) Breach of
Contract; (6) Avoidance of Collateral Agreement's Grant of Security as Insider Preference; (7)
Avoidance of Collateral Agreement's Perfection of Security as Insider Preference; (8) Avoidance
of Collateral Agreement's Unperfected Security Interests; (9) Recovery of Avoided Transfers; (10)

Declaratory Judgment Regarding Granting Clause; (11) Equitable Subordination; (12) Recharacterization; (13) Declaratory Judgment Regarding Extent of Collateral Agent's Security Interests Respecting DE Complaint and GA Complaint; (14) Objection to Collateral Agent's Claim; (15) Declaratory Judgment Regarding Ownership of Count 1 of the DE Complaint; (16) Declaratory Judgment Regarding Ownership of Count 2 of the Delaware Complaint; (17) Declaratory Judgment Regarding Ownership of Counts 1, 2, 3, 4, 5, 6, 8, and 9 of GA Complaint; (18) Declaratory Judgment Regarding Ownership of Count 4 of GA Complaint; (19) Declaratory Judgment Regarding Ownership of Count 7 of Georgia Complaint; (20) Permanent Injunction Enforcing the Automatic Stay; (21) Damages for Violation of the Automatic Stay; (22) Avoidance and Recovery of Constructively Fraudulent Transfers Pursuant to 11 U.S.C. § 548(a)(1)(B); and (23) Avoidance and Recovery of Constructively Fraudulent Transfers Pursuant to the Texas Uniform Fraudulent Transfer Act. JIG brings an additional three counts in intervention, including (24) Breach of Contract; (25) Avoidance of Attachment of Security Interest; and (26) Tortious Interference. ECF No. 90. The Court will address each of the counts categorically below.

### III. <u>Conclusions of Law</u>

#### a. <u>Disallowance of Unsigned Series 2 Notes – Count 14</u>

Count 14 is a general objection to the Collateral Agent's Claim. The Trustee asserts that certain Series 2 Notes made part of the Collateral Agent's proof of claim should be disallowed because there is no proof that the notes were ever executed by the Debtor. Pursuant to Rule 3001(a) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), a proof of claim is a written statement setting forth a creditor's claim against the bankruptcy estate. When a claim is based on a writing, the original or a duplicate shall be filed with the proof of claim. Fed. R. Bankr. P. 3001(c)(1). Official Form 410 underscores the rule, providing that a copy of the supporting

documents for the claim must be attached to the proof of claim. If a proof of claim is filed in the proper form and has copies of all required documents attached to it, it is deemed *prima facie* valid in the amount of the asserted claim. Fed. R. Bankr. P. 3001(f). A failure to fully comply with Bankruptcy Rule 3001 by failing to include certain required documents with the proof of claim, will result in a loss of the proof of claim's *prima facie* validity, but it does not necessarily result in the disallowance of the claim. *In re Gulley*, 400 B.R. 529, 540 (Bankr. N.D. Tex. 2009); *In re White*, No. 06-50247RLJ13, 2008 WL 269897, at *3 (Bankr. N.D. Tex. Jan. 29, 2008).

In the underlying bankruptcy case, on June 12, 2023, OnPoint filed Proof of Claim 44-1 (the "**Collateral Agent's Claim**") for $28,515,552. ECF No. 104-1. Exhibit C to the Collateral Agent's Claim contains a list of thirty-four Series 2 Notes identified by note number (CN2-"X") and investor. *Id.* at 72. The Collateral Agent's Claim also attaches a fully executed version of the Agency Agreement (Exhibit A) and the Security Agreement (Exhibit D). *See id.* at 7 and 73. However, the Collateral Agent's Claim only attaches a copy of OnPoint's Series 2 Note CN2-10 (Exhibit B). It does not include any of the other Series 2 Notes listed on Exhibit C. *See id.* at 52. Therefore, only OnPoint's Series 2 Note CN2-10 has *prima facie* validity pursuant to Bankruptcy Rule 3001(f).

If a debtor or trustee objects to a proof of claim for failure to attach supporting documents, the creditor has the burden of proof to establish its claim by a preponderance of the evidence. *Gulley*, 400 B.R. at 540; *White*, 2008 WL 269897, at *6. The Series 2 Notes provide that the notes shall be "governed by and construed in accordance with the internal laws of the State of Texas[.]" ECF No. 105-4 at § 16.2. Section 3.401 of the Texas Business and Commerce Code provides that "[a] person is not liable on an instrument unless the person: (1) signed the instrument; or (2) is represented by an agent or representative who signed the instrument and the signature is binding

22

on the represented person under Section 3.402." Further, a "loan agreement in which the amount involved in the loan agreement exceeds $50,000 in value is not enforceable unless the agreement is in writing and signed by the party to be bound or by the party's authorized representative." Tex. Bus. & Com. Code § 26.02(b).

At the hearing, the Collateral Agent offered into evidence fully executed copies of most of the Series 2 Notes but failed to submit evidence supporting the full execution of CN2-26 for DRJ Properties Ltd. in the amount of $200,000 and CN2-31 for Magic Rise Group Ltd. in the amount of $1,000,000. Although the Collateral Agent submitted a version of CN2-31 signed by the Magic Rise Group Ltd., it never introduced into evidence a version of the note signed by the Debtor as obligor. *See* ECF No. 104-69. Furthermore, the Collateral Agent introduced a version of CN2-26 that was unsigned by both DRJ Properties Ltd. and the Debtor. ECF No. 104-67. Neither DRJ Properties Ltd. nor Magic Rise Group Ltd. presented any evidence at trial. Therefore, the Court lacks sufficient evidence to verify the validity of CN2-26 and CN2-31. As such, that portion of the Collateral Agent's Claim is hereby disallowed, and the overall Collateral Agent's Claim shall be reduced by $1,200,000. The Trustee also notes that there is no evidence of Series 2 Note CN2-23 for JNW Family LP in the amount of $100,000, but, upon further review, the Court believes that this note was misidentified on the Collateral Agent's Claim and is Series 2 Note CN2-36. *See* ECF No. 103-161. Thus, the Trustee's objection as to the overall validity of all of the Series 2 Notes, except for CN2-26 and CN2-31, set forth in Count 14 is hereby overruled.

**b. <u>Avoidance of Preferential Transfer – Counts 6-9</u>**

In Counts 6-9, the Trustee seeks to avoid both the grant and perfection of a security interest to the Collateral Agent as an insider preference as to Series 2 Notes CN2-1 through CN2-20 (the

"**Pre-9/30 Notes**"), those notes with an issuance date prior to September 30, 2022. The Trustee's

preference claim is based on Section 547(b) of the Bankruptcy Code, which provides:

> (b) Except as provided in subsections (c) and (i) of this section, the trustee may, based on reasonable due diligence in the circumstances of the case and taking into account a party's known or reasonably knowable affirmative defenses under subsection (c), avoid any transfer of any interest of the debtor in property—
> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made—
> (A) on or within 90 days before the date of the filing of the petition; or
> (B) between ninety days and one year before the date of the petition, if such creditor at the time of the transfer was an insider; and
> (5) that enables such creditor to receive more than such creditor would receive if—
> (A) the case were a case under Chapter 7 of this title;
> (B) the transfer had not been made; and
> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

"Section 547(b) ... allows a trustee to recover as a preferential payment certain transfers made by a debtor to a creditor within the ninety-day period prior to bankruptcy." *Braniff Airways, Inc. v. Exxon Co., U.S.A.*, 814 F.2d 1030, 1033 (5th Cir. 1987).  The purpose of Section 547(b) is twofold: (1) it permits a trustee to avoid pre-bankruptcy transfers occurring on the eve of bankruptcy so as to discourage creditors "from racing to the courthouse to dismember the debtor during [its] slide into bankruptcy"; and (2) it ensures fair distribution among the creditors. *Union Bank v. Wolas*, 502 U.S. 151, 161 (1991) (quoting H.R. Rep. No. 95–595, at 177 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6138) (internal quotation marks omitted). In a preference action, Section 547(b) places the burden of proof on the trustee to establish the avoidability of a transfer by a preponderance of the evidence. *See* 11 U.S.C. § 547(g). Moreover, the trustee must overcome any defenses a transferee may have pursuant to Section 547(c).

24

Here, the Collateral Agent disputes that the transfer was made "for or on account of an antecedent debt", that the transfer was made "while the debtor was insolvent", and that the Collateral Agent constituted an insider at the time of the transaction.

### i.  The Transfer Was Made For or On Account of an Antecedent Debt

The Collateral Agent asserts that the Trustee failed to establish that the pledge of security to the Collateral Agent was on account of an antecedent debt. Rather, the Collateral Agent asserts that the pledge of security to the Collateral Agent under the Collateral Agreement was part of a contemporaneous transaction pursuant to Section 547(c)(1). Specifically, the Collateral Agent argues that "the [Agency] Agreement provided the Collateral Agent with specific, stand-alone rights that were created and perfected as part of the same transaction that gave rise to the [Series 2] Notes." ECF No. 136 at ¶ 60. In contrast, the Trustee argues that the debts were antecedent because "by October 13, 2023, the Debtor owed both OnPoint and most of the Series 2 creditors the underlying debts, whether or not the Debtor had signed the actual promissory notes by that time." ECF No. 135 at ¶ 129.

The Fifth Circuit has noted that the "antecedent debt" requirement of Section 547(b)(2) and the "contemporaneous exchange" exception of Section 547(c)(1) "present two analytically separate inquiries." *In re Ramba, Inc.*, 416 F.3d 394, 398 (5th Cir. 2005). "[A] given transaction might be one or the other, neither, or both." *Id.* Therefore, the Court will consider the two issues separately.

The Bankruptcy Code defines "debt" as "liability on a claim." 11 U.S.C. § 101(12). "Claim," in turn, is defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." *Id.* at § 101(5). A debt is "antecedent" for purposes of

Section 547(b) if it was "incurred *before* the alleged preferential transfer." *Ramba*, 416 F.3d at 399 (emphasis added). For the majority of the Pre-9/30 Notes, the Debtor incurred the debt between one to five months before granting a security interest to the noteholders because the Series 2 Notes and Security Agreements were not fully executed until October 7 through October 13, 2022. Therefore, the obligations underlying the Pre-9/30 Notes constituted antecedent debt. There is one exception, the Word B. Wilson Investments, LP Series 2 Note (CN2-19) was fully executed the day of the investment. *See* ECF No. 108-1; ECF No. 120-11.

Additionally, the Animo Bancorp Series 2 Note (CN2-18) was unquestionably made on account of antecedent debt. To be certain, Animo Bancorp never "invested" in the Series 2 Raise in the traditional sense. Mr. Neugebauer testified that the money that formed the basis of the Animo Bancorp Series 2 Note was transferred[10] from Animo Bancorp to GloriFi between mid-November 2021 to January 2022. ECF No. 131 at 80-82.[11] The alleged transfer occurred before the Series 2 Raise had been approved by the board of directors. Furthermore, it was not until September 2022 that GloriFi granted Animo Bancorp a Series 2 Note securing Animo Bancorp's alleged transfer of funds to GloriFi as a way to clean up the intercompany financial transaction between the two affiliated companies for regulatory purposes. *See* ECF No. 131 at 80-82. Therefore, the Animo Bancorp Series 2 Note was made on account of an antecedent debt.

The Collateral Agent further argues that the pledge of security was part of a contemporaneous exchange for new value. Section 547(c)(1) provides that a transfer may not be avoided if it is a "contemporaneous exchange for new value given to the debtor." 11 U.S.C. § 547(c)(1). The purpose of the contemporaneous exchange exception is to protect transactions that

---

[10] There is a dispute as to the amount of money that Animo Bancorp allegedly transferred to or on behalf of the Debtor.
[11] Mr. Neugebauer described the Animo Bancorp Series 2 Note as a way to compensate Animo Bancorp for an "involuntary loan. ECF No. 131 at 80.

do not result in a diminution to the bankruptcy estate. *In re Bison Bldg. Holdings, Inc.*, 473 B.R. 168, 175 (Bankr. S.D. Tex. 2012) (citing *Velde v. Kirsch*, 543 F.3d 469, 472 (8th Cir. 2008)). To establish the contemporaneous exchange defense, the creditor is required to demonstrate "intent, contemporaneousness and new value." *Southmark Corp. v. Schulte Roth & Zabel (In re Southmark Corp.)*, No. 99-11404, 2000 WL 1741550, at *3 (5th Cir. Nov. 7, 2000); *Sherman v. OTA Franchise Corp. (In re Essential Financial Education, Inc.)*, 629 B.R. 401, 446 (Bankr. N.D. Tex. 2021).

Section 547(c)(1) requires that the exchange of a transfer by a debtor for new value be "in fact a substantially contemporaneous exchange[.]" 11 U.S.C. § 547(c)(1)(B). "Contemporaneousness is a flexible concept that requires a case-by-case inquiry into all relevant circumstances—such as length of delay, reason for delay, nature of the transaction, intentions of the parties, and possible risk of fraud—surrounding an alleged preferential transfer." *Bison*, 473 B.R. at 176. Courts have generally found that the longer the delay between the payment and the alleged preferential transfer, the less likely it is that the transaction was substantially contemporaneous. *See, e.g, Ray v. Security Mut. Fin. Corp. (In re Arnett),* 731 F.2d 358, 362 (6th Cir. 1984) (33 days held not to be contemporaneous); *Pine Top Ins. Co. v. Bank of America National Trust & Savings Ass'n,* 969 F.2d 321, 328 (7th Cir. 1992) (holding that two-to-three week delay in transfer of collateral in connection with issuance of secured standby letter of credit was substantially contemporaneous); *In re Bullion Reserve of North America,* 836 F.2d 1214 (9th Cir. 1988) (77 days not contemporaneous); *In re Hencie Consulting Services, Inc*., No. 03-39402 BJH7, 2006 WL 3804991 (Bankr. N.D. Tex. Dec. 21, 2006) (Houser, J.) (35 days held not to be contemporaneous); *Telecash Indus., Inc. v. Universal Assets (In re Telecash Indus., Inc.),* 104 B.R. 401, 404 (Bankr. D. Utah 1989) (holding that contemporaneous exchange not precluded as a matter of law when defendant perfected security interest more than 10 days after loan transaction,

27

despite Section 547(e)(2)); *In re Tucker Freight Lines, Inc.,* 62 B.R. 210 (Bankr. W.D. Mich. 1986) (seven weeks not contemporaneous); *Gropper v. Samuel Kunstler Textiles, Inc. (In re Fabric Buys of Jericho, Inc.),* 22 B.R. 1013, 1016 (Bankr. S.D.N.Y. 1982) (over 90 days is not contemporaneous); *Jahn v. First Tenn. Bank of Chattanooga (In re Burnette),* 14 B.R. 795 (Bankr. E.D. Tenn. 1981) (20 days contemporaneous); *In re Hall,* 14 B.R. 186, 188 (Bankr. S.D. Fla. 1981) (90 days not contemporaneous); *Steinberg v. Nat'l Bank & Trust Co. (In re Independence Land Title Corp.),* 9 B.R. 394, 396 (Bankr. N.D. Ill. 1981) (two months not contemporaneous).

The Debtor received the funds for the Pre-9/30 Notes between 36 and 149 days prior to the execution of the Series 2 Notes and the corresponding Security Agreements. Additionally, the Debtor allegedly received the funds that form the basis of the Animo Bancorp Note from November 2021 to January 2022.  The Collateral Agent and the Debtor offered no reason for the delay. Therefore, the Court comfortably concludes that the relevant exchanges prior to September 30, 2022, were not substantially contemporaneous with the execution of the Series 2 Notes and the Security Agreements. While the transfers do not need to be simultaneous, the Court finds that the gap here of 36 to 149 days is not substantially contemporaneous pursuant to Section 547(c)(1). Therefore, the Court finds that the all of the Pre-9/30 Notes, except for CN2-19, were on account of antecedent debt and did not constitute a contemporaneous exchange.

### ii.  The OnPoint's Insider Status

The Bankruptcy Code contains a non-exhaustive list of *per se* insiders. 11 U.S.C. § 101(31). While this list is illustrative, courts have routinely recognized parties not on this list as non-statutory insiders. *U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 583 U.S. 387, 389 (2018). In the Fifth Circuit, the determination of non-statutory insider status generally focuses on two factors: (1) the closeness of the relationship between the transferee

and the debtor; and (2) whether the transactions between the transferee and the debtor were conducted at arm's length. *Browning Interests v. Allison (In re Holloway)*, 955 F.2d 1008, 1011 (5th Cir. 1992). The controlling question as to the first factor is whether the relationship is close enough for the alleged insider to gain advantage due to affinity. *Neutra, Ltd. v. Terry (In re Acis Cap. Mgmt., L.P.)*, 604 B.R. 484, 535 (N.D. Tex. 2019) (Fitzwater, J.); *In re Premiere Network Servs.*, 333 B.R. 126, 129 (Bankr. N.D. Tex. 2005) (Hale, J.). Furthermore, an arm's-length transaction is defined as a transaction taking place as if the two parties were strangers. *U.S. Bank*, 583 U.S. at 397.

This Court has previously found the following factors insightful in the determination of who qualifies as a non-statutory insider:

> whether the alleged insider: '(1) attempted to influence decisions made by the debtor; (2) selected new management for the debtor; (3) had special access to the debtor's premises and personnel; (4) was the debtor's sole source of financial support; (5) generally acted as a joint venture or prospective partner with the debtor rather than an arm's-length creditor; (6) [had] control over the debtor's voting stock; (7) [had] managerial control, including personnel decisions and decisions as to which creditors should be paid; [and] (8) whether the relationship between the debtor and [the creditor] was the result of an arm's-length transaction.'

*Essential Financial*, 629 B.R. at 431 (Bankr. N.D. Tex. 2021) (quoting *Official Unsecured Creditors' Comm. of Broadstripe, LLC v. Highland Capital Mgmt., L.P. (In re Broadstripe, LLC)*, 444 B.R. 51, 80 (Bankr. D. Del. 2010)).

The Trustee asserts that OnPoint itself was an insider in its role as the initial collateral agent. The Collateral Agent and OnPoint argue that OnPoint was not an insider at the time of the relevant transactions and assert that there are significantly different facts in this case than those before the Court in *Essential Financial*. Furthermore, the Collateral Agent and OnPoint assert that it was not until there was a default under the terms of the financing documents that any actions were taken to control the Debtor's assets.

In *Essential Financial*, this Court found that a franchisor's actions qualified it as an insider of the debtor. For instance, in *Essential Financial*, the franchisor made management decisions for the Debtor, had access to the Debtor's premises, personnel, and financial data, and, among other things, negotiated settlements on the Debtor's behalf. 692 B.R. at 431-32. After applying the *Essential Financial* factors, the Court finds that OnPoint was not an insider at the time of the transaction. OnPoint did not have any managerial control over GloriFi and did not control the Debtor's voting stock. Although OnPoint helped solicit support for the Series 2 Raise, it was not the sole source of financial support. Furthermore, during the time of the transaction, OnPoint did not select new management for the Debtor. There is also little evidence that OnPoint had special access to the Debtor's premises and personnel beyond that of a typical investor. There was also no special relationship between OnPoint and the Debtor or even OnPoint and Mr. Neugebauer prior to its selection as collateral agent. *See* ECF No. 126 at 201-02. There was also little evidence to suggest that OnPoint's selection as the collateral agent was not done at arm's length. All in all, the Court finds that OnPoint was not an insider at the time of the transaction.

The Trustee also makes the alternative argument that if the Court finds that OnPoint is not an insider, that many of the individual Series 2 Noteholders were, in fact, insiders. Under Section 101(31)(B), "[t]he term 'insider' includes… if the debtor is a corporation—(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor[.]" 11 U.S.C. § 101(31)(B). Likewise, an "affiliate [of the Debtor], or an insider of an affiliate," is deemed an insider. *Id.* at § 101(31)(E). Under this definition, there are at least five Pre-9/30 Notes belonging to statutory insiders, including CN2-1 for Charles Hamilton (a former board member and president of the Debtor); CN2-

11 and CN2-14 for Neugebauer Family Enterprises, LLC (one of Mr. Neugebauer's affiliated companies); CN2-12 for Banzai Capital Partners, LLC (one of Mr. Neugebauer's affiliated companies); and CN2-18 for Animo Bancorp (an affiliate of the Debtor). The Court does not find the other remaining Pre-9/30 Noteholders to be insiders.

### iii.    The Debtor was Insolvent at the Time of the Transfer

The Trustee asserts that the Debtor was insolvent on the date that it issued each Series 2 Note and on the date on which it granted a security interest in its collateral. The Collateral Agent asserts that the Debtor was not insolvent at the time of the alleged preferential transfers because the Trustee did not prove that the sum of the Debtor's liabilities exceeds the fair valuation of its assets at the time of the transfer as required by Section 547(b)(3). ECF No. 136 at ¶ 58. Specifically, the Collateral Agent asserts that the Trustee failed to meet his burden because his expert relied solely on historical book value, while ignoring the fair valuation requirement. *Id.* at ¶ 59.

To avoid a transfer as preferential, the plaintiff must prove that the debtor was insolvent at the time the allegedly preferential transfer occurred. 11 U.S.C. § 547(b)(3). There is a presumption of insolvency for the ninety days preceding the filing of bankruptcy, but that presumption is not applicable to this case because the allegedly preferential transfers were made approximately four months before the Debtor filed for bankruptcy. 11 U.S.C. § 547(f). Thus, the plaintiff has the burden of proving insolvency by a preponderance of evidence, without the benefit of a presumption. *Matter of Lamar Haddox Contractor, Inc.*, 40 F.3d 118, 121 (5th Cir. 1994). The burden of proving a fact by a preponderance of the evidence "simply requires the trier of fact to believe that the existence of the fact is more probable than its nonexistence[.]" *Concrete Pipe & Products of California, Inc. v. Constr. Laborers Pension Tr. for S. California*, 508 U.S. 602, 622 (1993) (internal citations omitted). A trustee may meet its burden by expert testimony, financial

31

statements, public documents, appraisals, or a combination of these. *In re WRT Energy Corp.*, 282

B.R. 343, 368 (Bankr. W.D. La. 2001). Furthermore, a bankruptcy court has broad discretion when

considering evidence to support a finding of insolvency. *See In re Roblin Indus., Inc.*, 78 F.3d 30,

35 (2d Cir. 1996).

> [T]he matrix within which questions of solvency and valuation exist in bankruptcy
> demands that there be no rigid approach taken to the subject. Because the value of
> property varies with time and circumstances, the finder of fact must be free to arrive
> at the "fair valuation" defined in § 101[(32)] by the most appropriate means.

*Porter v. Yukon Nat'l Bank*, 866 F.2d 355, 357 (10th Cir. 1989).

A corporate debtor is insolvent when its "financial condition [is] such that the sum of [its]

debts is greater than all of [its] property, at a fair valuation." 11 U.S.C. § 101(32)(A). Courts refer

to this test as a balance sheet test and then engage in the "fair valuation" of the debts and property

shown on the balance sheet, as required by the statute. *Lamar Haddox*, 40 F.3d at 121. The Fifth

Circuit has stated:

> [A] fair valuation may not be equivalent to the values assigned on a balance sheet.
> Financial statements reflect the book value of assets, ordinarily the cost of the
> property reduced by accumulated depreciation. The rate of depreciation is usually
> maximum allowed by income tax regulations. ***The fair value of property is not
> determined by asking how fast or by how much it has been depreciated on the
> corporate books, but by 'estimating what the debtor's assets would realize if sold
> in a prudent manner in current market conditions.'***

*Id.* (quoting *Pembroke Dev. Corp. v. Commonwealth Sav. & Loan Ass'n*, 124 B.R. 398, 402 (Bankr.

S.D. Fla. 1991)) (emphasis added).

To perform this test, courts make a two-step analysis. *In re Brentwood Lexford Partners*,

LLC, 292 B.R. 255, 268 (Bankr. N.D. Tex. 2003) (Felsenthal, J.) (internal citations omitted). The

court must first determine whether the Debtor was a "going concern" or was "on its deathbed." *Id.*

The Court must then value the debtor's assets, depending on the status determined in the first

inquiry, and apply the balance sheet test to determine whether the debtor was solvent. *Id.*

A liquidation analysis is used to determine a "fair valuation" of assets where the debtor is "financially dead or mortally wounded." *WRT Energy*, 282 B.R. at 369 (quoting *Langham, Langston & Burnett v. Blanchard*, 246 F.2d 529, 532-33 (5th Cir. 1957)). Liquidation or scrap value of assets must be used because, if the entity is not a going concern at the time of the transfer, "it would not be proper for the assets to be valued at a going concern value." *Id.* For a debtor that was a going concern, the court must "determine the fair market price of the debtor's assets as if they had been sold as a unit, in a prudent manner, and within a reasonable time." *Brentwood*, 292 B.R. at 268 (internal citations omitted). Additionally, contingent assets or liabilities should be included as part of the balance sheet insolvency test. *WRT Energy*, 282 B.R. at 370. In reaching its conclusions on fair valuation, a court may adopt the asset values of either party or make its own fair valuation after weighing all the evidence. *Roblin*, 78 F.3d at 38.

Rodney L. Crawford, a certified public accountant and Senior Managing Director at B. Riley Advisory Services, testified as an expert on behalf of the Trustee. Mr. Crawford opined that "[o]n a balance sheet basis, basically working off book value of assets, the company was insolvent" in both June 2022 and September 2022.[12] ECF No. 119 at 132. Mr. Crawford analyzed the audited financial statements as of December 31, 2021, as well as the monthly internal financial statements of the Debtor for each month of 2022 through the end of September 2022. *Id.* at 133. Mr. Crawford also analyzed a draft set of financial statements that had been prepared internally as of June 30, 2022. *Id.*[13]

---

[12] Mr. Crawford chose September 30, 2022, as the appropriate date at which to analyze the Debtor's balance sheet solvency because of the Debtor's purported grant of security interests in October 2022. ECF No. 98-1 at ¶ 14. Mr. Crawford also chose to analyze June 30, 2022, due to the availability of more complete disclosure information in the draft financial statements prepared as of that date. *Id.* at ¶ 16.

[13] Mr. Crawford testified that, in terms of reliance, the internally created financials had an indicia of reliability.

When analyzing GloriFi's financials as of June 2022, Mr. Crawford testified that GloriFi

had $5,808,272 in total cash and cash equivalents but testified that he believed that about $5 million

was set aside for Reciprocal. *Id.* at 138; *see also* ECF No. 98-1 at 32. Mr. Crawford testified that

the next material asset was an inventory account called "Card Supplies" in the amount of

$2,601,225, which is a portion of GloriFi's investment in unissued credit/debit card stock. ECF

No. 119 at 139; *see also* ECF No. 98-1 at 33. Mr. Crawford further testified that there was an asset

on the balance sheet described as "Property, Plant, and Equipment at Cost" valued at $29,232,430,

which comprised mainly of GloriFi's capitalized software development costs. ECF No. 119 at 139;

*see also* ECF No. 98-1 at 33. The only other significant asset on the Debtor's books was a line

item called "Prepaid Exp–Debt/ATM Cards" for $3,250,494, which he understood to be money

that was prepaid to a credit/debit card vendor to develop and acquire cards that the company had

not yet received. ECF No. 119 at 139-140; see also ECF No. 98-1 at 33. Overall, in June 2022, Mr.

Crawford testified that the company's total assets were $52.6 million at book value, but that

included around $10 million in investments in subsidiaries, which if adjusted on a consolidating

basis brings the company's total assets to around $42.6 million. ECF No. 119 at 140; *see also* ECF

No. 98-1 at 34.[14]

When analyzing GloriFi's liabilities in June 2022, Mr. Crawford testified that the

company's largest liability was $27,994,490 in "Accounts Payable – Regular" and its second

largest liability was the obligation relating to the Series 2 Notes, which totaled $13,325,000 in June

2022. ECF No. 119 at 140; *see also* ECF No. 98-1 at 34-35. As of June 30, GloriFi's total liabilities

were $47,656,500. Therefore, Mr. Crawford testified that as of June 2022, the Debtor was insolvent

---

[14] Mr. Crawford testified that it is customary that investments in subsidiaries had to be eliminated to avoid double-counting. ECF No. 98-1 at ¶ 17. The adjustment is routine and not challenged by the Collateral Agent.

because they had an equity deficit of $4,966,313 ($47,656,500 (Assets) - $52,622,813 (Liabilities)). ECF No. 119 at 143; *see also* ECF No. 98-1 at 35.

Moving on to the Debtor's financials in September 2022, Mr. Crawford's expert report showed that the GloriFi had about $5,355,465 in total cash and cash equivalents, with $4,877,899 of that balance being credit card receivables held by GloriFi Receivables Acquisition Company, a subsidiary of the Debtor. ECF No. 98-1 at 32. As was the case in June 2022, the September 2022 balance sheet included $2,601,225 in "Card Supplies" and $3,250,494 in "Prepaid Exp-Debit/ATM Cards." *Id.* at 33. Furthermore, in September 2022, the Mr. Crawford's report showed that the Debtor's book value of the "Computer Software" had increased to $33,694,741. *Id.* Overall, according to Mr. Crawford's expert report, the Debtor's total assets in September 2022 were $63,789,731 at book value, which adjusted downward by $17,492,383 on a consolidating basis to exclude investments in subsidiaries brings the book value of assets to $46 million to eliminate the double-count of investment in subsidiaries. *Id.* at 34.

Mr. Crawford also testified that not all the Generally Accepted Accounting Principles ("**GAAP**") were applied to the Debtor's financial statements. ECF No. 98-1 at 11. Mr. Crawford testified that while in June 2022 the Debtor had "properly written off … the previously capitalized costs of an abandoned software development project, there remained on the Debtor's books assets for additional capitalized costs of software development projects totaling approximately $33.7 million at September 30, 2022." *Id.* He testified that to the extent that these projects were no longer viable, there was likely no remaining value of these software development efforts under GAAP. *Id.*

Furthermore, the Debtor's liabilities also increased in September 2022 according to Mr. Crawford's report. For instance, the Debtor's total accounts payable increased to $36,614,362 and

the liabilities for the Series 2 Notes increased to $23,450,000. *Id.* Therefore, Mr. Crawford testified

that the Debtor was insolvent by as much as $20,537,490 as of the end of September 2022. *Id.* Mr.

Crawford also testified that if the Series 1 Notes had not converted to equity that the Debtor's

insolvency would increase by $55 million, which would put the Debtor's insolvency for June 2023

at ($60.2 million) and for September 2022 at ($75.7 million). *See* ECF No. 119 at 144-45; *see also*

ECF No. 98-1 at 35.

The Collateral Agent primarily argues that the Trustee failed to prove insolvency because

his expert failed to give a fair valuation of the Debtor, relying instead solely on the Debtor's book

value. Furthermore, the Collateral Agent asserts that the Trustee's expert: (i) failed to provide any

valuation of GloriFi as a going concern, (ii) did nothing to determine the fair value of GloriFi's

software, (iii) ignored the $1.6 billion transaction contemplated by the DHC term sheet and filed

with the SEC, (iv) ignored the fact that investors made loans to GloriFi after September 30, 2022

at a valuation of at least $250 million, (v) ignored employee stock options issued based on equity

value of $68.11 per share, and (vi) did nothing to determine the fair value of intangibles, like

goodwill, that were not on GloriFi's balance sheet. ECF No. 136 at ¶ 59. It is important to note

that the Collateral Agent did not present any contradictory expert witness testimony, nor did the

Collateral Agent provide an alternative valuation of the company besides the investment valuations

for both the DHC transaction (which never closed) and the Series 2 Raise (which was only partially

funded).

The Collateral Agent is correct that Mr. Crawford conducted a book valuation of the

Debtor's assets instead of a fair valuation, which Mr. Crawford readily admitted during his

testimony.[15] *See* ECF No. 119 at 159. It is "true that book values are not ordinarily an accurate reflection of the market value of an asset. Nevertheless, while book value alone may be inappropriate as a direct measure of the fair value of property, such figures are, in some circumstances, evidence from which inferences about a debtor's insolvency may be drawn." *Roblin*, 78 F.3d at 36 (internal citations omitted). Likewise, it can be said that book value may at times be a more accurate value (when properly adjusted) given that it is based upon actual, verifiable historical data, prepared contemporaneously by accountants or other financial professionals, using conservative methodology.

Although Mr. Crawford's analysis was at book value, the Court finds his methodology sound. First, the Debtor was making no revenue at this time as it remained pre-operational. As of June 30, 2022, the Debtor had a deficit in shareholder equity of almost $5 million, indicating liabilities exceeded assets by such amount. While the Collateral Agent criticized Mr. Crawford for not including goodwill, (1) Mr. Crawford credibly testified that he was aware of no evidence of intangible or undervalued assets, (2) goodwill is not typically existent if a company is not a going concern, (3) goodwill is usually calculated as a part of a sale transaction,[16] and (4) there was no evidence of the existence of goodwill adduced at trial. Additionally, $30 million of the $42 million in assets represented capitalized costs of software under development for *internal use*. See ECF No. 98-1 at 12 (citing Financial Accounting Standards Board, Accounting Standards Codification 350-40-35-3). Mr. Crawford credibly testified that there is a preconception that such uncompleted software should be valued at **zero**. ECF No. 119 at 164-65.  Likewise, $5.8 million of GloriFi's

---

[15] Although the Court is puzzled why the Trustee would not seek out an expert opinion of a fair valuation, for the reasons that follow, based upon the body of the evidence, the Court concludes that the Debtor was insolvent as of September 30, 2022 (the date the Court finds relevant to the transfers at issue).

[16] There was never a sale of any of the Debtor's assets except at foreclosure. Additionally, there is no evidence of any value above foreclosure value.

assets constituted "unissued" and "branded" credit/debit card inventory, "each of highly dubious actual value." ECF No. 98-1 at 13. Furthermore, the Debtor had reported losses of over $72 million in the first six months of 2022. *Id.* Finally, although the Collateral Agent is critical of Mr. Crawford's failure to value the assets at "going concern" value, the Crowe Audit as of June 2022 did not indicate GloriFi was a going concern, nor did Mr. Crawford make the downward customary adjustments to value necessary if the Debtor were not a going concern. ECF No. 119 at 165. Based upon the foregoing methodology, the Court believes that Mr. Crawford's opinion of GloriFi's insolvency as of June 30, 2022, to be reasonable.

As it pertains to insolvency as of September 30, 2022, the Court likewise finds Mr. Crawford's methodology, although not at fair valuation, to be sound and reasonable. Again, the Debtor was not making revenue as it was pre-operational. The consolidated balance sheet of the Debtor as of September 30, 2022, indicated a shareholder's equity deficit of over $20 million, indicating balance sheet insolvency. ECF No. 98-1 at 14. Furthermore, as of September 30, 2022, the Debtor had a recorded balance of $23.4 million in Series 2 Notes, but that does not include the $5.8 million Animo Bancorp note, which would increase the Debtor's insolvency by like amount. *Id.* As of September 30, 2022, cash was fully depleted (except for a required credit card reserve). *Id.* Trade payables had ballooned to almost $37 million. *Id.*[17] The Debtor's remaining assets were all in the form of capitalized software expenses around $33.7 million and $5.8 million of unissued credit card stock. *Id.* Mr. Crawford credibly testified that through the end of September 2022, the Debtor had not received more than minimal reported revenue generating activity and various cash infusions from the Series 2 Notes, which were inadequate to fund continued operations. *Id.*

---

[17] Mr. Crawford credibly testified that based on the $37 million of payables, the Debtor could not have been paying its debts as they came due.

Therefore, the Court believes that Mr. Crawford's opinion of GloriFi's insolvency as of September 30, 2022 to be reasonable.

The court must consider the whole of Mr. Crawford's expert testimony about the Debtor's book value, along with the Debtor's financial documents, public documents, contemporaneous communications amongst company officials, and the other evidence presented at trial. More specifically, in reaching its conclusions, the Court has considered the following evidence:

- Mr. Acuna, a former member of the GloriFi finance team, testified that he believed in January 2022 that GloriFi would run out of money at the end of the first quarter if fundraising did not go well. Bankruptcy ECF No. 352 at 203.

- On February 4, 2022, the Debtor entered into the DHC LOI, which required the Debtor to raise $40 million to complete the transaction. ECF No. 103-166. The Debtor projected that it could raise the $40 million by March 2022, which never occurred. *Id.*

- At the end of March 2022, Mr. Neugebauer pressured multiple investors, including Vivek Ramaswamy and Andy Rolfes, to vote on a term sheet[18] by saying that each investor was the deciding vote and that the company would be forced to file bankruptcy without the investor's vote in favor of the term sheet. *See* Bankruptcy ECF Nos. 329-27 & 329-31.

- Mr. Neugebauer testified that he began to contact bankruptcy counsel at the end of March 2022. Bankruptcy ECF No. 361 at 138-40. Mr. Neugebauer also testified that at the end of March and beginning of April 2022, the company was out of money and the need for money was imperative. *Id.* at 127 & 220. In fact, money was flowing out of the company much faster than it was being raised.

- At a board meeting on May 5, 2022, Mr. Pennington, the Debtor's then chief financial officer, informed the board of directors that "the company had extremely limited cash available to fund its operations" and further "commented that there could be immediate challenges to meet payroll requirements in the near term." Bankruptcy ECF No. 330-5 at 1.

- The Crowe Audit, which was issued on June 24, 2022, and covered the period of May 5, 2021, to December 31, 2021, identified issues regarding the Debtor's ability to operate as a going concern, noting that the Debtor's financial conditions "raise substantial doubt about the Company's ability to continue as a going concern." ECF No. 103-52

---

[18] In the term sheet, Mr. Neugebauer proposed loaning $30 million to the Debtor, with $10 million immediately available and another $20 million in the form of a line of credit, but in connection with an agreement whereunder Animo Bancorp would purchase certain assets of the Debtor along with a revenue sharing agreement. Bankruptcy ECF No. 329-87.

- Mr. Neugebauer testified that the independent investigations into him by Locke Lord (occurring between April 28, 2022, to June 24, 2022) and the WSJ Article (published October 10, 2022) both created liquidity crises for GloriFi. Bankruptcy ECF No. 361 at 230.

- Mr. Hamilton stated that the aforementioned investigations into Mr. Neugebauer brought fundraising to a "screeching halt, at a time where we were running out of money." Bankruptcy ECF No. 348 at 50.

- The Debtor was not paying its trade obligations as they became due, which caused at least one of its key trade vendors to terminate its contract with the Debtor on June 7, 2022. *See* ECF No. 103-24.

- At a board meeting on June 30, 2022, Mr. Kang, the Debtor's chief operating officer, "opined that the tech stack is not transferable because it is a bespoke development." Bankruptcy ECF No. 303-7 at 2.

- On July 25, 2022, the Debtor entered into a Business Combination Agreement with DHC Acquisition Corp. ECF No. 103-190. To close the merger with DHC, the Debtor had to raise at least $60 million, which the Debtor covenanted to use its best efforts to do before September 30, 2022. *Id.* The DHC merger never occurred because the Debtor only raised approximately $36 million in the Series 2 Raise. *See* ECF No. 104-7.

- On September 12, 2022, Mr. Neugebauer sent an email to Mr. Kang, Mr. Hamilton, Mr. Joiner, and Tanya Wallace stating that his gut told him that "we don't make it at GloriFi." ECF No. 103-200. Mr. Neugebauer also stated that GloriFi needed "to pivot into maximizing value" and that the company needed to "basically do a reorg outside of [bankruptcy]. *Id.*

- In September 2022, GloriFi began asking its trade vendors to convert their outstanding payables balance to convertible notes. ECF No. 108-26.

- Ms. Landtroop testified that she believed that GloriFi was considering filing for bankruptcy as early as mid-October 2022. Bankruptcy ECF No. 349 at 48.

- Mr. Neugebauer resigned as the Debtor's CEO on October 16, 2022. *See* ECF No. 131 at 76.

- Mr. Neugebauer testified that all financing markets had dried up for GloriFi by November 1, 2022.

- GloriFi sent an email on November 21, 2022, announcing that the company would being winding down. ECF No. 122-2. GloriFi was only "operational" for approximately a month, launching in mid-October 2022.

- The Debtor hired Mr. Bywaters on December 13, 2022, as an independent director to help wind down the company and prepare it for a potential Chapter 11 bankruptcy filing. ECF Nos. 103-39 & 103-40. Mr. Bywaters testified that when he was hired, that the "company was basically nonexistent." ECF No. 126 at 192. Mr. Bywaters further testified that GloriFi was only spending money to prepare to dissolve the company and that less than 10 employees remained.

- On December 13, 2022, Bill Roberts of CR3 Partners sent an email to Mr. Hamilton stating that the value of the Tech Stack is the "great unknown." ECF No. 103-41. Mr. Roberts also discusses how the Tech Stack could be sold in a bankruptcy case.

- Mr. Bywaters testified that when he was hired the Tech Stack was in pieces and it was an application programming interface that connected third party platforms together. ECF No. 126 at 144.

- On January 4, 2023, an involuntary Chapter 7 proceeding was filed against the Debtor's subsidiary, Animo Services, LLC. *See Animo Servs., LLC*, 23-30035-mvl7 (Bankr. N.D. Tex. Jan 4, 2023).

- OnPoint valued the Tech Stack at $7.5 million in its partial strict foreclosure notice that was sent on January 5, 2023. ECF No. 103-69 at 3. Mr. Bywaters executed the Bywaters Consent to the partial strict foreclosure on January 6, 2023, and delivered the same to OnPoint. ECF Nos. 105-13 & 105-14.

- Mr. Bywaters testified that he felt that the $7.5 million credit bid for the Tech Stack was more than fair. ECF No. 126 at 150.

- On February 8, 2023, the Debtor filed its voluntary Chapter 7 petition. Bankruptcy ECF No. 1.

Valuation of a start-up, pre-revenue enterprise, is by no means an exact science. Investment valuations are not hard evidence, absent eventual operations or other proliferation or embodiment of actual value. For all the promise the "idea" of GloriFi held, the fact remains that the enterprise itself was in constant financial distress, in public relations distress after the WSJ Article (which predated the Security Agreements), and completely out of business within mere weeks of its launch. The Debtor was only "cash flow operational" for approximately a month, and the touted Tech Stack was in pieces and liquidated for less than 25% of its stated book value at foreclosure. Drawing inferences from the whole of the evidence admitted after four days of trial, nine witnesses, hundreds of exhibits (together with the Trustee's expert opinion), the Court finds that the Debtor was insolvent, at a fair valuation, as of June 30, 2022, and on September 30, 2022.

The Court finds that the Trustee has met his burden of proving that the security interests granted in the Pre-9/30 Notes owned by Mr. Hamilton, Mr. Neugebauer, the Neugebauer related entities, and Animo Bancorp are avoidable as an insider preferences. The Court finds that each of the security interests in these Series 2 Notes were granted on account of antecedent debt to insiders

while the Debtor was insolvent. Therefore, with regard to Counts 6-9, the Court avoids the grant

of the security interest as to Series 2 Notes CN2-1, CN2-11, CN2-12, CN2-14, and CN2-18 on the

basis of an insider preference for the benefit of the estate and reclassifies $16,990,552 of the

Collateral Agent's Claim, represented by these notes, as unsecured.

### c.    Avoidance of Fraudulent Transfers – Counts 22-23

As an alternative to his preference claim (Counts 6-9), pursuant to Counts 22 and 23 of his

Complaint, the Trustee seeks the avoidance of the Animo Bancorp note (CN2-18) as a fraudulent

transfer pursuant to 11 U.S.C. § 548(a)(1)(B). A trustee in bankruptcy may avoid a transfer as

constructively fraudulent under the Bankruptcy Code if: (1) the transfer was of an interest of the

debtor in property; (2) the transfer was made or incurred on or within two years before the date of

filing of the petition; (3) the debtor voluntarily or involuntarily received less than reasonably

equivalent value in exchange for such transfer or obligation; and (4) the debtor was in a financially

vulnerable position. 11 U.S.C. § 548(a)(1)(B). Under Section 548(a)(1)(B)(ii), financially

vulnerable means one of the following: (i) the debtor was insolvent, either on the date of the

transfer at issue or because of it; (ii) the debtor was engaged or was about to engage in business or

a transaction "for which any property remaining with the debtor was an unreasonably small

capital"; (iii) the debtor either intended to incur or believed it would incur "debts that would be

beyond the debtor's ability to pay as such debts matured"; or (iv) the debtor made the transfer at

issue or incurred an obligation to or for the benefit of an insider "under an employment contract

and not in the ordinary course of business." *Id.*

Section 548(a)(1)(B) essentially allows a trustee to "nullify certain inflated transactions 'to

conserve the debtor's estate for the benefit of creditors.'" *Jalbert v. Wessel GmbH (In re Louisiana*

*Pellets), Inc.*, 838 Fed. Appx. 45, 49 (5th Cir. 2020) (quoting *In re Minn. Util. Contracting, Inc.*,

110 B.R. 414, 420 (Bankr. D. Minn. 1990)). Unlike causes of action based on actual fraudulent transfers, constructive fraudulent transfers do not implicate the debtor's intent, but rather the value the debtor received. *Id.* (citing 11 U.S.C. § 548(a)(1)).

In addition to the Section 548 claim, the Trustee has also asserted his "strong arm" powers under Section 544 of the Bankruptcy Code to invoke the Texas Uniform Fraudulent Transfer Act ("**TUFTA**"). Section 544 requires that a transfer be avoidable "under applicable law by a creditor holding an unsecured claim that is allowable under Section 502 of this title." 11 U.S.C. § 544(b)(1). It is undisputed that there exists an unsecured creditor that could bring the action to avoid the transfer. Under TUFTA, similar to Section 548 of the Bankruptcy Code, a transfer is constructively fraudulent if: (1) the debtor transferred an interest in property; (2) without receiving reasonably equivalent value in exchange for the transfer; and (3) while the debtor was in a financially vulnerable position. *See* Tex. Bus. & Com. Code § 24.005(a)(2). Under TUFTA, financially vulnerable means one of the following: (i) the debtor "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction"; or (ii) the debtor intended, believed, or reasonably should have believed that the debtor would incur debts beyond the debtor's ability to pay as they became due. *Id.*

It is undisputed that the Debtor transferred an interest in property by granting a security interest to Animo Bancorp. It is also undisputed that this transfer took place within two years of the bankruptcy petition, having executed the promissory note on September 9, 2022. *See* ECF Nos. 108-1 & 108-2. As the Court decided above with regard to the Trustee's preference action (Counts 6-9), the Debtor was insolvent at the time of the transfer to Animo Bancorp. Therefore, the only

43

issue that the Court must decide is whether the Debtor received reasonably equivalent value for the transfer. *See* Tex. Bus. & Com. Code § 24.005; *see also* 11 U.S.C. § 548(a)(1)(B).

### i. The Debtor Did Not Receive Reasonably Equivalent Value in Exchange for the Series 2 Note and Security Agreement

To establish a *prima facie* case for avoiding a transfer as constructively fraudulent, the trustee must demonstrate that the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation." *In re Hannover Corp.*, 310 F.3d 796 (5th Cir. 2002) (quoting 11 U.S.C. § 548(a)(1)(B)(i)). Reasonably equivalent value is not defined in the Bankruptcy Code. In the Fifth Circuit, to satisfy this element, the debtor must have "received value that is substantially comparable to the worth of the transferred property." *Stanley v. U.S. Bank Nat'l Ass'n. (In re TransTexas Gas Corp.)*, 597 F.3d 298, 306 (5th Cir. 2010) (quoting *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 548 (1994)) (internal quotation marks omitted). Reasonably equivalent value is measured from the standpoint of creditors and the proper focus is on the net effect of the transfers on the debtor's estate, and the funds available to unsecured creditors. *Id.* (citing *In re Hinsley*, 201 F.3d 638, 644 (5th Cir. 2000)) (internal citations and quotation marks omitted).

In *Janvey*, the Texas Supreme Court answered a certified question from the Fifth Circuit as to the definition of reasonably equivalent value under TUFTA. *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 564 (Tex. 2016). There, the Texas Supreme Court held that reasonably equivalent value, for the purpose of analyzing a good-faith affirmative defense under TUFTA, has three prongs: (1) full performance under a lawful, arm's-length contract for fair market value; (2) provision of consideration that had objective value at the time of the transaction; and (3) making the exchange in the ordinary course of the transferee's business. *Id.*

Mr. Neugebauer testified that Animo Bancorp spent money to develop the Debtor's Tech Stack. *See* ECF No. 126 at 67-68; *see also* Bankruptcy ECF No. 330-6 at 64-69. At the time that

Animo Bancorp spent the money, allegedly on GloriFi's behalf, it was not promised a security interest or even repayment by GloriFi. On June 30, 2022, GloriFi's board of directors met and discussed the process of reconciliation between Animo Bancorp and GloriFi for expenses that Animo Bancorp paid on behalf of GloriFi. *See* Bankruptcy ECF No. 330-7. At the board meeting, Jin Kang, the Debtor's chief operating officer, presented summary materials describing the timeline of transactions between Animo Bancorp, Inc. and GloriFi. *Id.* At the conclusion of the board meeting, GloriFi's board of directors approved the issuance of a Series 2 Note to Animo Bancorp as a way to reconcile the money spent by Animo Bancorp on behalf of GloriFi. *See* Bankruptcy ECF No. 330-7; *see also* ECF No. 126 at 68-75. Animo Bancorp's Series 2 Note (CN2-18) was not fully executed until September 9, 2022. *See* ECF No. 108-1 & 108-2.

The Trustee argues that the Debtor did not receive reasonably equivalent value because Animo Bancorp did not transfer any funds to the Debtor as a loan, and even if it did transfer funds to the Debtor as a loan, it was never promised a security interest in the Debtor's assets at the time of the transfer. Further, the Trustee asserts that there is no evidence of the value that Animo Bancorp provided to the Debtor in exchange for the Series 2 Note.

The Collateral Agent points to the summary materials shown to GloriFi's board of directors at its June 30, 2022, meeting as evidence to demonstrate that the Debtor received reasonably equivalent value for the issuance of the Animo Bancorp Series 2 Note (CN2-18). *See* Bankruptcy ECF No. 330-6 at 63-69. When going through the summary materials, Mr. Neugebauer testified that in 2021 Animo Bancorp spent $1,473,365 to help develop the Tech Stack for GloriFi, which was a "hundred percent" for the benefit of GloriFi. ECF No. 126 at 67; *see also* Bankruptcy ECF No. 330-6 at 64. Mr. Neugebauer also testified that Animo Bancorp spent $3,091,653 on behalf of GloriFi in 2022. ECF No. 126 at 67; *see also* Bankruptcy ECF No. 330-6 at 64. He also testified

45

that at the time of the June 2022 board meeting that Animo Bancorp had $841,550 in unpaid invoices on behalf of GloriFi. ECF No. 126 at 67; *see also* Bankruptcy ECF No. 330-6 at 64.

Mr. Neugebauer's testimony that all of the cash spent by Animo Bancorp from 2021 until the June 2022 board meeting was for the sole benefit of GloriFi does not align with the more detailed reconciliation summaries in the summary materials provided to the GloriFi board of directors. *See* Bankruptcy ECF No. 330-6 at 63-69. According to the summary information presented to the GloriFi board, Animo Bancorp spent $2,109,018 on "Expenses Incurred on Behalf of Bancorp to Date." Bankruptcy ECF No. 330-6 at 65. These expenses included a deposit for the bank that Animo Bancorp was acquiring, legal fees associated with bank regulatory filing, and rent payments for the bank. *Id.* All of these payments were made on behalf of and for the benefit of Animo Bancorp, not GloriFi. Furthermore, the summary materials state that only $1,672,044 were spent on "Costs Incurred for GloriFi Partnership." *Id.* While some of the expenses under this heading appear to relate to the development of the Tech Stack for the benefit of GloriFi, there are several other expenses that seem to relate only to Animo Bancorp. For instance, there are expenses for the Animo Bancorp offices in Dallas and Birmingham, as well as the internet bill for both offices. *Id.* Therefore, based on the evidence presented to the Court by both the Trustee and the Collateral Agent, the Court finds that the Debtor received, at most, around $1.6 million in value from Animo Bancorp.

As such, the Court finds that the Debtor did not receive reasonably equivalent value for the grant of a Series 2 Note to Animo Bancorp in the amount of $5,840,552. As stated above, the Court finds, based on the evidence, Animo Bancorp may have paid, at most, $1.6 million for the benefit of the Debtor from 2021 to June 2022. Nevertheless, the value that the Debtor received is not "substantially comparable to the worth of the transferred property." *See TransTexas*, 597 F.3d at

306. Furthermore, the grant of the Series 2 Note to Animo Bancorp securitized prior payments made on behalf of Animo Bancorp for the benefit of GloriFi. There was no evidence that these prior payments were considered a loan at the time of the payment or that Animo Bancorp made the payments in exchange for a security interest in virtually all of the Debtor's assets.[19] Therefore, the Court finds that the securitization of the prior payments made by Animo Bancorp had a negative effect on the Debtor's unsecured creditors because it gave Animo Bancorp priority over the claims of unsecured creditors. Thus, the Court finds that the Debtor did not receive reasonably equivalent value for the Series 2 Note or the corresponding security interest.

Because the Court finds that the Debtor did not receive reasonably equivalent value in exchange for the transfers, Animo Bancorp's Series 2 Note (CN2-18) is avoided as a constructive fraudulent transfer pursuant to Count 22-23 of the Complaint. The avoidance of the Animo Bancorp Series 2 Note reduces the unsecured portion of the Collateral Agent's Claim by $5,840,552 to $11,150,000.[20]

### d.  Equitable Subordination – Count 11

In Count 11, the Trustee brings a claim for equitable subordination as to Mr. Neugebauer and the Collateral Agent. The Trustee claims that in or around September 2022, Mr. Neugebauer knew that the "ship was sinking," and that he tried to get the Debtor's Tech Stack for himself. ECF No. 135 at ¶ 141. The Trustee asserts that when Mr. Neugebauer and the Collateral Agent knew that GloriFi was going out of business, they started to take action to enhance their rights and to improve their position vis-à-vis all of the Debtor's other creditors. *Id.* at ¶ 142. The Collateral Agent counters that the Series 2 Noteholders provided substantial value to the Debtor, and the

---

[19] Again, Mr. Neugebauer described this transaction as an "involuntary" loan from Animo Bancorp to GloriFi. ECF No. 131 at 80.
[20] This determination is without prejudice to any other objections or defenses the Trustee or other parties might have to the Animo Bancorp claim.

Trustee failed to establish inequitable conduct or harm to creditors at trial. ECF No. 136, ¶ 75-77. Particularly, the "[Series 2] Noteholders provided tens of millions of dollars to the Debtor, enabling it to sustain operations and preserve value." *Id.* at ¶ 77.

A bankruptcy court may equitably subordinate the claims of a creditor under § 510(c) of the Bankruptcy Code. 11 U.S.C. § 510(c). In the Fifth Circuit, equitable subordination is appropriate when three preconditions are met: (1) the claimant engaged in inequitable conduct; (2) the conduct resulted in harm to the creditors or conferred an unfair advantage upon the claimant; and (3) equitable subordination is not inconsistent with the Bankruptcy Code. *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 357 (5th Cir. 1997); *In re Mobile Steel Co.*, 536 F.2d 692, 700 (5th Cir. 1977). Furthermore, a claim should be subordinated only to the extent necessary to offset the harm which the debtor or its creditors have suffered as a result of the inequitable conduct. *Wooly v. Faulkner (In re SI Restructuring, Inc.)*, 532 F.3d 355, 360-61 (5th Cir. 2008). Equitable subordination is inappropriate if any element is not satisfied. *In re Equip. Equity Holdings, Inc.*, 491 B.R. 792, 842 (Bankr. N.D. Tex. 2013).

Further, "equitable subordination is remedial, not penal, in nature, and in the absence of actual harm, equitable subordination is inappropriate." *SI Restructuring*, 532 F.3d at 361. When reviewing equitable subordination claims, courts impose a higher standard on the conduct of insiders. *Matter of Herby's Foods, Inc.*, 2 F.3d 128, 131 (5th Cir. 1993). If a claimant is an insider, less egregious conduct may support equitable subordination. *Id.* Under Fifth Circuit precedent, equitable subordination has typically been found proper in three scenarios: (1) when a fiduciary of the debtor misuses his position to the disadvantage of other creditors; (2) when a third party

controls the debtor to the disadvantage of other creditors; and (3) when a third party actually defrauds other creditors. *Cajun Electric*, 119 F.3d at 357.

For a lender to be classified as an insider, it must have exercised actual managerial control over the debtor or had some special affinity with the debtor that extends beyond an arm's-length business relationship. *In re WCC Holding Corp.*, 171 B.R. 972, 987 (Bankr. N.D. Tex. 1994) (Abramson, J.) (citing *Lynn v. Continental Bank, N.A. (In re Murchison)*, 154 B.R. 909, 913 (Bankr. N.D. Tex. 1993) (Abramson, J.)). Control is not indicated by financial leverage or the ability to exercise contractual rights. *Id.* To become an insider, a lender must be able to unqualifiedly dictate a corporate debtor's policy and its disposition of assets. *Id.* As stated above, the Court finds that the Collateral Agent was not an insider but that it represents several claims of insiders including Mr. Neugebauer, the entities controlled by Mr. Neugebauer, and Mr. Hamilton. Based on the evidence, the Court finds it inappropriate to equitably subordinate any of the Series 2 Notes held by non-insiders. The evidence did not reflect that such parties engaged in any inequitable conduct. Therefore, the Court limits its inquiry to the potential equitable subordination of the Series 2 Notes held by insiders—namely, Mr. Neugebauer, Mr. Neugebauer's entities, and Mr. Hamilton.[21]

The Trustee alleges that Mr. Neugebauer knew that GloriFi was failing and he feared that the WSJ Article would mean that GloriFi would struggle to raise investments. Since he knew that the "ship was sinking," the Trustee contends that Mr. Neugebauer took actions to enhance his rights and improve his position compared to the Debtor's other creditors. The Trustee argues that Mr. Neugebauer handpicked OnPoint to be the collateral agent and rushed to get Security Agreement

---

[21] These notes include CN2-1, CN2-11, CN2-12, CN2-14, CN2-18, CN2-24, CN2-27, CN2-28, CN2-34, and CN2-35. The Court declines to address whether CN2-18 for Animo Bancorp should be equitably subordinated given the Court's previous rulings classifying the grant of the note as both a constructive fraudulent transfer and an avoidable preference. Should the Court's judgment be reversed and remanded, the Trustee's equitable subordination claim would be addressed.

and Agency Agreement executed in order to grant him and the other Series 2 Noteholders security interests. Finally, the Trustee claims that Mr. Neugebauer and OnPoint backdated the Pre-9/30 Notes to hide the true dates that they were negotiated and executed.

The Court is hesitant to declare Mr. Neugebauer's conduct as inequitable as it relates to the grant of the Series 2 Notes. As the evidence has shown, the Debtor conducted the Series 2 Raise to raise capital to complete the SPAC transaction with DHC. The Series 2 Raise raised money from insiders, existing investors, and new investors. Furthermore, the Debtor's insiders, including Mr. Neugebauer and Mr. Hamilton, consistently participated in the Series 2 Raise, contributing funds throughout the entire process up until the eventual demise of the Debtor only weeks later. The Court finds that the Trustee did not bear his burden to prove that the Series 2 Notes held by insiders should be equitably subordinated.[22] As such, the Court denies Count 11 for equitable subordination.

### e. Recharacterization – Count 12

Pursuant to Count 12 of the Complaint, the Trustee seeks to recharacterize the claims of Mr. Neugebauer, his entities, and OnPoint[23] as equity. When a creditor files a timely claim, the Bankruptcy Code states that "the court, after notice and a hearing, shall determine the amount of such claim … and shall allow such claim in such amount, except to the extent that—(1) such claim

---

[22] In his post-hearing briefing, the Trustee alleges that Mr. Neugebauer engaged in inequitable conduct by trying to get the Debtor's Tech Stack for himself. *See* ECF No. 135 at 65-66. The Court determines the Trustee did not bear his burden to prove that Mr. Neugebauer attempted to take the Tech Stack for himself so as to constitute inequitable conduct. Furthermore, the Trustee asserts that a variety of post-petition conduct by the Collateral Agent and Mr. Neugebauer also constituted inequitable conduct sufficient for equitable subordination. The Court finds that this post-petition conduct (much of which was addressed in the Conversion Opinion) goes beyond the conduct alleged in the Complaint as it relates to the equitable subordination cause of action (Count 12) and is better addressed in the Court's discussion of the Collateral Agent's and Mr. Neugebauer's violation of the automatic stay (Counts 20 & 21*). See In re With Purpose, Inc.*, No. 23-30246-MVL7, 2025 WL 271469 (Bankr. N.D. Tex. Jan. 22, 2025).

[23] These notes include CN2-10, CN2-11, CN2-12, CN2-13, CN2-14, CN2-18, CN2-20, CN2-24, CN2-27, CN2-28, and CN2-35. The Court declines to address whether CN2-18 for Animo Bancorp should be recharacterized given the Court's previous rulings classifying the grant of the note as both a constructive fraudulent transfer and an avoidable preference. Should the Court's judgment be reversed and remanded, the Trustee's recharacterization claim would be addressed.

is unenforceable against the debtor and the property of the debtor, under any agreement or applicable law…" 11 U.S.C. § 502(b). The Supreme Court has held that the "applicable law" is state law: "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law. *Butner v. United States*, 440 U.S. 48, 54 (1979). Here, there is some dispute as to whether Texas or Delaware law applies. The Court does not need to determine which state's law applies because, under both Texas and Delaware law, the Court reaches the same conclusion.

The Fifth Circuit has recognized that *Butner* and § 502(b) support a bankruptcy court's authority to recharacterize claims. *In re Lothian Oil Inc.*, 650 F.3d 539, 543 (5th Cir. 2011). Recharacterization is a doctrine similar to that of equitable subordination but is aimed at different conduct and has different remedies. *Equip. Equity Holdings*, 491 B.R. at 848. While equitable subordination analyzes the creditor's behavior in connection with either the creditor's creation or enforcement of its loan, recharacterization is more of a "substance versus form" analysis. *Id.* A claim for recharacterization has been described by some courts as being a "no fault" cause of action that does not require proof or findings of misconduct. *Id.*

Courts analyzing recharacterization under both Texas and Delaware law have used the factors laid out in *In re AutoStyle Plastics*, Inc., 269 F.3d 726 (6th Cir. 2001). *See In re HH Liquidation, LLC*, 590 B.R. 211, 292-296 (Bankr. D. Del. 2018); *see also Equip. Equity*, 491 B.R. at 850. These factors include:

> (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire

capital assets; and (11) the presence or absence of a sinking fund to provide repayments.

*AutoStyle*, 269 F.3d at 750. In addition to the eleven *AutoStyle* factors, Delaware courts have considered several other factors in evaluating a recharacterization inquiry. These courts evaluate "the certainty of payment in the event of the corporation's insolvency or liquidation." *HH Liquidation*, 590 B.R. at 296. Another factor courts consider is the "presence or absence of voting rights" because equity is frequently associated with voting rights in the company. *Id.* Finally, courts consider "how parties accounted for the advance on their financial statements and accounting records." *Id.* Overall, "while a formulaic checklist certainly aids the court in analyzing whether a loan should be regarded as debt or equity, courts analyzing a factor test must contextualize the facts giving rise to the loan and keep in mind the economic realities surrounding such loan." *Equip. Equity*, 491 B.R. at 850.

This Court will now apply the factors laid out in *AutoStyle* and expressly recognized under both Texas and Delaware law. First, each of the instruments is named a "Secured Convertible Promissory Note," which weighs in against recharacterization. *See, e.g.,* ECF No. 103-129. The Trustee argues that since the notes were "convertible" in nature that this should signal that the noteholders believed that they were actually equity instead of a loan. The Court is unconvinced because various triggering events must occur before the notes are converted to equity. Thus, the court finds that the first factor weighs against recharacterization.

The second and third factors that courts consider are the presence or absence of a fixed maturity date, fixed rate of interest, and schedule of payments. Here, each of the Series 2 Notes has a fixed maturity date, which is two years from the date of issuance. *See, e.g.,* ECF No. 103-129. Furthermore, the Series 2 Notes accrued interest at a "simple rate of 10% per annum" which "shall be paid in kind by capitalizing and adding such interest amount to the outstanding principal

balance of this Note on the last day of each fiscal quarter[.]" *Id.* There is a fixed interest rate and a fixed maturity date. Although the interest is "paid in kind," there was still a fixed rate of interest. Thus, these two factors weigh against recharacterization.

The fourth factor is the source of repayments. "If the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of a capital contribution." *AutoStyle*, 269 F.3d at 251 (citing *Roth Steel Tube Co. v. C.I.R.*, 800 F.2d 625, 631 (6th Cir. 1986). This factor is neutral because no repayments were ever made to Series 2 Noteholders, but the notes were in their infancy when the company began to shut down and file for bankruptcy. Since the Court has no evidence as to the source of the repayment of these notes, this factor is neutral.

The fifth factor is the adequacy or inadequacy of capitalization. Thin or inadequate capitalization is strong evidence that the advances are capital contributions rather than loans. *Id.* Here, the Debtor faced one liquidity crisis after another and was never adequately capitalized. This factor weighs in favor of recharacterization.

The sixth factor regarding the identity of interest between the creditor and stockholder, weighs slightly against recharacterization. If stockholders make advances in proportion to their respective stock ownership, an equity contribution is indicated. *Id.* On the other hand, a sharply disproportionate ratio between a stockholder's percentage interest in stock and debt is indicative of bona fide debt. *Id.* Here, not all of the Debtor's shareholders were participants in the Series 2 Raise. Therefore, Mr. Neugebauer, his entities, and OnPoint's participation interests did not exactly correlate to their ownership interests in the Debtor. As a result, this factor weighs slightly toward debt.

The seventh factor looks at the security for the advances. "The absence of a security for an advance is a strong indication that the advances were capital contributions rather than loans." *Id.* at 752. Here, the Series 2 Noteholders received security interests in the Debtor's assets through the Security Agreement and the Agency Agreement with the Collateral Agent. Therefore, this factor weighs against recharacterization.

The eighth factor is the corporation's ability to obtain outside financing. "When there is no evidence of other outside financing, the fact that no reasonable creditor would have acted in the same manner is strong evidence that the advances were capital contributions rather than loans." *Id.* Around 61% of the money raised during the Series 2 Round came from Mr. Neugebauer, his entities, and OnPoint. The rest of the money was raised from stockholders, Series 1 Noteholders, and outside investors. This raise was a prerequisite for the planned SPAC transaction. Therefore, this factor weighs slightly in favor of recharacterization.

The ninth factor is the extent to which advances were subordinated to claims of outside creditors. "Subordination of advances to claims of all other creditors indicates that the advances were capital contributions and not loans." *Id.* Here, the Series 2 Notes were "subordinated in right of payment to all current and future indebtedness of the Company for borrowed money … to banks, commercial finance lenders or other intuitions regularly engaged in the business of lending money." *See, e.g.,* ECF No. 103-129 at § 3. This factor weighs slightly in favor of recharacterization.

The tenth factor is the extent to which advances were used to acquire capital assets. "Use of advances to meet the daily operating needs of the corporation, rather than to purchase capital assets, is indicative of bona fide indebtedness." *AutoStyle*, 269 F.3d at 752. The purpose of the Series 2 Raise was to raise enough funds to close the DHC Transaction. The funds were used to

54

meet the daily operating needs of the Debtor, which included paying its trade vendors who were developing the Tech Stack. Therefore, this factor weighs against recharacterization.

The eleventh factor is the presence or absence of a sinking fund to provide repayments. In *AutoStyle*, the court noted that when the loan was secured by liens, it obviated any need for a sinking fund. *Id.* at 753. Here, there was no sinking fund, but the advances were secured by liens. Therefore, the Court concludes that this factor only slightly weighs toward equity.

There are also three additional factors that Delaware courts consider to determine if recharacterization is proper—the  presence or absence of voting rights, how parties accounted for the advance on their financial statements and accounting records, and the certainty of payment in the event of the corporation's insolvency or liquidation. *HH Liquidation*, 590 B.R. at 296. Here, the Series 2 Noteholders were not granted voting rights as if they were equity holders unless the notes converted into equity. Additionally, the Series 2 Notes were accounted for as liabilities in the Debtor's financial records and not as equity, which also weighs against recharacterization. The only factor that weighs in favor of recharacterization is the certainty of payment in the event of the corporation's insolvency or liquidation because it goes hand in hand with the previous factor of capitalization. Here, it was unlikely in the company's state for the Series 2 Noteholders to recover their entire contribution.

Taking all these factors into account, the Court finds that the Trustee did not meet his burden to prove that the insider and OnPoint Series 2 Notes should be recharacterized as equity. Therefore, the Court will deny the Trustee's Count 12 for recharacterization.

**f.   Validity of Foreclosure – Counts 2 & 4**

The Court will now turn to the Trustee's attacks on OnPoint's prepetition foreclosure. In Counts 2 and 4, the Trustee seeks a declaratory judgment regarding the validity of the foreclosure

and brings a wrongful foreclosure action against OnPoint and the Collateral Agent. The Trustee alleges three primary reasons why OnPoint's foreclosure upon the Debtor's assets was improper: (1) OnPoint was not authorized to foreclose; (2) the Debtor was not in default; and (3) the Bywater's Consent, allowing the foreclosure, is not determinative or operative. In contrast, the OnPoint and the Collateral Agent, who has acceded to OnPoint's position by virtue of being the successor collateral agent, argue that the foreclosure was properly executed under the terms of the Security Agreement and the Agency Agreement.

### i. OnPoint was Authorized to Foreclose

The Trustee asserts that under the Agency Agreement, the "Required Noteholders," which must include Mr. Neugebauer due to his being the majority noteholder, were required to provide a "written instrument" to OnPoint before any enforcement action under the Security Agreement. *See* ECF No. 103-109 at §§ 2.1(e) & 5.2. The Trustee contends the OnPoint was not authorized to foreclose because Mr. Neugebauer never authorized OnPoint in writing to declare a default, accelerate the notes, or foreclose.

The Collateral Agent  and OnPoint argue that the Agency Agreement explicitly authorized it to act on behalf of the Series 2 Noteholders for purposes of enforcing liens. *See id.* at § 2.1(c). Furthermore, the Collateral Agent and OnPoint assert that the Trustee does not have standing to assert that OnPoint lacked authority to foreclose under the Agency Agreement because the Debtor is not a party to the Agency Agreement. Additionally, the Collateral Agent and OnPoint argue that even if OnPoint did not have authority from the Series 2 Noteholders at the time of the foreclosure, that the Series 2 Noteholders ratified the foreclosure in writing on April 22, 2024. *See* ECF No. 105-17.

The Court agrees with the Collateral Agent and OnPoint. First, the Trustee lacks standing to challenge the lack of authority under the Agency Agreement. The Texas Supreme Court has stated that "the benefits and burdens of a contract belong solely to the contracting parties, and 'no person can sue upon a contract except he be a party to or in privity with it.'" *First Bank v. Brumitt*, 519 S.W.3d 95, 102 (Tex. 2017) (quoting *House v. Hous. Waterworks Co.*, 88 Tex. 233, 31 S.W. 179, 179 (1895)). Here, the Debtor is not a party to the Agency Agreement. Therefore, the Trustee does not have standing to claim that OnPoint lacked authority pursuant to the Agency Agreement. Furthermore, the Court finds that even if OnPoint lacked authority from the Series 2 Noteholders at the time of the foreclosure, the Series 2 Noteholders ratified the foreclosure on April 22, 2024. *See* ECF No. 105-17.[24]

### ii.   The Debtor was in Default Under the Security Agreement

The Trustee argues that the Debtor was not in default under the Series 2 Notes. The Trustee argues that since there was not a maturity default as of the January 5, 2023 foreclosure, the only conceivable event of default was whether the Debtor was "dissolved, terminated, or [had] cease[d] to operate its business." The Trustee asserts that the Debtor had not ceased to operate its business as of January 3, 2023. Specifically, the Trustee points to the following facts to demonstrate that the Debtor's business had not ceased:

(i)     There were still employees at the Debtor;
(ii)    The Debtor was able to make payroll, albeit barely;
(iii)   The Debtor still had offices at Mr. Neugebauer's house;
(iv)    The Debtor had $40,000 in cash in the bank and Mr. Bywaters was able to locate another $500,000 much to the chagrin of Mr. Neugebauer;
(v)     The Debtor maintained employee insurance, and even obtained D&O insurance;
(vi)    The Debtor hired company counsel to assess the entire business and value of the Tech Stack and overall health of the company;

---

[24] Mr. Neugebauer testified that he was on the phone call where authorization was discussed and that he admittedly remained silent, thereby implicitly acquiescing to OnPoint's decision as Collateral Agent. He was clear that he did not intend to be an "impediment" to foreclosure. ECF No. 126 at 19-20.

(vii)    The Debtor has three business lines it was seeking to monetize; and

(viii)    The Debtor was "in the business of creating a business," even the day after launch with no revenue or product.

ECF No. 135 at ¶ 160 (internal citations omitted).

Cessation of business is not defined in the Series 2 Notes. When a term in a written agreement is not specifically defined, the term should be given its plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used it in a technical or different sense. *DeNucci v. Matthews*, 463 S.W.3d 200, 217 (Tex. App.—Austin 2015, no pet.) (citing *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996)). As a bankruptcy court, this Court is uniquely positioned and skilled at determining whether a business ceased its business operations. As the Trustee notes in his post-hearing briefing, bankruptcy courts analyze cessation of business under Section 507(a)(4) of the Bankruptcy Code to determine the priority status of certain prepetition wages and salary. *See* 11 U.S.C. § 507(a)(4). Courts utilize a balancing test to determine whether a business has ceased operations under Section 507(a)(4). *See Etzelsberger v. Fisker Auto. Holdings, Inc. (In re FAH Liquidating Corp.)*, 613 B.R. 390, 396 (Bankr. D. Del. 2019) (citing *In re Adcock Excavating, Inc.*, 42 B.R. 84, 85-86 (Bankr. N.D. Ill. 1984). Under the balancing test, courts look first to whether the debtor had discharged substantially all of its employees, and second to "whether the debtor had ceased performing its *usual* work and whether the debtor had liquidated or continued in business." *Id.* (citing *In re Bodin Apparel, Inc.*, 56 B.R. 728, 732 (S.D.N.Y. 1985)) (emphasis added). While not determinative, the Court finds this analysis persuasive.

The first factor requires the Court to determine whether the Debtor had discharged substantially all of its employees. *Id.* Further, the Court looks at the qualitative aspects of the work the remaining employees performed. *Id.* at 397. For example, the court in *FAH* noted that it was significant if the few remaining employees performed duties "germane to the preparation of a

bankruptcy filing, when the company contemplates filing for bankruptcy over the horizon, instead of conducting its usual and principal business." *Id.* (citing *In re Stunzi, U.S.A, Inc.*, 7 B.R. 401, 403 (Bankr. W.D. Va. 1980)).

Here, the Court finds that the Debtor had discharged substantially all of its employees, and the only few remaining employees worked on matters pertaining to a potential bankruptcy filing or liquidation. On November 21, 2022, the Debtor sent an email to all of its investors stating that the "Board of Directors and leadership of GloriFi [had] come to the heartbreaking conclusion that [they needed] to begin winding down the company's operations." ECF No. 122-2. The email stated that the Debtor had "executed another reduction in force, letting go of all employees not directly engaged and legally required to assist [the Debtor's] customers in transferring funds and closing their GloriFi accounts." *Id.* Mr. Bywaters testified that once the account holders got their funds back, that the Debtor "did a reduction in force to only two employees[.]" ECF No. 126 at 138. Mr. Bywaters further testified that the two remaining employees were there because they had "institutional knowledge" that would be "valuable to have as part of winding up the company." *Id.* at 192. Since the Debtor had discharged substantially all of its employees, the Court finds that the first factor is satisfied.

The Court next looks at whether the Debtor ceased performing its *usual* work and whether the Debtor continued in business. *See FAH*, 613 B.R. at 398. The Debtor was a financial services company. After the letter to the investors on November 21, 2022, the company began the process of unwinding customer accounts and getting depositors their money back. *See* ECF No. 126 at 138. Furthermore, Mr. Bywaters testified that when he was hired in mid-December 2022, that the "company was basically nonexistent" and no revenues were being generated. *Id.* at 138. After those customers received their money back, GloriFi only retained two employees to assist in the winding

down of the business. *Id.* at 192. Therefore, it is clear that the Debtor no longer provided financial services for its customers. Additionally, Mr. Bywaters acknowledged in the Bywaters Consent that the Debtor was "in default under the [Series 2] Notes and had ceased business operations." ECF No. 105-14. The Court need not reach whether the Bywaters Consent is operative or determinative, but it is informative of what company executives believed at the time of the foreclosure. Therefore, the Court finds that the Debtor had ceased performing its *usual* work as a financial services company and did not meaningfully continue in business, except to wind down.  Accordingly, based on the overall evidence, the Court finds that the Debtor was in default under the Series 2 Notes because the Debtor had ceased business operations. Therefore, Counts 2 and 4 are denied, as the Court finds that the foreclosure was authorized and proper.

### g. <u>Breach of Contract – Count 5</u>

By virtue of Count 5, the Trustee brings a breach of contract claim against the Collateral Agent and OnPoint, alleging that OnPoint breached the Security Agreement when OnPoint transmitted the Foreclosure Notice and effectuated the foreclosure by transferring the Debtor's property to itself. ECF No. 44 at ¶ 125. The Trustee alleges that OnPoint breached because there was no "Event of Default" pending when it foreclosed and because OnPoint lacked the required authorization from the required noteholders to foreclose on the Debtor's property. *Id.*

Under Texas law, "[t]he essential elements of a breach of contract action are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Smith Int'l., Inc. v. Egle Group, LLC*, 490 F.3d 380, 387 (5th Cir. 2007). For the reasons set forth above with regard to Counts 2 and 4, the Court finds that OnPoint did not breach the Security Agreement because the Debtor was in default under the Series 2 Notes because the Debtor

had ceased business operations. Furthermore, the Trustee does not have standing to claim that OnPoint lacked authority to foreclose pursuant to the Agency Agreement. Therefore, the Court denies Count 5, finding that neither OnPoint nor the Collateral Agent breached a contract when OnPoint foreclosed on the Debtor's assets.

### h. <u>Extent of Foreclosure – Counts 1 and 3</u>

Although the Court finds that the foreclosure was valid, in Count 1 of the Complaint, the Trustee seeks a declaratory judgment as to the **extent** of the foreclosure. The Trustee asserts that the sole assets transferred to OnPoint at the time of foreclosure were the Debtor's "Software" and the "Software Assets," as defined in the Foreclosure Notice. The Trustee argues that "Software" and "Software Assets" do not include "Intellectual Property, trade secrets, General Intangibles, causes of action, rights against third parties, or any of the claims and causes of action asserted by the Collateral Agent in the [Georgia Litigation]." ECF No. 44 at ¶ 104. The Collateral Agent argues that the language of the Foreclosure Notice evinces OnPoint's intent to foreclose on the "Software," "Software Assets," and "any intellectual property rights associated with the Software, including but not limited to the Intellectual Property". Furthermore, the Collateral Agent asserts that the language of the Foreclosure Notice is clear and unambiguous.

In the Foreclosure Notice, under the heading "Notice of Exercise of Collateral Rights Under the Collateral Agreement," OnPoint states that pursuant to Section 7 of the Security Agreement that it will take all actions necessary to identify and secure:

> (a) The software that was being developed by or on behalf of the Company for its business (the "Software"), including but not limited to source code, object code, scripts, programming tools, diagrams, documentation, presentations, correspondence and notes relating to the Software, any hardware used in connection with the Software, as well as any other tangible or intangible asset of the Company or its agents related to the Software, wherever located (the "Software Assets"); and (b) any intellectual property associated with the Software, including but not limited to the Intellectual Property (specifically including the intellectual property listed as

part of the Collateral in Schedule 5 of the Collateral Agreement, trade secrets, shop rights, work made for hire.

ECF No. 105-12 at 2.

Under the heading "Notice of Intention to Exercise Rights Under the Uniform Commercial Code," the Foreclosure Notice provides that OnPoint intended to "take possession of the Collateral consisting of the Software and Software Assets" pursuant to Section 9.609 of the Texas Business and Commerce Code. *Id.* at 2-3. Finally, the Foreclosure Notice provides that unless the Company consents or cures the existing default, that OnPoint "will accept exclusive ownership of the Software and Software Assets in satisfaction of $7.5 million of the Total Amount Due, with the remaining secured principal indebtedness of $29.5 million remaining due and owing" pursuant to Section 9.620 of the Texas Business and Commerce Code. *Id.* at 3. Furthermore, in the Bywaters Consent, the Debtor consented to OnPoint "taking control of the Software Assets pursuant to Section 9.609 of the Texas Uniform Commercial Code as of January 5, 2023[.]" ECF No. 105-14. Likewise, the Company consented to OnPoint's "acceptance of exclusive title to the Software and Software Assets in satisfaction of $7.5 million of the Total Amount Due, with the remaining secured indebtedness in the principal amount of $29.5 million remaining due and owing[.]" *Id.*

Section 9.620 of the Texas Business and Commerce Code sets out the procedures by which a secured party can accept collateral in full or partial satisfaction of an obligation it secures. *Smith v. Cmty. Nat. Bank*, 344 S.W.3d 561 (Tex. App.—Eastland 2011, pet. denied). A secured party may accept collateral in partial satisfaction of an obligation only if the debtor consents to the terms of the acceptance in a record authenticated after default. Tex. Bus. & Com. Code § 9.620(a)(1), (c)(1). To be an effective acceptance of collateral, the secured party must consent to the acceptance in an authenticated record or send a proposal to the debtor. *Id.* at § 9.620(b)(1). A secured party's

62

acceptance of collateral in full or partial satisfaction of the obligation discharges the obligation to the extent consented to by the debtor. *Id.* at § 9.622(a)(1).

As noted above, pursuant to the Bywaters Consent, the Debtor expressly consented to "the partial strict foreclosure, pursuant to Section 9.620." ECF No. 105-14. In particular, the Bywaters Consent states that "the Company consents to the Collateral Agent's acceptance of exclusive title to the *Software and Software Assets* in satisfaction of $7.5 million of the Total Amount Due, with the remaining secured indebtedness in the principal amount of $29.5 million remaining due and owing[.]" *Id.* (emphasis added). Pursuant to Section 9.622, the acceptance of collateral discharges the obligation *to the extent* consented to by the debtor. *See* Tex. Bus. & Com. Code § 9.622(a)(1). While the Foreclosure Notice states that the OnPoint intended to exercise its rights under the security agreement with regards to the Debtor's "intellectual property," the Bywaters Consent is silent as to the Debtor's intellectual property. Therefore with regard to Count 1 of the Complaint, the Court finds that OnPoint properly foreclosed only upon the Debtor's *Software and Software Assets* as defined in the Foreclosure Notice and consented to by the Debtor. Furthermore, pursuant to Count 3 of the Complaint, the Court hereby enjoins the Collateral Agent from making any statement, or taking any action indicative, of ownership or control of, or dominion over, any property of the estate which the Court has found that the Collateral Agent has not validly foreclosed upon.

### i.   <u>Analysis of the Collateral Agent's Security Interests – Counts 10 & 13</u>

The Court will now turn to the Trustee's challenges with regard to the extent of the Collateral Agent's security interest in the Debtor's assets contained in Counts 10 and 13. The Security Agreement is "governed by and construed in accordance with the internal laws of the State of Texas." ECF No. 103-108 at § 8.11.  A security interest, under Texas' version of the

Uniform Commercial Code (the "**Texas UCC**"), is "an interest in personal property or fixtures which secure[s] payment or performance of an obligation." Tex. Bus. & Com. Code § 1.201(b)(35). A security interest attaches to collateral when three conditions have been satisfied: (1) value has been given; (2) the debtor has rights in the collateral; and (3) the debtor has authenticated a security agreement that provides a description of the collateral. Tex. Bus. & Com. Code § 9.203(b)(1)-(3)(A). Therefore, the Court must first determine the extent of the Collateral Agent's security interest.

     i.  <u>The Extent of the Collateral Agent's Security Interest in the Debtor's Trademarks—Count 10</u>

In Count 10, the Trustee seeks a declaratory judgement regarding whether the Debtor's trademarks are part of the Collateral Agent's security interest pursuant to the Security Agreement. In the Security Agreement, the Debtor granted a security interest in all of its intellectual property to the Collateral Agent. *See* ECF No. 103-108 at § 3. Intellectual property is defined under the Security Agreement as "the collective reference to all rights, priorities and privileges relating to intellectual property, … including the Copyrights, the Copyright Licenses, the Patents, the Patent Licenses, the Trademarks and the Trademark licenses, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom." *Id.* at § 1.2. Schedule 5 of the Security Agreement lists the intellectual property owned by the Debtor as twenty pending *trademark applications* (the "**Trademarks**") filed with the U.S. Patent and Trademark Office (the "**PTO**"). *Id.* at 41. The Trademarks were filed between August 13, 2021 and June 15, 2022, and the five Trademarks for magnetically encoded credit cards were all filed on May 6, 2022. *See* ECF Nos. 103-214 – 103-234.

The Lanham Act provides two different ways to register a trademark depending on the trademark's use or lack thereof. *See* 15 U.S.C. § 1051(a)-(b). One way is to register a trademark

that is already in use. *Id.* at § 1051(a). The other, is to file an intent-to-use application for a company which has not started using the mark but has a "bona fide intention" of using the mark. *Id.* at § 1051(b). Although a company can apply to register its trademark on an intent-to-use basis, it cannot actually register the trademark until it has shown that it has started using it in commerce, and it files the proper form with the PTO. *See id.* If the applicant never files an amendment, then the mark stays in "intent-to-use" status until it is terminated. *See id.*

The Trustee argues that the Series 2 Noteholders do not have a security interest in the Debtor's Trademarks or in any commercial tort claims. In particular, the Trustee asserts that the Trademarks listed on Schedule 5 of the Security Agreement were all filed with the PTO on an "intent-to-use" basis, and such trademark applications were explicitly *excluded* from the collateral package as "excluded assets" under the Security Agreement. *See* ECF No. 103-108. The Security Agreement specifically *excludes* from the security interest granted to the Collateral Agent:

> any application for trademarks or service marks filed in the United States Patent and Trademark Office or any successor thereto (the "PTO") *on the basis of the applicant's intent-to-use such trademark or service mark, prior to the filing of an amendment with the PTO under 15 U.S.C. § 1051(c) that brings the application into conformity with 15 U.S.C. § 1051(a) or the filing of a verified statement of use with the PTO under 15 U.S.C. § 1051(d) that has been examined and accepted by the PTO.*

*Id.* at § 1.2 (excerpt from the definition of "Excluded Property") (emphasis added). Each of the Trademarks listed on Schedule 5 of the Security Agreement were filed on an intent-to-use basis. *See* ECF Nos. 103-214 – 103-234. There were never any amendments filed to bring the applications into conformity with 15 U.S.C. § 1051(a), nor were any verified statements of use sent to the PTO for any of the Trademarks. *See id.* Therefore, each of the Trademarks fall under the definition of "Excluded Property" in the Security Agreement and are specifically excluded from the definition of "Collateral". *See* ECF No. 103-108 at § 1.2. Therefore, pursuant to Count 10, the Court finds that the Collateral Agent does not have a security interest in the Trademarks.

65

## ii.  The Extent of the Collateral Agent's Security Interest in the Debtor's Commercial Tort Claims - Count 13

In Count 13, the Trustee seeks a declaratory judgment regarding *the extent* of the Collateral Agent's security interest in the "tort claims" brought by the Collateral Agent in the DEGA Litigation. Generally, the Trustee argues that the Collateral Agent does not hold a security interest in the Debtor's commercial tort claims because the Security Agreement lacks the specificity required by the Uniform Commercial Code (the "**UCC**"). The Trustee further argues that commercial tort claims are not considered proceeds of other collateral under the UCC.

In contrast, the Collateral Agent asserts that it has a security interest that encumbers the Debtor's intellectual property, commercial tort claims, breach of contract claims, and proceeds thereof. The Collateral Agent argues that the Security Agreement has sufficient specificity under the UCC to grant it a security interest in the Debtor's commercial tort claims because the definition of "Intellectual Property" includes "all rights to sue in law or equity for any infringement or other impairment [of any intellectual property], including the right to receive all proceeds and damages therefrom." *See* ECF No. 103-108 at 4. The Collateral Agent argues that this "broad description satisfies the UCC's requirement for specificity under Section 9-108(a)[.]" ECF No. 136. Furthermore, the Collateral Agent asserts that even if the language in the definition of Intellectual Property is not sufficient, the Collateral Agent has a security interest in GloriFi's commercial tort claims as proceeds of its security interest in GloriFi's intellectual property.

To support its arguments, the Collateral Agent presented the expert report and testimony of Professor Ronald J. Mann, who is currently the Albert E. Cinelli Enterprise Professor of Law at Columbia Law School. *See* ECF No. 97. In his report, Professor Mann opines that "the security interest that GloriFi granted in the [Security Agreement] also extends to the [Intellectual Property] Claims because they are proceeds of the intellectual property itself." *Id.* at ¶ 30. Professor Mann

66

opines that the general description in the definition of intellectual property of the commercial tort claims reasonably identifies the claims by description. *Id.* at ¶ 33. Further, it is important to note that Mr. Mann testified that he did not "do any legal research" because his expert opinion was not a "legal opinion," did not consider the Texas UCC in particular, and did not review the DEGA Complaints to determine if any specific cause of action was in fact a commercial tort claim.  ECF No. 131 at 235.

The Court disagrees with Professor Mann and the Collateral Agent. Under the Texas UCC, creditors may take a security interest in commercial tort claims as original collateral. Tex. Bus. & Com. Code § 9.109(d)(12). A commercial tort claim is a specific type of collateral and is defined, in relevant part, as "a claim arising in tort with respect to which … the claimant is an organization." *Id.* at § 9.102(a)(13). Although most debtor property can be secured by referencing its "type," such as "general intangibles" or "fixtures," the Texas UCC imposes ***heightened*** identification requirements to encumber commercial tort claims. *Compare id.* at § 9.108(a) (stating "a description of personal or real property is sufficient, whether or not it is specific, if it reasonably identifies what is described") *with id.* at § 9.108(e) (stating that "*[a] description only by type of collateral defined in this title is an **insufficient** description of ... a commercial tort claim*") (emphasis added). The Texas UCC imposes this heightened description requirement "in order to prevent debtors from inadvertently encumbering" commercial tort claims. *Id.* at § 9.108 cmt. 5. Furthermore, an after-acquired property clause in a security agreement cannot create a security interest in a commercial tort claim. *Id.* at § 9.204(b)(2). The claim must already exist when the parties enter into the security agreement. *See id.* cmt. 4; *Bayer CropScience, LLC v. Stearns Bank Nat'l Ass'n*, 837 F.3d 911, 916 (8th Cir. 2016) (the drafters of the UCC "intended for the proceeds of a commercial tort claim to be excluded from an after-acquired general intangible clause.").

Courts analyzing both the Texas UCC and identical provisions under other state's versions of the UCC have **uniformly** held that bare assertions in a security agreement that state that it secures commercial tort claims are insufficient to meet the heightened burden of § 9.108(e). *See Helms v. Certified Packaging Corp.*, 551 F.3d 675, 681 (7th Cir. 2008); *Polk 33 Lending, LLC v. Schwartz*, 555 F. Supp. 3d 38, 43 (D. Del. 2021) (finding that the description of "all commercial tort claims (including D&O Claims)" insufficient under § 9.108(e)); *Shirley Med. Clinic, P.C. v. United States*, 446 F. Supp. 2d 1028, 1034 (S.D. Iowa 2006), *aff'd*, 243 Fed. Appx. 191 (8th Cir. 2007) (finding that the description as "any lawsuit due or pending" was insufficient for a security interest to attach because it lacks any specific reference to the basis of any possible tort claim). In *Helms*, the Seventh Circuit held that a security agreement failed to perfect a security interest in listed collateral when the security agreement stated that the collateral for the loan includes "Commercial Tort Claims listed on Schedule B" but Schedule B had no listed claims. 551 F.3d at 679. The security agreement in *Helms* also provided for the opportunity to amend the schedule listing the commercial tort claims when the parties become aware of a potential commercial tort claim. *Id.*

Here, the Collateral Agent argues that it has a security interest in GloriFi's commercial tort claims based on the definition of "Intellectual Property", which states that the Collateral Agent has "all rights to sue at law or in equity for any infringement or other impairment thereof[.]" *See* ECF No. 103-108 at 4. The Court finds that this description is not specific enough to meet the high standard of Section 9.108(e) because it lacks any specific identification of any possible tort claim. Furthermore, Schedule 7, attached to the Security Agreement, lists the commercial tort claims as "none." *See id.* at 49. The Security Agreement provides an opportunity for the parties to amend the Security Agreement should the Debtor acquire a commercial tort claim, but at no point was the

Security Agreement ever amended to add any commercial tort claims. *See id.* at 17. Therefore, like the Seventh Circuit in *Helms*, the Court finds that there is an insufficient description of any specific commercial tort claim for a security interest to have attached to the Debtor's commercial tort claims.

To be certain, in the Court's estimation, the Collateral Agent's reading of the UCC would turn decades of UCC jurisprudence on its head by simply allowing the definition of collateral to include any unspecified version of commercial tort claim and therefore take a security interest in it. The Court believes that the requirements of the UCC are not so elastic that the terms "chattel and any right to sue relating thereto" or "commercial paper and any right to sue relating thereto" could be enough to obviate the need to specifically list commercial tort claims. Such a reading neuters Section 9.108(a) in its entirety. "If a creditor could evade the UCC limitations on granting a security interest in commercial tort claims simply by obtaining a security interest under a generalized grant of security interest in general intangibles, not in the claim itself but instead on what gives the claim value—recovery on the claim, those limitations would be meaningless." *In re S-Tek 1, LLC*, 635 B.R. 860, 869 (Bankr. D.N.M. 2021). The Court can simply find no legal authority for the Collateral Agent's proposition.

In an effort to circumvent the specificity requirement for listing commercial tort claims, the Collateral Agent argues that the Debtor failed to list the known, existing commercial tort claims, including the four filed arbitration claims, on Schedule 7 of the Security Agreement, and that OnPoint had no knowledge of the existence of the claims. The Collateral Agent argues that since OnPoint had no knowledge of the existing commercial tort claims, that the Security Agreement should be interpreted against the Debtor and in favor of the Collateral Agent. First, although it is uncertain that OnPoint had specific knowledge of the identifiable commercial tort

claims, the evidence shows that GloriFi knew about them, as did a number of the Series 2 Noteholders that signed the Agency Agreements and Security Agreements (including the majority noteholder). Even if a borrower knows about the existence of a commercial tort claim and fails to list it, that does not mean a security interest was implicitly granted. Rather, it means the borrower arguably has defaulted under the security documents. So, GloriFi's knowledge is immaterial. But, more importantly, the Court finds this argument unpersuasive because of the policy rationale behind requiring commercial tort claims to be listed with specificity. The Texas UCC imposes a heightened identification requirement "in order to prevent debtors from inadvertently encumbering" commercial tort claims. Tex. Bus. & Com. Code § 9.108 cmt. 5. The Texas UCC is unambiguous in its requirement for specificity with regard to listing commercial tort claims as collateral, and, here, there were none listed.

Next, the Court must determine whether the Collateral Agent has an interest in the Debtor's commercial tort claims as proceeds of the Debtor's intellectual property. Proceeds are defined in relevant part as "rights arising out of collateral [and,] to the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, the collateral." Tex. Bus. & Com. Code § 9.102 (a)(65). The Collateral Agent argues that its security interest confers upon it the right to prosecute claims arising from interference with the Debtor's intellectual property as proceeds. The Court interprets the term "proceeds" to mean the secured creditor's right to value derived ***from*** the collateral, not to the mere act of attempting to recover that value. *See In re Am. Cartage, Inc.*, 656 F.3d 82, 88 (1st Cir. 2011). The Texas UCC explicitly states in comment 5(g) to Section 9.102 that "[a] security interest in a tort claim also may exist under the Article if the claim is proceeds of other collateral." Tex. Bus. & Com. Code § 9.102 cmt. 5(g). It is a right to payment from the resolution of a tort claim, and

70

not the claim itself, that may constitute proceeds of the collateral. *Am. Cartage*, 656 F.3d at 88. As the First Circuit stated in *American Cartage*, "treating commercial tort claims themselves as proceeds would blur any meaningful distinction between the two categories." *Id.* at 89. Furthermore, in *Bayer CropScience*, the Eighth Circuit, specifically interpreting the Texas UCC, found that a security interest holder may claim an interest in the *proceeds* of commercial tort claims with respect to damage to its original collateral. 837 F.3d at 917.

The Collateral Agent attempts to rely on *BMW Fin. Servs., NA, LLC v. Rio Grande Valley Motors, Inc.*, No. CIV.A. M-11-292, 2012 WL 4623198, at *10 (S.D. Tex. Oct. 1, 2012), for the proposition that commercial tort claims can be considered proceeds. The facts of *BMW* are factually distinct from the instant facts. In *BMW*, the commercial tort claims at issue had already been settled and *settlement funds* had been deposited into the registry of the court. *Id.* at *6. Here, none of the commercial tort claims have been litigated or liquidated; thus, no value has yet to be derived upon which a security interest in proceeds could attach.

Accordingly, the Court finds that although the commercial tort claims themselves are not considered proceeds of the Debtor's intellectual property and are not part of the Collateral Agent's security interest, any recovery from a commercial tort claim relative to intellectual property would be considered proceeds of the Debtor's intellectual property. Therefore, the Collateral Agent, at most, has a security interest in the proceeds of a commercial tort claim pertaining to the Debtor's intellectual property.

### j. Declaratory Judgment of the Ownership of Various Causes of Action – Counts 15-19

In Counts 15-19, the Trustee seeks a declaratory judgment as to the ownership of the specific causes of action asserted in the DEGA Litigation by the Collateral Agent and the

Neugebauer Parties (Counts 15-19)[25]. The Georgia Litigation alleges the following causes of action: (1) Violation of the Georgia RICO Act: O.C.G.A. § 16-14-4(a); (2) Violation of the Georgia RICO Act: O.C.G.A. § 16-14-4(b); (3) Violation of the Georgia RICO Act: O.C.G.A. § 16-14-1(c); (4) Theft of Trade Secrets Under Georgia Code § 10-1-761, et seq.; (5) Violation of RICO: 18 U.S.C. § 1962(c); (6) Violation of the Lanham Act 15 U.S.C. § 1125; (7) Conspiracy to Breach Contract: Stockholders Agreement; (8) Punitive Damages (O.C.G.A. § 51-12-5.1); (9) Attorneys' Fees and Expenses. In the Delaware Litigation, the Delaware Plaintiffs allege the following causes of action: (1) Breach of Contract and Conspiracy to breach Contract: Stockholders Agreement and (2) Violations of RICO: 18 U.S.C. § 1962(c).

The filing of a bankruptcy petition creates an estate that is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). This includes "rights or actions" such as claims based on state or federal law. *In re Seven Seas Petroleum, Inc.*, 522 F.3d 575, 585 (5th Cir. 2008) (citations omitted). If a cause of action belongs to the bankruptcy estate, the Trustee has exclusive standing to assert the claim. *Id.* (citing *In re Educators Group Health Trust*, 25 F.3d 1281, 1284 (5th Cir. 1994)); *In re NC12*, 478 B.R. 820, 831 (Bankr. S.D. Tex. 2012). If, however, a cause of action belongs solely to the estate's creditors, the Trustee has no standing to bring the cause of action. *Educators*, 25 F.3d at 1284.

There are two critical questions when deciding the proper ownership of the causes of action asserted in the DEGA Litigation. First, whether the Collateral Agent has a valid, perfected lien that was foreclosed upon by the partial strict foreclosure in the various causes of action. Second,

---

[25] Count 15 seeks declaratory judgment as to the ownership of Count 1 of the Delaware Complaint. Count 16 seeks declaratory judgment regarding Count 2 of the Delaware Complaint. Count 17 seeks declaratory judgement regarding ownership of Counts 1, 2, 3, 5, 6, 8, and 9 of the Georgia Complaint. Count 18 seeks declaratory judgment regarding ownership of Count 4 of the Georgia Complaint. Count 19 seeks declaratory judgment as to Count 7 of the Georgia Complaint.

whether the causes of action are direct claims that can be brought by either the Collateral Agent or the Neugebauer Parties.

### i. Ownership of Causes of Action Based on Foreclosure

The Collateral Agent argues that the Counts 1, 2, 3, 5, and 6 in the Georgia Complaint concern the Collateral Agent's attempt to recover damages to the Debtor's intellectual property on which it foreclosed. Pursuant to Count 4 of the Georgia Complaint, the Collateral Agent seeks to recover loss in value of the Intellectual Property under Georgia law related to theft of trade secrets. The Collateral Agent justifies bringing each of these causes of action by stating that it had foreclosed on the Debtor's intellectual property, which included "all rights to sue at law or in equity for any infringement or other impairment [of the Intellectual Property], including the right to receive all proceeds and damages therefrom."

For the reasons laid out above, the Collateral Agent never had a security interest in the Debtor's commercial tort claims related to the Debtor's intellectual property because the description of the collateral lacked the required specificity. As such, the Collateral Agent does not own the causes of action asserted in Counts 1-6 of the Georgia Litigation. Therefore, pursuant to Counts 17 and 18 of the Complaint, the Court finds that Counts 1-6 of the Georgia Complaint constituted property of the Debtor's estate, except for parts of Counts 2 and 3 which seek recovery for the alleged disparagement of Mr. Neugebauer as explained further below. While the Collateral Agent does not own the causes of action asserted in Counts 1-6 of the Georgia Litigation, as mentioned above, it could hold a security interest in the proceeds of such cause of action should they ever be litigated and liquidated.

### ii.  The Direct and Derivative Causes of Action

The Court must next determine, pursuant to Counts 15, 16, 17, and 19, whether the

remaining causes of action in the DEGA Litigation are direct or derivative causes of action.

Whether a particular state law cause of action belongs to the estate depends on whether under

applicable state law the Debtor could have raised the claim as of the commencement of the case.

*Educators*, 25 F.3d at 1284. As part of the inquiry, the Court must look at the nature of the injury

for which relief is sought and consider the relationship between the Debtor and the injury. *Seven*

*Seas*, 522 F.3d at 584; *Educators*, 25 F.3d at 1284.

> If a cause of action alleges only indirect harm to a creditor (i.e., an injury which
> derives from harm to the debtor), and the debtor could have raised a claim for its
> direct injury under the applicable law, then the cause of action belongs to the estate.
> Conversely, if the cause of action does not explicitly or implicitly allege harm to
> the debtor, then the cause of action could not have been asserted by the debtor as of
> the commencement of the case, and thus is not property of the estate.

*Seven Seas*, 522 F.3d at 584 (quoting *Educators*, 25, F.3d at 1284). Thus, to determine whether

DEGA Plaintiffs' causes of actions are property of the estate, the Court must look at whether, under

state law, the claims could have been asserted by the Debtor and whether, under the test put forward

by the Fifth Circuit in *Educators* and *Seven Seas*, the Plaintiffs assert an injury that is not merely

derivative of an injury of the Debtor. *See NC12*, 478 B.R. at 833-35; *Ebert v. Gustin*, No. 4:15-

CV-00225-O, 2016 WL 11663145, at *3 (N.D. Tex. Dec. 2, 2016) ("The critical inquiry is

[whether] the cause of action explicitly or implicitly alleges harm to the debtor; if it does not, the

cause of action is not property of the estate.").

Whether a claim is derivative or direct depends on the nature of the claim itself. As the

Fifth Circuit stated in *Seven Seas*: "[W]e look to the nature of the injury for which relief is sought

and consider the relationship between the debtor and the injury." 522 F.3d at 584. Specifically, in

*Seven Seas*, the Fifth Circuit held that holders of bonds issued by the debtor, Seven Seas Petroleum,

74

could bring "claims based on damages that *they* suffered as a result of *their* reliance on the false reserve estimates when *they* invested in the unsecured notes, as Seven Seas simply was not harmed by misrepresentations made to the bondholders to induce them to buy." *Id.* at 585 (emphasis added). As the Honorable Reed O'Connor stated in *Ebert v. Gustin*, "read in conjunction with [*Educators*], *Seven Seas* reaffirms the rule that when a party relies upon a corporate misrepresentation in a manner *distinguishable* from others similarly situated, the fraud claim belongs to the party, not the corporation." No. 4:15-CV-00225-O, 2016 WL 11663145, *5 (N.D. Tex. Dec. 2, 2016) (emphasis added).

In *Educators*, at issue was whether school districts who participated in a health benefits trust that filed for Chapter 7 bankruptcy could assert claims against the third-party administrators of the trust or whether those claims belonged to the bankruptcy estate. 25 F.3d at 1283. The Fifth Circuit found that the school districts could not pursue claims for negligent management and breach of fiduciary duty, as those claims derived from harm suffered by the trust as a whole. *Id.* at 1285-86. Yet, the plaintiff school districts' claim "that the defendants intentionally misrepresented to them the financial situation of [the trust], and that they materially relied on such representations to their detriment," was determined to be a direct injury to the school districts and therefore a direct claim. *Id.* at 1285.

Likewise, in *In re Margaux City Lights Partners, Ltd.*, the Honorable Barbara J. Houser found that certain claims alleging damages to limited partners, including a loss in the value of the partnership, were derivative claims because they were not separate from the direct injury to the partnership. No. 12-35828-BJH, 2014 WL 6674922, *12 (Bankr. N.D. Tex. Nov. 24, 2014). However, Judge Houser went on to find that a claim for fraudulent inducement to enter into the

partnership agreement was a direct claim insofar as it involved direct harm to the investors in the form of their initial investment in the partnership. *Id.* at *12-13.

This Court has also faced a similar issue in a related adversary proceeding in this very bankruptcy case. *See Seven Talents, LLC et al. v. Neugebauer et al. (In re With Purpose, Inc.)*, 654 B.R. 715 (Bankr. N.D. Tex. 2023). In that case, this Court specifically ruled that "the Plaintiffs [were] ***not*** entitled to assert claims resulting from an alleged breach of fiduciary duty, mismanagement, self-dealing, conversion of the 'tech-stack' or any claim based upon a harm ***to all investors or to the enterprise occurring after the initial investment***." *Id.* at 725 (emphasis in original).

Here, the Neugebauer Parties bring causes of action in both Delaware and Georgia against the DEGA Defendants. In Count 1 of the Delaware Litigation, the Neugebauer Parties bring a breach of contract claim against all of the Delaware Defendants, specifically alleging that the Delaware Defendants "used a customer acquisition strategy similar to GloriFi" in violation of Section 5.04(c) of the Original Stockholders Agreement and disclosed confidential information in violation of Section 5.04(e) of the Amended and Restated Stockholders Agreement. Bankruptcy ECF No. 328-41 at 74-76. The Neugebauer Parties, allege that the Defendants violated Section 5.04(d) of the Stockholders' Agreement by disparaging or conspiring to disparage Mr. Neugebauer. *Id.* at 76-77. Count 7 of the Georgia Litigation brought by the Neugebauer Parties mirrors that of Count 1 of the Delaware Litigation, thus the Court will analyze the ownership of the causes of action together.

The Court finds that the claims for violating Section 5.04(c) of the Original Stockholders Agreement and Section 5.04(e) of the Amended and Restated Stockholders Agreement "by using a customer acquisition strategy similar to GloriFi" and disclosure of confidential information are

derivative claims that belong to the estate. The Court finds that the alleged breach of these two sections only indirectly harmed the Neugebauer Parties, because the main injury occurred to the Debtor *and to all investors* and not just the Neugebauer Parties. Therefore, pursuant to Counts 15 and 19 of the Complaint, the Court finds that the breaches of Section 5.04(c) of the Original Stockholders Agreement and Section 5.04(e) of the Amended and Restated Stockholders Agreement in Count 1 of the Delaware Litigation and Count 7 of the Georgia Litigation belong to the Estate.

However, the Court finds that the claim for breach of Section 5.04(d) of the Stockholders Agreement for allegedly disparaging or conspiring to disparage Mr. Neugebauer is a direct cause of action that does not belong to the estate. The alleged disparagement of Mr. Neugebauer only injured Mr. Neugebauer or the Neugebauer Parties and did not injure the Debtor. Thus, the claim for breach of Section 5.04(d) of the Stockholders Agreement in Count 1 of the Delaware Litigation and Count 7 of the Georgia Litigation belongs to Mr. Neugebauer or the Neugebauer Parties.

Additionally, Mr. Neugebauer brought a cause of action against the Delaware Defendants for violation of 18 U.S.C. § 1962(c), the federal civil RICO statute, in the Delaware Litigation. In Count 2 of the Delaware Litigation, Mr. Neugebauer alleges that a RICO enterprise comprised of the Delaware Defendants who associated for the "unlawful purpose of defaming and disparaging [Mr.] Neugebauer so people would not do business with him and he would give them GloriFi; and (2) stealing GloriFi's confidential and proprietary information and knowingly using the stolen information to compete against GloriFi[.]" Bankruptcy ECF No. 328-41 at 80. In the Delaware complaint, Mr. Neugebauer alleged various facts to demonstrate a pattern of racketeering activity, including:

- Transmitting disproven allegations about Neugebauer to the Wall Street Journal in wire transmissions across state lines in violation of 18 U.S.C. § 1343;
- Sending emails to Locke Lord with untrue allegations about Neugebauer for the fraudulent purpose of damaging him to interfere with GloriFi's fundraising ability in violation of 18 U.S.C. § 1343;
- Filing a false police report about Neugebauer as a means to extort him to give up GloriFi in violation of 18 U.S.C. § 1951;
- Illegally downloading GloriFi's confidential and/or proprietary data on or around November 9, 2021, with intent to convert it for the RICO Enterprise's benefit in interstate commerce in violation of 18 U.S.C. § 1343 and § 1832;
- Illegally downloading GloriFi's confidential and/or proprietary data on or around October 2, 2022, with intent to convert it for the RICO Enterprise's benefit in interstate commerce in violation of 18 U.S.C. § 1343 and § 1832;
- Copying GloriFi's credit card for the benefit of Coign and its owners, who used it in interstate commerce in violation of 18 U.S.C. § 1832;
- Converting GloriFi's trade secrets for the benefit of Strive and its owners, who used it in interstate commerce in violation of 18 U.S.C. § 1832;

*Id.* at 80-81. Mr. Neugebauer also claims that he was injured because he "would not have loaned tends [sic] of millions of dollars to GloriFi had [he] known Defendants were in the process of misappropriating GloriFi's Intellectual Property[.]" *Id.* at 81. Through this action Mr. Neugebauer seeks to "recover the money loaned to GloriFi in reliance on the good faith of Defendants." *Id.* at 82.

Mr. Neugebauer also brought two causes of action under the Georgia RICO Act (Counts 2 and 3 of the Georgia Complaint), alleging violations of O.C.G.A. §§ 16-14-4(b) and 16-14-1(c) by the Georgia Defendants. Much of these causes of action mirror the federal cause of action brought in the Delaware Litigation. These two causes of action add the following alleged racketeering activity:

- In connection with the offer, sale, or purchase of securities in GloriFi, directly or indirectly employing a devise, scheme or artifice to defraud; and/or making an untrue statement of a material fact or to omitting to state a material fact necessary in order to make the statement made, in the light of the circumstances under which it is made, not misleading; and/or engaging in an act, practice, or course of business that operates or would

operate as a fraud or deceit upon another person including, but not limited to Plaintiffs, in violation of the Georgia Uniform Securities Act (O.C.G.A. § 10-5-50), which is defined as "Racketeering activity" by O.G.C.A. § 16-14-3(5)(A)(iii);

- Committing theft of trade secrets in violation of O.C.G.A. § 16-8-13, which is defined as "Racketeering activity" by O.C.G.A. § 16-14-3(5)(a)(xii);

- Committing theft of trade secrets under the laws of Texas and other states, which is punishable by imprisonment for more than one year, which is defined as "Racketeering activity" by O.C.G.A. § 16-14-3-(5)(B);

Bankruptcy ECF No. 328-42 at 109-110 & 115. In each of the causes of action brought under the Georgia RICO Act, Mr. Neugebauer alleged that he had "been injured in his business and property in that he lost his ability to make money in his chosen field[.]" *Id.* at 113 & 118.

Section 1964(c) of Title 18 embodies the only standing requirement which the federal civil RICO statute itself imposes. *Ocean Energy II, Inc. v. Alexander & Alexander, Inc.*, 868 F.2d 740, 744 (5th Cir. 1989). Only persons who have been injured "by reason of" the commission of predicate acts have standing to bring suit under Section 1964(c). *Id.* A person will be considered injured "by reason of" a RICO violation if the predicate acts constitute (1) factual (but for) causation and (2) legal (proximate) causation of the alleged injury. *Id.* In addition to the standing requirement embodied by the statute, the Fifth Circuit has found additional standing requirements imposed by the Bankruptcy Code. *Id.* The Fifth Circuit has imposed the direct/derivative injury distinction as discussed above. *Id.* Specifically, the Fifth Circuit has held that "shareholders may not bring a RICO action where the racketeering activity was directed against the corporation, where the injury to the shareholders merely derived from and thus was not distinct from the injury to the corporation, and where state law provided that the sole cause of action accrued to the corporation." *Id.* (citing *Leach v. Fed. Deposit Ins. Corp.*, 860 F.2d 1266 (5th Cir. 1988)). The Court sees no reason why the *Ocean Energy II* logic does not extend directly to the analysis of the ownership of the Georgia RICO claims.

Here, pursuant to Counts 16 and 17 of the Complaint, the Court finds that the vast majority of the alleged facts relating to both the federal RICO claim (Count 2 of Delaware Complaint) and the Georgia RICO claims (Counts 2 and 3 of the Georgia Complaint) brought by the Neugebauer Parties allege direct damage to the Debtor itself rather than to Mr. Neugebauer. For example, both DEGA Complaints allege that the DEGA Defendants sent false emails to Locke Lord "to interfere with GloriFi's fundraising ability," they "illegally download[ed] GloriFi's confidential and/or proprietary data," they "cop[ied] GloriFi's credit card," and they "convert[ed] GloriFi's trade secrets." Bankruptcy ECF No. 328-41 at 80-81. Although Mr. Neugebauer is attempting to recover the tens of millions of dollars that he and his companies allegedly loaned to the company, this injury is not particularized and is a derivative of the injury caused to the Debtor itself. Therefore, the parts of both the Federal RICO and Georgia RICO actions that are based on injury to the Debtor, belong to the estate and not to Mr. Neugebauer. However, as mentioned above, the parts of the RICO actions that deal with the injury to Mr. Neugebauer (and only Mr. Neugebauer or the Neugebauer Parties) directly through the alleged disparagement of same are solely owned by Mr. Neugebauer or the related Neugebauer Party.

Furthermore, the Court finds that Counts 8 and 9 of the Georgia Complaint seek derivative relief based upon the other causes of action in the Georgia Complaint. Because the Court has found that the Collateral Agent does not possess an ownership interest in any of the causes of action, it also does not have an interest in Counts 8 and 9 of the Georgia Complaint. The Court finds, pursuant to Count 17 of the Complaint, that the Neugebauer Parties have an interest in Counts 8 and 9 of the Georgia Complaint to the extent they can recover under the law based on the alleged disparagement of Mr. Neugebauer. In Sum, the Court finds that all of the causes of action brought

in the DEGA Complaints constituted property of the estate when they were brought, except for those relating to the alleged disparagement of Mr. Neugebauer.

### k.  <u>Violation of the Automatic Stay – Counts 20-21</u>

Given the Trustee's argument that certain causes of action brought in the DEGA Litigation constitute property of the estate, the Trustee also brought a cause of action seeking to permanently enjoin the Collateral Agent and the Neugebauer Parties from asserting or prosecuting, in any manner, any of the causes of action asserted in the DEGA Litigation (Count 20) and a cause of action for damages for bringing such actions in violation of the automatic stay imposed by Section 362 of the Bankruptcy Code (Count 21). *See* ECF No. 44 at 47. The Collateral Agent argues that it did not violate the automatic stay because it previously foreclosed on the causes of action and thus the claims are not "arguably" property of the estate. Furthermore, the Neugebauer Parties assert that they did not violate the automatic stay because they only brought personal causes of action which do not belong to the Debtor. The Court will address their argument in turn.

The automatic stay is designed to afford debtors "breathing space" to reorder their affairs, make peace with their creditors, and enjoy a clear field for future effort. *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 532 (1984); *In re Chesnut*, 422 F.3d 298, 301 (5th Cir. 2005); *In re Nilhan Dev., LLC*, 622 B.R. 795, 800 (Bankr. N.D. Ga. 2020). The Bankruptcy Code provides that a creditor must stay all proceedings against a debtor and its property after the debtor files a petition for bankruptcy. 11 U.S.C. § 362(a)(1). Section 362(a)(3) operates as a stay of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." *Id.* at § 362(a)(3). The stay of acts "against the debtor" is to be strictly construed. *Nilham*, 622 B.R. at 800; *In re Kay Bee Kay Props., LLC*, 618 B.R. 486, 491 (Bankr.

E.D. Mich. 2020); *In re Cincom iOutsource, Inc.*, 398 B.R. 223, 227 (Bankr. S.D. Ohio 2008)(citing *Patton v. Bearden*, 8 F.3d 343, 350 (6th Cir. 1993)).

When a bankruptcy petition is filed, the automatic stay operates as a self-executing injunction preventing creditors from taking "any act to obtain property of the estate or of property of from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). A willful violation of the automatic stay means acting with *knowledge* of the stay:

> A willful violation does not require a specific intent to violate the automatic stay. Rather, the statute provides for damages upon a finding that the defendant knew of the automatic stay and the defendant's actions which violated the stay were intentional. Whether the party believes in good faith that it had a right to the property is not relevant to whether the act was "willful" or whether compensation must be awarded.

*Campbell v. Countrywide Home Loans, Inc.*, 545F.3d 348, 355 (5th Cir. 2008) (quoting *Chesnut*, 422 F.3d at 302).

Therefore, to establish an actionable violation of the automatic stay pursuant to § 362(k), the Trustee must establish that: (1) the Collateral Agent and the Neugebauer Parties knew of the existence of the stay; (2) that the Collateral Agent's and the Neugebauer Parties' actions were willful; and (3) that the Collateral Agent's and Neugebauer Parties' actions violated the stay. *See id.*

First, it is unquestionable that the Collateral Agent and the Neugebauer Parties knew of the existence of the automatic stay. Mr. Neugebauer is the authorized representative of the Debtor that signed the bankruptcy petition putting the Debtor into bankruptcy on February 8, 2023. Bankruptcy ECF No. 1. Furthermore, counsel for the Collateral Agent and the Neugebauer Parties held a meeting with the Trustee and his counsel about the filing of the DEGA Complaints on May 10, 2024. At that meeting, the Trustee and his counsel expressed concerns about whether the filing of the suit would violate the automatic stay, which counsel for the Collateral Agent and the

Neugebauer Parties admits. *See* ECF No. 104-50 at 2. Counsel for the Collateral Agent and the Neugebauer Parties also admits that the Trustee and his counsel suggested that before filing the DEGA Litigation that they should seek relief from the stay. *Id.* at 3. Accordingly, there is no question that both the Collateral Agent and the Neugebauer Parties knew about the existence of the stay. Likewise, Mr. Neugebauer previously filed his own motion for violation of the automatic stay in the underlying bankruptcy proceeding approximately one year earlier and was awarded $103,997.97 in damages based upon similar facts. *See* Bankruptcy ECF No. 118. The fact that he and his counsel would, in turn, eschew the Trustee's forewarning and the Bankruptcy Code itself and file the DEGA complaints to be the fit of irony.

Now the Court turns to whether the actions taken by the Collateral Agent and the Neugebauer Parties were willful and whether they, in fact, violated the stay. As to willfulness, it is unnecessary to prove that the Collateral Agent and the Neugebauer Parties intended to violate the stay itself; instead, the statute only requires that the Collateral Agent and the Neugebauer Parties intended to take the actions that allegedly violated the automatic stay. *In re Wilson*, 610 B.R. 255, 276 (Bankr. N.D. Tex. 2019) (Morris, J.). As to whether these actions were violations of the automatic stay, such determination largely depends on whether the claims in the DEGA Litigation constituted property of the estate or were at least arguably property of the estate. *See Chesnut*, 422 F.3d at 303.

This Court has repeatedly had occasion in this proceeding to forewarn parties that the Fifth Circuit's decision in *Chesnut* stands for a simple proposition in questioning whether the stay applies—"Ask for permission not forgiveness." *See* Bankruptcy ECF No. 118. In *Chesnut*, a creditor with knowledge of the stay foreclosed on real property that the debtor contended was part of the estate without first obtaining relief from the stay. 422 F.3d at 300. There was some dispute

83

over whether the debtor had an interest in the real property, with the debtor contending he held a

community interest in the foreclosed property and the creditor contending that the property was

the sole separate property of the debtor's wife. *Id.* The debtor brought an action against the creditor

for violating the automatic stay, and the creditor contended that the creditor's belief that the real

property was not part of the estate obviated the need of seeking to lift the stay. *Id.* at 301. Without

deciding whether the real property was property of the estate, the bankruptcy court held that the

creditor violated the automatic stay. *Id.* The district court reversed, holding that the real property

was the separate property of the debtor's wife and therefore there was no violation of the stay given

the debtor and estate had no interest in the real property. *Id.*

The Fifth Circuit first determined that the violation was willful. *Id.* at 302. The Court

explained that it did not matter whether the party believed in good faith that it was not violating

the automatic stay. *Id.* Rather, it only mattered that the party knew of the automatic stay and that

the actions taken were intentional. *Id.*  The Fifth Circuit also found that the creditor's actions

violated the automatic stay. *Id.* at 304. The Fifth Circuit held that a violation occurs if a creditor

seizes the property or takes an action against property that is **arguably** property of the estate. *Id.*

The Fifth Circuit stated, "**Where seized property is arguable property, it is no answer for the

creditor to defend the foreclosure by claiming that the property was not covered by the stay.**"

*Id.* (emphasis added).

Here, as the Court has previously stated, the causes of action in the DEGA Litigation were

primarily causes of action belonging to the estate. The Collateral Agent and the Neugebauer Parties

willfully filed the DEGA Litigation. Even if the Collateral Agent and the Neugebauer Parties had

an "arguable" belief that they owned the causes of action asserted in the DEGA Litigation, *Chesnut*

nonetheless instructs them to come to the Court for "permission" to proceed with the causes of

action. Despite meeting with the Trustee ahead of filing the DEGA litigation and hearing the Trustee's warnings about seeking relief from the stay, the Collateral Agent and the Neugebauer Parties pushed forward and filed the DEGA Litigation. Neither the Collateral Agent nor the Neugebauer Parties ever requested the Court to lift the automatic stay as to the causes of action asserted in the DEGA Litigation. Again, the fact that Mr. Neugebauer (using the same counsel) previously brought a similar stay violation motion and was awarded judgment speaks volumes of the willfulness of the violation. Further, Mr. Manning candidly testified that one of the reasons that the Collateral Agent filed the DEGA Litigation was to impact the Trustee's sale of the estate's causes of action. Bankruptcy ECF No. 361 at 41-42. Therefore, the Court easily concludes that the filing of the DEGA Complaints constitutes a willful violation of the automatic stay by the Neugebauer Parties and the Collateral Agent. Moreover, given the Court's findings above as to ownership of the various causes of action in the DEGA Litigation, the causes of action at issue were not only **arguably** property of the estate, but they were also **actual** property of the estate in many cases. Accordingly, the Court finds, pursuant to Counts 20 and 21 of the Complaint, that the actions taken by the Collateral Agent and the Neugebauer Parties relative to commencement of the DEGA Litigation to be in violation of the automatic stay imposed by Section 362(a)(3) of the Bankruptcy Code, and the Collateral Agent is permanently enjoined from pursuit of the DEGA Litigation in its current form.[26] Furthermore, this Court also has the power to enjoin the Collateral Agent from pursuit of the DEGA Litigation  pursuant to Section 105 of the Bankruptcy Code and this Court's contempt powers. *See Mirant Corp. v. Potomac Elec. Power Co. (In re Mirant Corp.)*, 378 F.3d 511, 523 (5th Cir. 2004).  The Court reserves any judgment as to damages until a damages trial can be conducted.

---

[26] The Collateral Agent and the Neugebauer Parties may seek authority to amend/refile the DEGA Litigation to bring any causes of action which are not derivative claims.

Overall, the Court finds, pursuant to Count 21, that the Collateral Agent and the Neugebauer Parties willfully violated the automatic stay by filing the DEGA Litigation. As such, the Court hereby enjoins, pursuant to Count 20, the Collateral Agent and the Neugebauer Parties form pursuing the DEGA Litigation in its current form.

### l.    **Motions for Relief from Automatic Stay**

Separate from the DEGA Complaints, but related to the relief sought therein, the Collateral Agent filed two motions for relief from that automatic stay. In the Computer Stay Motion, the Collateral Agent requests that the Court lift the automatic stay and allow it to file an additional claim in the Georgia Litigation for violation of the Georgia Computer Systems Protection Act (Georgia Code § 16-9-93). Bankruptcy ECF No. 199. In the Contracts Stay Motion, the Collateral Agent requests that the Court "lift the automatic stay and allow it to foreclose on GloriFi's actual and/or potential claims against any and all persons for alleged breach of contract, conspiracy to breach contract, and/or statutory causes of action arising from the alleged breach of [GloriFi's Contracts.]" Bankruptcy ECF No. 201 at 4. The Contracts Stay Motion also requests that the Court "lift the automatic stay to allow it to foreclose on all actual and/or potential claims by GloriFi against any and all persons for any purported misappropriation of any GloriFi asset, conspiracy to misappropriate any asset, or a statutory violation resulting from that misappropriation of any asset[.]" *Id.* at 7.

In the Lift Stay Motions, the Collateral Agent requests relief from the automatic stay under 11 U.S.C. § 362(d)(1), which provides in relevant part that:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this subsection, such as by terminating, annulling, modifying, or conditioning such stay—(1) for cause, including the lack of adequate protection of an interest in property of such party in interest;

11 U.S.C. §362(d)(1).

The Court finds that cause does not exist to lift stay as to the Computer Stay Motion. The Computer Stay Motion asks the Court to lift the stay so that the Collateral Agent can file a cause of action for violation of the Georgia Computer Systems Protection Act. This cause of action would be considered a commercial tort claim under the Texas UCC. The Collateral Agent argues that it has a right in the collateral because of its security interest in the Debtor's intellectual property. As stated above, the Collateral Agent does not have a security interest in the Debtor's commercial tort claims related to the Debtor's intellectual property because the Security Agreement lacked a sufficient description of the collateral. At most, the Collateral Agent has a security interest in the eventual proceeds from the liquidation of the commercial tort claim. Therefore, the Court does not find that cause exists to lift the automatic stay to allow the Collateral Agent to file an additional claim for violation of the Georgia Computer Systems Protection Act in the Georgia Litigation. Thus, the Computer Stay Motion is denied.

Additionally, the Court finds that cause does not exist to grant the Collateral Agent relief pursuant to the Contracts Stay Motion. Similar to the Computer Stay Motion, the Contracts Stay Motion seeks to lift the automatic stay to pursue misappropriation claims, which are commercial tort claims under the Texas UCC. As stated above, the Collateral Agent does not have a security interest in the Debtor's commercial tort claims because the Security Agreement lacked a sufficient description of the collateral. At most, the Collateral Agent has a security interest in the eventual proceeds from the liquidation of this type of commercial tort claim. Therefore, the Court does not find that cause exists to lift the automatic stay as to Contracts Stay Motion. Therefore, the Contracts Stay Motion is denied.

### m. **JIG's Causes of Action – Counts 24-26**

Having addressed all of the Trustee's causes of action as well as the Collateral Agent's Lift Stay Motions, the Court now turns to JIG's causes of action. On August 30, 2025, JIG filed its *Motion to Intervene*, which asked the Court to allow JIG to intervene in the Adversary Proceeding. ECF No. 64. The Court held a hearing on November 12, 2025, on the Motion to Intervene. ECF No. 81. The Court issued an oral bench ruling on November 14, 2025, granting JIG the right to permissively intervene in the Adversary Proceeding pursuant to Rule 24(a). ECF No. 89. JIG filed its *Complaint in Intervention* (the "**JIG Complaint**") on November 20, 2024. ECF No. 90. In the JIG Complaint, JIG alleges three causes of action against the Collateral Agent including: Count 24: Breach of Contract; Count 25: Avoidance of Attachment of Security Interest; and Count 26: Tortious Interference.

The JIG Complaint centers on the Side Letter issued to certain Series 1 Noteholders. JIG alleges that the Debtor and JIG were parties to the Series 1 Notes and Side Letter. JIG argues that Section 5 of the Side Letter states that "as long as the Series 1 Notes were outstanding, no other debt could be issued that was senior to the Series 1 Notes." ECF No. 90 at ¶ 4. JIG then alleges that while the Series 1 Notes were outstanding and unpaid, the Debtor, by the actions of Mr. Neugebauer, granted liens to the Collateral Agent and issued debt to the Series 2 Noteholders secured by liens. JIG asserts that Mr. Neugebauer acquired control of approximately half of the Series 2 Notes, and that a material number of Series 2 notes were issued to Mr. Neugebauer's friends and family. JIG asserts that the granting of liens and issuance of the debt violated Section 5 of the Side Letter.

### i.   **Breach of Contract (Count 24)**

In Count 24, JIG brings a breach of contract claim against the Collateral Agent, claiming that the liens granted to the Collateral Agent were created in knowing violation of the Side Letter. The Collateral Agent argues that the breach of contract claim should fail because the Collateral Agent was not a party to the Side Letter.

The Side Letter is governed by Texas law. ECF No. 103-163 at § 11(e). "Texas law requires privity of contract to assert a breach of contract claim, meaning a non-party to a contract typically cannot be sued for breach of contract." *Fid. Funding Bus. Credit, Ltd. v. Republic Bus. Credit LLC*, No. 3:16-CV-2492-B, 2017 WL 4923880, at *2 (N.D. Tex. Oct. 30, 2017) (citing *Chico Auto Parts & Serv., Inc. v. Crockett*, 512 S.W.3d 560, 569 (Tex. App. – El Paso 2017, pet. denied)). Courts have found some narrow exceptions to this rule, finding that contracts may be enforced by or against non-parties "through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver, and estoppel." *Mayers v. Addison Brown, LLC*, No. 3:19-CV-3043-S, 2020 WL 7646973, at *2 (N.D. Tex. Dec. 22, 2020). However, the party seeking to hold a non-party liable for breach of contract has the burden to prove that the non-party obligated itself under the contract. *Id.*

Here, it is clear that the Collateral Agent is not a party to the Side Letter. The Side Letter is an agreement between GloriFi and JIG. *See* ECF No. 103-163. Since the Collateral Agent is not a party to the Side Letter, the Court finds that it could not breach the contract with the JIG. Thus, JIG's claim for breach of contract pursuant to Count 24 is denied.

### ii.   **Tortious Interference (Count 26)**

In Count 26, JIG alleges that the Collateral Agent tortiously interfered with the Series 1 Notes and Side Letter when the Debtor granted liens to the Collateral Agent on a secured basis,

senior to the claims of the Series 1 Noteholders. ECF No. 90 at ¶ 21. To state a claim for tortious interference with an existing contract, a plaintiff must show "(1) an existing contract subject to interference, (2) a willful and intentional interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss." *Centennial Bank v. Holmes*, 717 F. Supp. 3d 542, 578 (N.D. Tex. 2024) (quoting *Prudential Ins. Co. of Am. v. Fin. Rev. Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000)). To interfere with the contract, a defendant's action must "make the performance of the contract more difficult" or prevent performance. *Id.* (quoting *Fluor Enters., Inc. v. Conex Int'l Corp.*, 273 S.W.3d 426, 442–43 (Tex. App.—Beaumont 2008, pet. denied)). Importantly, the defendant must intend to cause a breach of the contract. *Id.* Regarding actual damages or loss, the measure of damages at issue is the amount necessary "to put the plaintiff in the same economic position [it] would have been in had the contract interfered with been actually performed." *Id.* (quoting *Am. Nat'l Petroleum Co. v. Transcon. Gas Pipe Line Corp.*, 798 S.W.2d 274, 278 (Tex. 1990)).

### 1.  <u>Statute of Limitations</u>

The Collateral Agent argues that the statute of limitations for JIG's tortious interference claim has already lapsed. In Texas, the statute of limitations for tortious interference with a contract claim is two years. *Bren Ins. Servs., Inc. v. Envision Pharm. Servs., LLC*, No. 3:22-CV-2650-G, 2023 WL 2799735 (N.D. Tex. Apr. 5, 2023); *Snell v. Sepulveda*, 75 S.W.3d 142 (Tex. App.—San Antonio 2002, no pet.). Generally, a cause of action accrues, and the limitations period begins running, when a wrongful act causes some legal injury, even if the fact of the injury is not discovered until later. *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996). Under Texas law, there is a "very limited exception to the statute of limitations" called the discovery rule. *Comput. Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996). The discovery rule applies "only when the nature

of the plaintiff's injury is both inherently undiscoverable and objectively verifiable." *Shell Oil Co. v. Ross*, 356 S.W.3d 924, 929-30 (Tex. 2011). The legal question of whether an injury is inherently undiscoverable is determined on a categorical basis rather than the facts of the individual case. *Via Net v. TIG Ins. Co.*, 211 S.W.3d 310, 314 (Tex. 2006). The Supreme Court of Texas has not yet addressed whether tortious interference is the type of injury that is inherently undiscoverable, but the Fifth Circuit has expressed its doubts whether tortious interference is "the type of conduct that, *by its nature*, is unlikely despite due diligence, to be discovered within the limitations period." *In re Coastal Plains, Inc.*, 179 F.3d 197, 214-215 (5th Cir. 1999) (emphasis in original).

Here, JIG alleges in the JIG Complaint that "[t]he Collateral Agent intentionally interfered in the Series 1 Notes and Side Letter when the Debtor granted liens to the Collateral Agent on a secured basis senior to the claims of the Series 1 Noteholders." ECF No. 90 at ¶ 21. As explained above, the liens provided to the Collateral Agent were granted between September 2022 and October 2022. JIG filed its Motion to Intervene on August 30, 2024, which is within the 2 years of the granting of the liens. Thus, JIG's claim for tortious interference is not barred by the two-year statute of limitations.

### 2.  Willful and Intentional Interference with Contract

JIG asserts that OnPoint knew of the Side Letter and then procured liens in violation of the Side Letter interfering with the rights of Series 1 Noteholders. The Collateral Agent argues that JIG offered no evidence that OnPoint intended to interfere with any Side Letter rights. The Collateral Agent contends that JIG proved that OnPoint was aware of the Side Letter, but did not prove that OnPoint knew that the Side Letter was still in effect at the time it was granted liens under the Series 2 Notes.

The requirement concerning "willful and intentional interference" is dependent upon a strict requirement of adequate proof. *Hill v. Heritage Res., Inc.*, 964 S.W.2d 89, 124 (Tex. App.— El Paso 1997, pet. denied). There must be some direct evidence of a willful act of interference. *Id.* (citing *Browning–Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 927 (Tex.1993)). Furthermore, the interfering party must know of the existence of a contract between the plaintiff and a third party or have knowledge of facts that would lead a reasonable person to conclude that a contract existed. *Id.* (citing *Armendariz v. Mora*, 553 S.W.2d 400, 406 (Tex. App.—El Paso 1977, writ ref'd n.r.e.)). Thus, the defendant must be more than just a "willing participant." *Browning-Ferris*, 865 S.W.2d at 927.

Here, the Court finds that it is undisputed that OnPoint knew about the existence of the Side Letter,[27] but there is a genuine dispute as to whether the Series 1 Noteholders still had rights under the Side Letter at the time of the alleged interference. Therefore, the question becomes whether OnPoint knew or that a reasonable person would conclude that the Side Letter was still in effect at the time of the alleged interference. This genuine dispute arises out of whether the April 2022 Equity Raise qualified as a "Next Equity Financing" event under the Side Letter.

The Side Letter defines "Next Equity Financing" as:

> For purposes of the Note, "Next Equity Financing" shall mean the next sale (or series of related sales) by the Company of its Equity Securities after January 31, 2022 following the date of issuance of the Note, in one or more bona fide, arms' length offerings relying on Section 4(a)(2) of the Securities Act or Regulation D thereunder for exemption from the registration requirements of Section 5 of the Securities Act, from which the Company receives aggregate gross proceeds of not less than US$10,000,000.00 (excluding, for the avoidance of doubt, the aggregate principal amount of the Series 1 Notes) from sophisticated investors (unless the Company receives aggregate gross proceeds of more than US$30,000,000.00).

ECF No. 103-163 at § 7.

---

[27] OnPoint is a Series 1 Noteholder and had a Side Letter agreement with GloriFi, which it later waived. *See* ECF No. 125-1.

On April 6, 2022, the Debtor sent a letter entitled "Notice of Issuance of New Shares" to each of its stockholders and holders of Series 1 Notes. *See* ECF No. 104-23. In this letter, the Debtor explained that it was raising $10 million at a valuation of $250 million and that stockholders were entitled to purchase shares on a pro rata basis. *Id.* at 1. Furthermore, the term sheet attached to the letter stated that the issuance of these shares would qualify as "Next Equity Financing," which would convert the Series 1 Notes. *Id.* at 4. Mr. Travers, OnPoint's co-founder, testified that the April 2022 Equity Raise automatically converted the Series 1 Notes to equity. ECF No. 126 at 203. Mr. Travers also testified that OnPoint elected to participate in the April 2022 Equity Raise with the understanding that the raise would convert the Series 1 Notes to equity. *Id.* at 203-04.

JIG disputes that the April 2022 Equity Raise converted the Series 1 Notes to equity because it did not qualify as a Next Equity Financing event. In particular, JIG disputes that the April 2022 Equity Raise was a "bone fide, arms' length offering" because 93% of the equity sold in the equity raise was sold to entities controlled by Mr. Neugebauer and to Mr. Neugebauer. *See* ECF No. 134 at ¶ 20. JIG also argues that the rest of the shares were sold to "existing directors, management and shareholders of the Debtor." *Id.* Furthermore, JIG disputes that the Debtor ever raised the $10 million necessary under the Side Letter and that the investors qualified as "sophisticated investors." *Id.* at ¶ 38.

The Court need not decide whether the April 2022 Equity Raise converted the Series 1 Notes into equity thus extinguishing the Side Letter. The Court concludes that since there was a bone fide dispute[28] as to whether the Side Letter was still in effect at the time of the alleged interference, that OnPoint did not know that the Side Letter was in effect and that a reasonable person could conclude that the Side Letter was not in effect. Thus, OnPoint did not willfully nor

---

[28] It should be noted that at least five other witnesses testified that their Series 1 notes had been converted to equity.

93

intentionally interfere with the JIG's rights under the Side Letter and JIG's Count 26 for tortious interference with an existing contractual relationship is denied.

### iii.  <u>Avoidance of Attachment of Security Interest (Count 25)</u>

JIG's Count 25 is a cause of action for avoidance of attachment of the Collateral Agent's security agreement "[p]ursuant to the Court's equitable powers and/or state law[.]" *See* ECF No. 90 at ¶ 17.  Since the JIG Complaint does not reference the statute pursuant to which JIG is bringing the cause of action, the Court interprets this cause of action as asking for relief pursuant to 11 U.S.C. § 502(b)(1). Section 502 provides that "a claim or interest, proof of which is filed under § 501 of this title, is deemed allowed, unless a party in interest… objects." 11 U.S.C. § 502(a). The legislative history of § 502 provides in relevant part, that "a proof of claim or interest is *prima facie* evidence of the claim or interest. Thus, it is allowed under subsection (a) unless a party in interest objects." House Rep. No. 95-595, 95th Cong., 1st Sess. 351 (1977); Senate Rep. No. 95-989, 95th Cong., 2d Sess. 62 (1978).

Once a claim objection is raised, the court, after notice and a hearing, shall determine the amount of the claim as of the petition date and "shall allow such claim in such amount" unless the claim falls under one of the nine statutory grounds for disallowance listed in § 502(b)(1)-(9). *In re Northbelt, LLC*, 630 B.R. 228, 247 (Bankr. S.D. Tex. 2020). In this case, JIG objects under § 502(b)(1), which states that a bankruptcy court may disallow a claim if the claim is unenforceable against the debtor under any agreement or applicable law. 11 U.S.C. § 502(b)(1). The Supreme Court has interpreted this provision to mean that "any defense to a claim that is available outside of the bankruptcy context is also available in bankruptcy." *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450 (2007).

Bankruptcy Rule 3001 allocates the burden of proof with respect to a proof of claim to which an objecting party has raised an objection that would warrant disallowance under § 502. *Id.*; *see* Fed. R. Bankr. P. 3001. If a creditor files a proof of claim in full compliance with Bankruptcy Rule 3001, that claim is deemed *prima facie* valid, and if a party in interest objects to that claim, he or she must produce evidence sufficient to rebut the presumption of validity and establish that the claim should be disallowed pursuant to § 502(b). *Northbelt*, 630 B.R. at 247. Therefore, JIG must meet two burdens under Section 502(b)(1). *See In re Devonshire PGA Holdings LLC*, 548 B.R. 689, 691 (Bankr. D. Del. 2016). First, JIG must point to specific law(s) that would render the Collateral Agent's Claim unenforceable. *Id.* Second, JIG must demonstrate that the facts of this case make that law applicable. *Id.*

While JIG has brought two other causes of action alleging (1) breach of contract and (2) tortious interference with existing contract, the Court, as stated above, has found that neither of these causes of action pass muster. Therefore, JIG has failed to meet its burden under Section 502(b)(1). Since the Collateral Agent's Claim is *prima facie* valid and JIG has failed to meet its burden, the Court must decline to avoid the attachment of a security interest as to JIG under Section 502(b)(1) as requested in Count 25.

### IV.    Conclusion

In summation, the Court concludes that based upon the evidence presented at trial, that the Series 2 Notes CN2-26 and CN2-31 shall be disallowed, thus reducing the Collateral Agent's Claim by $1.2 million. Additionally, the Court avoids the grant of the security interest as to Series 2 Notes CN2-1, CN2-11, CN2-12, CN2-14, and CN2-18 on the basis of an insider preference, thus reclassifying as unsecured $16,990,552 of the Collateral Agent's Claim. The Court also finds that Animo Bancorp's Series 2 Note CN2-18 can also be avoided as a fraudulent transfer, which further reduces the unsecured portion of the Collateral Agent's Claim to $11,150,000. Therefore, the

Collateral Agent holds a remaining secured claim of $10,325,000 and an unsecured claim of $11,150,000.

Furthermore, the Court finds that OnPoint validly foreclosed on the Debtor's Software and Software Assets but that it did not validly foreclose on any other collateral in accordance with the Texas UCC, including the Debtor's commercial tort claims. The Court also determines that the Collateral Agent's security interest did not include the Debtor's trademarks listed on Schedule 5 of the Security Agreement because they are all intent-to-use applications, which are explicitly excluded from the security interest by the terms of the Security Agreement. Additionally, the Collateral Agent's security interest did not include the Debtor's commercial tort claims. At most, the Collateral Agent has a security interest in the proceeds of the Debtor's commercial tort claims relative to intellectual property.

After taking this into account, the Court concludes that the vast majority of the causes of action that both Mr. Neugebauer and the Collateral Agent brought in the DEGA Litigation belonged to the estate. The only causes of action that Mr. Neugebauer owns are those related to the alleged disparagement of Mr. Neugebauer. As such, the Court also finds that the Collateral Agent and Mr. Neugebauer willfully violated the Automatic Stay by bringing the DEGA Litigation without leave of Court. The Court reserves any judgment as to damages for violation of the automatic stay until a damages trial can be conducted.  Furthermore, the Court finds that the Collateral Agent has failed to demonstrate cause to lift the automatic stay. Thus, the Court denies both the Contracts Stay Motion and the Computer Stay Motion.

Finally, the Court denies each of the three causes of action that JIG brings in the JIG Complaint. The Court finds that the Collateral Agent was not a party to the Side Letter and thus could not be held liable for breach of contract. Additionally, the Court must deny JIG's tortious

interference cause of action because OnPoint did not willfully interfere with the Side Letter as the ongoing validity of the rights under the Side letter were in bona fide dispute. As such, the Court finds that JIG failed to meet its burden and declines to avoid the attachment of the Collateral Agent's security interest pursuant to Section 502(b)(1).

The Court directs counsel for the Trustee to prepare a form of judgment in conformance with this Memorandum Opinion.

### END OF ORDER ###